## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **BRIAN MOSER, individually and** | ) | RECEIVED: SEP 05,2008 |
| **as the next friend of JACK MOSER,** | ) | 08CV5067 |
| **Plaintiffs,** | ) | JUDGE MANNING |
| v. | ) | MAGISTRATE JUDGE DENLOW |
| **CHICAGO POLICE OFFICERS** | ) | RCC |
| **G. GOUNARIS (Star #19235),** | ) | |
| **A.M. BARREZUETA (Star #17671)** | ) | |
| **SGT. KANE (Star # Unknown),** | ) | |
| **UNKNOWN CHICAGO POLICE** | ) | |
| **OFFICERS and the City of CHICAGO** | ) | |

### Civil Complaint

**NOW COMES** the Plaintiffs, Brian Moser, individually, and as the next best friend of

minor child, Jack Moser by and through their attorneys, THE LAW OFFICE OF

BRENDAN SHILLER, LLC, complaining of the Defendants, Chicago Police Officers

G. Gounaris (Star #19235), A.M. Barrezueta (Star #17671), Sergeant Kane (Star #

Unknown), other unknown Chicago Police Department Officers and the City of Chicago,

and in support thereof states as follows:

### Introduction

1.  This is a civil action seeking damages against defendants for committing acts under

    color of law, and depriving plaintiff of rights secured by the Constitution and laws of

    the United States.  In sum, Plaintiff Brian Moser was unlawfully seized, falsely

    arrested and imprisoned, and maliciously prosecuted by the Defendants in violation of

    his right to equal protection of the law. Defendants intentionally inflicted emotional

distress on both Plaintiffs and Plaintiffs have been harmed greatly by the unconstitutional conduct of the Defendants.

## Jurisdiction

2. The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C., § 1983, the Judicial Code, 28 U.S.C. § 1331 and 1343 (a); the Constitution of the United States; and pendent jurisdiction for attendant state claims as provided under U.S.C., § 1367(a).

## The Parties

3. Plaintiff Brian Moser is a citizen of the Unites States and currently resides at 655 W. Irving Park Road, #502 in Chicago, Illinois.

4. Plaintiff Jack Moser, is the minor son of Brian Moser and at the time of the complained of incident resided at 240 W. Scott with his father and mother in Chicago, Illinois.

5. Defendant Officers were, at the time of this occurrence, employees of the Chicago Police Department and acted under their authority as duly appointed police officers in the Chicago Police Department at all relevant times.

6. Defendant City of Chicago is a municipal corporation organized under the laws of the State of Illinois, which operates the Chicago Police Department. Defendant City of Chicago is ultimately responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and for injury occasioned thereby.

## Background Facts

7. On Father's Day, June 17, 2007, Plaintiff Brian Moser spent the day with his son, Plaintiff Jack Moser and other fathers in their family.

8. Plaintiff Brian Moser was in the midst of an ugly divorce from his wife, Nancy Moser, which was magnified because they were still living together in the marital home.

9. Prior to June 17, 2007, Nancy Moser had called police to the home on at least three separate occasions, in an unsuccessful effort to have Plaintiff Brian Moser removed from the home, during the divorce proceedings and each time police officers discerned that Nancy Moser was the aggressor and domestic abuser.

10. Plaintiff Brian Moser operated his business from the marital home and two days prior to the complained of incident on June 15, 2007, had been granted a restraining order against Nancy Moser, to stop her from breaking into Brian's home office and destroying documents and sending menacing emails to his clients.

11. Nancy Moser was infuriated by the restraining order being granted by the judge.

12. On June 17th, Brian and Jack Moser had been out of the home all day celebrating Father's Day.

13. During the day, Nancy Moser repeatedly called from her cell phone and sent emails and requested that when she left town for two (2) weeks for an upcoming trip, that Brian would allow Jack to "move in" with her sister.

14. Brian Moser repeatedly said, "no," that it was unnecessary for Jack to move out of the home, because he would be home, and available and willing to care for their son, as he always does.

3

15. When Plaintiffs arrived home, Nancy Moser was standing in their rear yard, with the cordless home phone in her hand.

16. When Moser did not say anything and began walking with Jack into the home, Nancy became irate and began cursing and yelling about how Jack was going to live with her sister.

17. Brian Moser then took Jack to his room and asked him to stay there while Brian talked to Nancy.

18. When Brian returned to the backyard to talk to Nancy, he attempted to close the screen door behind him.

19. At this point, Nancy grabbed the door and repeatedly slammed his hand in the door, which immediately began bleeding profusely.

20. Brian returned into the home and grabbed a towel and wrapped it around his hand.

21. As Brian turned to check on Jack, he heard Nancy on the phone calling the police and telling them that her husband Brian had a gun and was trying to kill her.

22. The call was falsely dispatched as a "man with a gun" and subsequent dispatches corrected the call, but were ignored by responding officers.

23. Within minutes the police had shut down the whole block and Plaintiff Brian Moser heard a SWAT team member on a bullhorn outside of his home saying, "Put your weapon down.  Come out of the house."

24. Brian went to the door, followed by Jack and cracked the door, and the barrels of three (3) rifles were pressed against Brian's face.

25. Officers ordered the Plaintiffs down on the ground both Brian and Jack got down, face down on the ground as the officers pushed through the door and entered the home.

26. At least twelve (12) officers entered the home, with weapons drawn.

27. Brian was handcuffed and shackled by his feet as well on the floor.

28. Brian continually asked the officers what was going on and why they came into to his home in this manner.

29. The officers responded by telling him to "shut the fuck up" and to "shut your damn mouth."

30. The officers asked Moser where the weapons were in the home and he told him that he had not brandished any weapons, but there was a Civil War antique inoperable gun that was passed down to him as an heirloom from his grandfather, that was mounted in a glass display case.

31. Brian also told officers about an heirloom Boy Scout pocket knife that had been given to him by his deceased father.

32. Defendant Officer Gounaris took the knife, but it was not inventoried and to date, has not been returned to Brian Moser.

33. Defendant Officers were told by Brian Moser where the antique firearm was, and they unnecessarily smashed the glass display case to remove it.

34. During this entire time, Brian Moser repeatedly tried to explain to Defendant Officers about the restraining order he had against his wife and tried to show them the paperwork and the order he had gotten two days prior from the judge.

35. Additionally, Brian Moser asked Defendant Officers to check Chicago Police Department records to verify that officers had been dispatched to his home on other occasions when he had been the victim of domestic attacks from his wife.

36. Officer Gounaris told Brian Moser to "Go to fucking hell" and that "We don't need to look for anything else."

37. Additionally, Officer Gounaris told Brian Moser that he now was going to be charged with a felony because of the gun.

38. Then, Brian Moser was carried outside of his home and placed into the back of a squad car.

39. When Defendant Officers spoke to Brian Moser during this time, they communicated to him that it had clearly been a vindictive effort on the part of his wife, but that since he was a man, he had to go to jail anyway.

40. When Brian Moser arrived at the 18th district police station, his finger continued to throb and bleed profusely.

41. Brian Moser was given Band-Aids and asked if he needed to go to the hospital, to which he responded yes, as he continued to bleed profusely from his hand.

42. A white, male officer with blond hair, a large build, appearing to be in his earlier thirties, then came to Moser and called him a sissy.

43. This same otherwise unidentified officer in plainclothes then told Moser that if he went to the hospital, he would miss his court date and would have to spend a week in jail.

44. Brian Moser has since lost all feeling and use of that finger and reporting officers failed to document his injury in police reports.

45. Brian Moser was charged with false and trumped up charges of Domestic Battery, Felony Possession of a Firearm and Failure to have a Firearm Owner Identification (FOID) Card.

46. Brian Moser was found Not Guilty of all charges on November 15, 2007.

**Count 1—Liability Under 42 U.S.C. § 1983--Denial of Equal Protection**

**(Brian Moser)**

47. Plaintiffs re-allege and reincorporate all previous paragraphs.

48. Under 42 U.S.C. § 1983, a person who, acting under color of state law, deprives another person of his federal constitutional rights is liable to the injured party.

49. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall deny any person the equal protection of the laws.

50. Defendant Officers' actions as alleged herein were motivated by anti-male gender animus. During, the actions as alleged herein, Defendant Officers subjected Moser to statements that this would not be happening to him if he were the woman as well as directing derogatory terms toward him regarding his masculinity and his injury.

51. Defendant Officers were acting under "color of law."

52. Defendants purposefully singled out Brian Moser for unequal treatment based on his sex.

53. As a result of Defendant Officers' denial of equal protection, Moser sustained permanent injury to his hand as a result of the denial of medical attention, as well as injuries in the form of, *inter alia*, mental and emotional pain and suffering, humiliation, and past and future psychological damage. As a result Defendant

Officers' denial of equal protection, Moser also lost wages and incurred additional medical expenses, costs and attorneys' fees.

54. Defendant Officers deprived Moser of the equal protection of the laws in violation of Moser's rights under the Fourteenth Amendment to the U.S. Constitution. Defendant Officers are, therefore, liable to Moser under 42 U.S.C. § 1983.

55. Wherefore, Plaintiff requests actual, punitive and compensatory damages in an amount deemed at time of trial to be just, and fair, as well as attorney's fees and costs.

### Count 2—Denial of Medical Attention (Brian Moser)

56. Plaintiffs re-allege and reincorporate all previous paragraphs.

57. The Fourteenth Amendment to the United States Constitution provides for citizens who have been arrested or are being detained prior to conviction, a substantive due process right to receive medical attention.

58. When Brian Moser was arrested by Defendant Officers, he had been injured as a result of a domestic attack by his wife.

59. Defendant Officers were aware of Brian Moser's injury, as he was bleeding profusely and complained on several occasions of the extreme pain and throbbing and requested to go to the hospital to receive medical attention.

60. One of the Defendant Officers referred to Brian Moser as a "sissy" when he responded "yes" when asked about going to the hospital and then told him that he would have to stay in jail for a week and would miss his court date if he received medical treatment, which is objectively unreasonable.

61. Defendant Officers deprived Brian Moser of due process of the law in violation of Moser's rights under the Fourteenth Amendment to the U.S. Constitution. Defendant Officers are, therefore, liable to Moser under 42 U.S.C. § 1983.

62. The acts and omissions of Defendant Officers in denying medical attention to Plaintiff Moser, despite his requests, were knowingly and willfully undertaken and said failure to supply that care was not reasonably related to any legitimate governmental objective.

63. Brian Moser was harmed by the unconstitutional acts of the Defendants, as evidenced by the loss of feeling and use of the finger that was injured.

64. Wherefore, Plaintiff requests actual, punitive and compensatory damages in an amount deemed at time of trial to be just, and fair, as well as attorney's fees and costs.

### Count 3—Assault (Jack and Brian Moser)

65. Plaintiffs re-allege and reincorporate all previous paragraphs.

66. The Defendant Officers intentionally created an apprehension of immediate physical harm by approaching the Moser home yelling into a bullhorn and by sticking three (3) guns into Brian Moser's face and ordering he and Jack facedown onto the ground.

67. These overt gestures created a reasonable fear in both Jack and Brian Moser and resulted in obvious harmful touching.

68. These actions were objectively unreasonable and were undertaken intentionally with malice, willfulness and reckless indifference to Plaintiffs' rights.

69. As a result of the Defendant Officers conduct, Plaintiffs sustained both physical and emotional injuries, including anxiety, depression, nightmares, day-mares, and unreasonable apprehension towards members of law enforcement.

70. Wherefore, Plaintiffs demand judgment against Defendant Officers for actual, punitive and compensatory damages in an amount deemed at time of trial to be fair and just, as well as reasonable attorneys' fees and legal costs.

**<u>Count 4—Intentional Infliction of Emotional Distress (Jack and Brian Moser)</u>**

71. Plaintiffs re-allege and reincorporate by reference all of the allegations in the preceding paragraphs.

72. The acts and conduct of Defendant Officers as set forth above were extreme and outrageous.

73. Particularly, the conduct of Defendant Officers in ordering Jack and Brian Moser to the ground at gunpoint was reasonably calculated to cause immense emotional distress to Plaintiffs.

74.  Defendant Officers intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiffs.

75. Defendant Officer's conduct was undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiffs.

76. Said actions and conduct did directly and proximately cause Plaintiffs to suffer various severe emotional and physical problems including anxiety, depression, nightmares, day-mares, and unreasonable apprehension towards members of law enforcement.

77. WHEREFORE, Plaintiff respectfully request that judgment be entered in his favor, awarding actual, compensatory and punitive damages, legal costs, including attorney's fees, and other such relief as the Court deems just and appropriate.

## Count 5—Failure to Provide Police Protection--Domestic Violence

78. Plaintiffs re-allege and reincorporate by reference all of the allegations in the preceding paragraphs.

79. Defendant Officers during this complained of incident, failed to respond properly to the call to Brian Moser's home.

80. Despite being advised of a pattern and history of Brian Moser's wife of committing violent attacks against him and calling the police to the marital home, as well as a valid restraining order against Nancy Moser, police charged Plaintiff with various crimes and sustained the charges against him, until such time as he was acquitted.

81. Defendant Officers acted in accordance with the unwritten policy of the Chicago Police Department to treat the male person involved as the perpetrator when calls regarding domestic violence are received, and to failed to investigate and protect Brian Moser from physical harm, as well as harm to his business and additional substantial financial repercussions that followed as a result of the complained of incident.

82. These unconstitutional actions were committed by defendants knowingly and willfully and without regard for the rights of Brian Moser.

83. WHEREFORE, Plaintiff respectfully request that judgment be entered in his favor, awarding actual, compensatory and punitive damages, legal costs, including attorney's fees, and other such relief as the Court deems just and appropriate.

## Count 6—State Claim Respondent Superior

84. Plaintiffs re-allege and incorporate by reference all of the allegations in the preceding paragraphs.

85. In committing the acts alleged, Defendant Officers were members and agents of the Chicago Police Department, acting at all relevant times within the scope of their employment.

86. Defendant City of Chicago is the employer of the Defendant Officers.

100. In Illinois, public entities are directed to pay for any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities. 735 ILCS 10/9-102.

101. As a proximate cause of Defendant Officer's unlawful acts, which occurred within the scope of their employment activities, Plaintiff suffered physical and emotional injuries.

102. WHEREFORE, Plaintiffs demand judgment against Defendants City of Chicago for substantial actual, compensatory, and punitive damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.


**PLAINTIFF DEMANDS TRIAL BY JURY.**


Respectfully Submitted,


_____
Brendan Shiller



Law Office of Brendan Shiller, LLC
36 S. Wabash, Suite 1310
Chicago, IL 60603
312-332-6462
ARDC: 6279789

08CV5077
JUDGE ANDERSEN
MAGISTRATE JUDGE COX

CEM

## Franchise Agreement

THIS AGREEMENT entered into at Elgin, Illinois, this 2nd day of July, 2005, hereinafter referred to as the "effective date", by and between ROARING FORK CAPITAL PARTNERS, INC., a Colorado corporation doing business as RE/MAX Northern Illinois whose address is 2205 Point Boulevard, Suite 100, Elgin, Illinois 60123, hereinafter referred to as the "Company", and Walter M. Zubricki whose address is 22 South Birchwood, Palos Park, Illinois 60464, hereinafter referred to as "Franchisee" and who shall conduct business under the trade name of RE/MAX Home Center. Franchisee shall not use any other trade name in the conduct of the business without the prior written consent of the Company.

## W I T N E S S E T H:

WHEREAS, RE/MAX International, Inc., a Colorado corporation (hereinafter referred to as "International"), owns and has developed and promoted a system (hereinafter referred to as the "System") for providing high quality real estate brokerage services to the general public, has devised policies and techniques for the operation of the System and has developed and promoted the System and the name "RE/MAX" for the advantage of the Company and its franchisees, hereinafter referred to as "Affiliates". The distinguishing characteristics of the System and of the real estate brokerage services provided, all of which shall constitute trade secrets, include, but are not limited to, the following:

1. A high commission concept;

2. Common use and promotion of the service marks " RE/MAX®", "Above the Crowd", a hot air balloon colored red, white and blue with the RE/MAX® logo on it and distinctive red-over-white-over-blue colored horizontal bar design associated with the real estate brokerage service;

3. Distinctive sales materials associated with the RE/MAX® real estate brokerage service;

4. Distinctive RE/MAX® promotional materials used hereafter by the Company or its Affiliates as part of the System;

5. Approved supplies and other materials used in the offices of the Company or its Affiliates as part of the System;

6. International and regional centralized advertising and public relations services;

7. Recommended procedures for operation of offices under the RE/MAX® System, publicity and record keeping;

8. A standardized uniform system for operation of a real estate brokerage service office in accordance with ethical standards and policies, efficiency, quality and courtesy.

WHEREAS, International granted to the Company the exclusive right to franchise the System to others, and the names and marks related thereto, in the northern portion of the State of Illinois, including Mercer, Henry, Bureau, Putnam, LaSalle, Grundy and Kankakee counties, and all counties to the north thereof in the State of Illinois, hereinafter referred to as the "Northern Illinois Region."

WHEREAS, Franchisee, is familiar with the Company and its operation, represents that he/she has dealt in many varied business transactions in the past which have been of greater amount and complexity than involved in this transaction and has been furnished all desired information regarding the Company, its System and its Affiliates.

1

WHEREAS, Franchisee desires to be licensed to use the System in a real estate brokerage service business and to become an Affiliate of the Company in a national network of such businesses under the terms and conditions contained in this Agreement.

WHEREAS, all parties acknowledge the importance of continuing goodwill toward the System, maintaining distinctive and high quality real estate brokerage services and performing this Agreement according to its terms.

IT IS AGREED:

**1.    License.**  Franchisee has applied for a license to operate a RE/MAX® real estate brokerage service office and such application has been approved by the Company in reliance upon all of the representations made therein. The Company hereby grants to Franchisee a license to use the System and to establish and operate a RE/MAX® real estate brokerage service office at and only at 6000 S. Pulaski, Chicago, Illinois 60629 (the "Office"). The location of the Office must be approved in advance by the Company.  If the location of the Office has not been selected and approved as of the effective date, and the parties cannot agree on a mutually acceptable location within ninety (90) days after the effective date, then it will be deemed to be a failure of a material condition precedent, entitling the Company to terminate this Agreement.

Except as otherwise provided herein, unless this Agreement expires or is terminated and so long as Franchisee is not in default under this Agreement, the Company shall not operate or grant a franchise for the operation of another RE/MAX® real estate brokerage service office offering residential real estate brokerage services, to be located within the protected area (the "Protected Area") identified in Exhibit A to this Agreement (if applicable). The Company expressly retains all other rights, including without limitation the sole and unlimited right (a) to operate or grant franchises for the operation of real estate brokerage offices at or from locations outside the Protected Area, and (b) to operate or grant franchises for the operation of "Commercial Real Estate Offices" at or from locations within or outside the Protected Area.  The term "Commercial Real Estate Office" shall mean a real estate office that is restricted from engaging in any real estate activities involving real property on which is located residential structures containing four dwelling units or less; provided however, that a Commercial Real Estate Office shall be permitted to engage in real estate activities with respect to single-family residential dwelling units owned personally by individuals affiliated with the Commercial Real Estate Office or by such individuals' family members.

For purposes of this Agreement, the terms "licensed real estate agent" or "licensed agent" shall mean each person who possesses a real estate license issued by the state that is assigned to or registered with the Office (or any branch office), and includes, without limitation, Franchisee, Franchisee's owners and any managers, sales associates, broker associates, brokers, licensed assistants, and the broker of record of the Office.

**2.    Name, Trade Secrets and Goodwill.**  This license authorizes Franchisee to use the System, the RE/MAX® name, service marks, trade secrets and goodwill, and any improvements and modifications of these items, for the purpose of operating a real estate brokerage service business and for no other purpose.  It is expressly agreed that ownership, right and title to the System, the RE/MAX® name, service marks, trade secrets and goodwill, and any improvements and modifications of these items, remain solely in International and the Company and are provided to and revealed to Franchisee in confidence.  Franchisee agrees to keep all such items in confidence and not disclose them to any person without the consent of the Company and except as provided in this Agreement.  The initial name or any subsequent name under which Franchisee proposes to do business must receive the prior written approval of International and the Company.

Franchisee agrees not to use the RE/MAX® name, service marks, trade secrets and goodwill, and any modifications of these items in connection with the performance, sale, endorsement or promotion of any other services or products, including any services or products ancillary to the operation of the Office, or in any other manner not expressly authorized by the Company.  Further, Franchisee agrees not to use the same in connection with any business practice that is contrary to those standards set forth in this Agreement or prescribed by the Company or International from time to time in operating procedures and guidelines.

2

The Company and/or International may change the System or any part of the System at any time and, as changed, it shall remain the System referred to in this Agreement. Any improvements in the System developed by Franchisee shall become the sole and exclusive property of the Company which shall have the right to adopt or modify them without compensation to Franchisee.

Franchisee acknowledges the exclusive right of the Company and/or International to use the System and to grant franchises to others to use the System in the conduct of real estate brokerage services in other areas. Franchisee agrees not to infringe upon, use or imitate the System or any part of the System, except under written license from the Company.

3.  **Obligations of Franchisee.**

    A.  <u>Management.</u> The Office shall at all times be managed by Franchisee, an owner of Franchisee or a manager approved by the Company. The person managing the Office shall at all times hold a real estate broker license and meet all other requirements imposed by state law. Franchisee and its owners shall comply in all respects with all legal requirements applicable to the formation, organization, ownership, and operation of real estate brokerage offices imposed by state law. Additionally, unless otherwise approved in writing by the Company, Franchisee, or an owner of at least 25% of the ownership interests of Franchisee, if Franchise is a corporation, limited liability company, partnership or other business entity, will hold a valid real estate broker license within 6 months of purchasing the franchise. The Company shall have the right to impose reasonable requirements on the ownership and structure of any approved entity acting as Franchisee.

    B.  <u>Service Standards.</u> Franchisee will maintain high ethical standards in the conduct of its real estate brokerage business; will maintain the Office in a clean and orderly manner; will provide efficient, courteous and high quality real estate brokerage service to the public, of the same high quality and distinguishing characteristics as provided at the Company's Affiliates' offices so that the real estate brokerage business operated under this Agreement will help to create and maintain goodwill among the public for the System on an international basis; will not engage in any acts or activities that may disrupt or discredit the RE/MAX® System, its operations, or the Company, or that may detract from or tend to undermine the growth of the RE/MAX® organization; and will act under a duty of loyalty in support and furtherance of the RE/MAX® concept and RE/MAX® organizations; and will maintain a proper attitude toward the public, the Company, and other Affiliates.

    C.  <u>Industry Group Memberships and Compliance With Law.</u> Franchisee will join and remain a member in good standing and comply with the codes and by-laws of (i) the local Board of REALTORS, (ii) where applicable, the local Multiple Listing Service, and (iii) the National Association of REALTORS; and will comply with all local, state and federal laws, ordinances, rules and regulations relating to his/her real estate brokerage business, and will not engage in any activity or practice which results or may be anticipated to result in litigation or public criticism of the Company or its business.

    D.  <u>Display of Marks.</u> Franchisee will feature in the operation of its real estate service business and in all materials and advertising the distinguishing characteristics of the System as prescribed by the Company or by International in the RE/MAX office operations materials or in specific guidelines issued from time to time by the Company or International.

    E.  <u>Signs.</u> Franchisee will prepare a drawing or depiction of the style and design of an exterior office sign and submit such materials to the Company for International's approval. Exterior office signage must include the phrase, "Each RE/MAX® office is independently owned and operated," or "independently owned and operated." After such approval, Franchisee will erect an exterior sign, subject to local codes, at the Office premises.

3

F.  <u>Independent Businesses</u>.  Franchisee will, in the use of the distinguishing characteristics of the System, identify Franchisee as being the independent owner of the Office under franchise from the Company, and disclose that the Company and its Affiliates are part of a national network of independently owned and operated real estate service offices.  Franchisee further agrees that it will not use the RE/MAX® name or any name or mark related thereto as part of any corporate name.  However, Franchisee agrees to obtain such fictitious or assumed name registrations as may be required under applicable law.

G.  <u>Promotion of the System</u>.  Franchisee will use every reasonable means to promote the use of the System on a national basis by the general public; and will not permit the advertising of any other real estate office on the Office premises, except that of another Affiliate in good standing as part of the System or, except through participation in the Multiple Listing Service.

H.  <u>Examination and Audit</u>.  Franchisee will permit regular inspection at reasonable times by agents or representatives of the Company of all books and records (including supporting accounting data), procedures and services of Franchisee including, client escrow accounts and bank records to determine compliance with this Agreement and applicable law.  Franchisee shall maintain readily available for inspection by the Company, and shall furnish to the Company upon the request, exact copies of all Franchisee's federal and state tax returns as reflect the operation of the business.  In addition, Franchisee, at his/her expense, shall furnish to the Company (and its agents) for inspection or audit such forms, reports, records, financial statements and other information as the Company may require. Franchisee shall retain for three (3) years copies of Franchisee's financial statements (including a balance sheet and profit and loss statement) and Franchisee's federal and state tax returns for inspection by the Company.

In the event an examination or audit of Franchisee shall disclose an understatement of payments due the Company, Franchisee shall pay to the Company, within fifteen (15) days after receipt of the examination or audit report, the full amount of payments plus late penalty (at the rate and on the terms as provided in Paragraph 9.L.(i) hereof) from the date originally due until the date of payment.  Further, in the event such examination or audit is made necessary by the failure of Franchisee to furnish reports, supporting records, financial statements or other documents or information, as required by this Agreement, or failure to furnish such reports, records, financial statements, documents or information on a timely basis or if any examination or audit discloses any deficiencies on any client or customer escrow account, or if an understatement of payments due the Company for any month is determined by any such examination or audit to be greater than three percent (3%), Franchisee shall reimburse the Company for the costs of such audit or examination, including, without limitation, the charges of any independent accountants and the travel expenses, room and board and compensation of employees of the Company.  The foregoing remedies shall be in addition to all other remedies and rights of the Company hereunder or under applicable law.

I.  <u>Compliance With System Standards</u>.  Franchisee will strictly observe the most current rules of operation established by the Company, including specific guidelines issued by the Company from time to time, and those contained in the RE/MAX office operations materials.  It is understood and agreed that such rules are an integral part of the System and that adherence to such rules by Franchisee is a material consideration for execution of this Agreement.

J.  <u>Insurance</u>.  Franchisee agrees to maintain and keep in force, at its own expense, forms of insurance including but not limited to, general public liability insurance against claims for bodily injury, personal injury, death or property damage; automobile liability insurance; errors and omissions insurance; and worker's compensation insurance.  Such insurance shall be in such minimum amounts and with such approved insurance companies as shall be required by the Company, naming the Company and International as additional insureds.  Franchisee will, prior to conducting business under this Agreement and on a yearly basis thereafter, deliver certificates of insurance to the Company evidencing that such insurance is in full force and effect.  Each insurance policy must provide the Company with thirty (30) days' advance written notice of any material modification, cancellation or expiration of the policy.

4

Additionally, Franchisee agrees to require its licensed agents to maintain, at their expense, general liability insurance, automobile liability insurance and errors and omissions insurance, in such minimum amounts and with such approved insurance companies as shall be required by the Company, naming Franchisee, the Company and International as additional insureds. Each insurance policy must provide Franchisee with thirty (30) days' advance written notice of any material modification, cancellation or expiration of the policy. Annually, Franchisee shall provide to the Company a signed certification in a form prescribed by the Company that evidences compliance with the above requirements

The Company may from time to time increase the minimum amount of coverage required under any policy of insurance, and require different or additional kinds of insurance to reflect inflation, identification or new risks, changes in law or standards of liability, higher damage awards or other relevant changes in circumstances. Franchisee shall at any time fail or refuse to maintain in effect any insurance coverage required by the Company, or to furnish satisfactory evidence of such insurance, the Company may, at the Company's option and in addition to any other rights and remedies under this Agreement, obtain such insurance coverage on behalf of Franchisee. Franchisee agrees to fully cooperate with the Company in their efforts to obtain such insurance policies, promptly execute any and all forms or instruments required to obtain any such insurance, allow any inspections of the premises of the Office which are required to obtain such insurance, and pay the Company, on demand, any costs and premiums incurred by the Company.

Franchisee acknowledges and agrees that the insurance requirements prescribed hereunder are the minimum requirements established by the Company for RE/MAX offices operating in the Northern Illinois Region, that the coverage and limits prescribed may not be sufficient to cover all claims made against Franchisee and that Franchisee may want to consult with his/her professional advisors to determine whether additional coverage or higher limits are appropriate based upon, among other things, the nature or size of the business conducted by Franchisee hereunder.

K.  Indemnification. Franchisee will assume sole and entire responsibility for fines, suits, proceedings, claims or damages relating to or arising out of his/her business, including any costs, expenses or liability by reason of any loss of life or injuries and claimed injuries to persons or property sustained in connection with the operation of his/her real estate brokerage service business and the Office, and agrees to indemnify and to hold the Company harmless from any and all liability or expenses that may be so incurred, including reasonable attorney's fees and costs in defense of any such claims.

L.  Reports. Within five (5) days after the close of each calendar month, Franchisee will file with the Company a financial statement in the form prescribed by the Company showing commissions paid, total income from all sources, costs of operations, shared office expenses, operating results, and monthly gross sales and revenues for such monthly period. Such monthly statement shall identify (in the form the Company specifies) the identity of each licensed agent. If the Company does not receive such monthly statement by the close of business on the tenth (10th) day of the month, Franchisee shall pay to the Company One Hundred Dollars ($100) per day until the Company receives the monthly statement. In addition, sixty (60) days after the close of Franchisee's fiscal year, as used for federal income tax purposes, Franchisee will file with the Company a financial statement showing the balance sheet and the results of operation for the year, including gross sales and revenues for said year. Franchisee shall also provide the Company all listing detail, if requested. Franchisee shall notify the Company in writing of any and all changes in management fees, broker service fees, shared office expenses or advertising fees within thirty (30) days of any such change. Franchisee further agrees to file with the Company any other such reports as the Company from time to time may request in the form prescribed by the Company. Franchisee shall adopt, at his/her expense, a standardized and computerized bookkeeping system approved by the Company.

M.  Transferring Licensed Agents. Prior to engaging or allowing any person to act as a licensed agent of the office, Franchisee agrees to verify that such person does not have any outstanding obligations to International, the Company or the RE/MAX real estate office with which he or she was previously affiliated, if any. If it is determined that the licensed agent does have any such outstanding obligations,

5

Franchisee shall require the licensed agent to satisfy all such obligations prior to engaging or allowing the licensed agent to act as a licensed agent of the Office.

N.    Services Offered by the Office.    Franchisee agrees that Franchisee's sole and exclusive business conducted in or from the Office shall be real estate brokerage services operated exclusively pursuant to the terms and conditions of this license and the System.

O.    Interest.    Franchisee shall promptly pay to the Company all sums due for supplies ordered and any fees due hereunder and agrees to pay the Company interest on any amount not paid when due at the rate of 1.5% per month or the highest legal rate, whichever is lower.

P.    Exclusive Relationship.    Neither Franchisee nor his or her spouse nor any immediate family member of Franchisee or his or her spouse (nor the owners of Franchisee or their spouses or the immediate family members of the owners or their spouses, if Franchisee is a corporation or other approved entity) will, during the term of this Agreement, operate, manage, own or have an interest, direct or indirect, in any real estate brokerage service business other than the business to be operated under this Agreement without the prior written consent of the Company. The term "real estate brokerage service business" for purposes of this prohibition shall be broadly defined to include the purchase, sale, leasing, management, investment counseling, syndication, development, financing, appraisal and/or respecting commercial or residential real estate or any interest therein, as agents for third parties. Franchisee agrees that the Company's written consent to continue or enter into other businesses may be revoked at any time in the Company's sole discretion and may be made contingent upon: amendment of this Agreement; immediate or future acquisition by the Company or International of a franchise covering such business; and/or termination or expiration of this Agreement.

Q    Broker/Owner Council.    Franchisee agrees to join, maintain membership at his expense, regularly attend meetings and actively participate in the Broker/Owner Council as the Company may establish and to abide by all rules and regulations as may be established for the Broker/Owner Council, including any decision reached in accordance with the rules and regulations of the Council. Franchisee shall attend at least seventy-five percent (75%) of all Broker/Owner Council meetings conducted each year. The Broker/Owner Council is a group comprised of all Affiliates within the Northern Illinois Region who meet on a regular basis throughout the year to discuss common issues that affect them and to exchange ideas on topics such as education, advertising, public relations, communications and current issues affecting the real estate industry.

R    Quality Control.    Franchisee will make every effort to protect, maintain and advance the RE/MAX trade name and service mark and the System, as standing for and having a secondary meaning of real estate offices operated solely under the System, and shall prevent limitations and infringements upon them. Franchisee agrees to strictly adhere to the quality control standards established by the Company. Franchisee agrees to assume responsibility for each licensed agent's compliance with all such standards.

S    Opening.    Franchisee agrees that an Office location approved by the Company shall be secured no later than ninety (90) days after the effective date of this Agreement and that the Office shall be opened and operating (with a minimum of 1200 square feet of office space, equipped with furniture, phones and office equipment and staffed by a broker of record and a full-time secretary) no later than one hundred eighty (180) days from the date hereof or within such other time period as is approved in writing by the Company. The Company may condition any extension of the date by which Franchisee must open the Office hereunder upon Franchisee's agreement to commence paying minimum continuing franchise fees as provided in Section 9.B. hereof. In the event Franchisee has used a telephone number in any business previously operated by Franchisee, Franchisee shall establish and use a new principal business telephone number for the Office which is different from the telephone number previously used.

T    Training.    Franchisee shall send its manager or other responsible broker to the training program conducted by International in Greenwood Village, Colorado (or such other location designated by the

6

Company) within thirty (30) days of the execution of this Agreement, but in any event before opening the Office. Prior to attendance at the training program, such manager shall be under written contract with Franchisee, which contract shall contain such confidentiality and trade secret provisions as approved by the Company. All managers subsequently appointed by Franchisee must also attend the International training session within thirty (30) days of their appointment. The Company retains the right to require that Franchisee's manager or other responsible broker attend refresher training courses.

U    Orientation. Franchisee will attend the orientation program conducted by the Company at its offices (or at such other location the Company designates within ninety (90) days of execution of this Agreement). Franchisee should ensure that each licensed real estate agent attends the orientation session or receives equivalent orientation within ninety (90) days after the licensed real estate agent joins the Office. The orientation session is intended to provide licensed real estate agents with the history of the RE/MAX organization and the Northern Illinois Region, the resources available in the RE/MAX System and information about the Website. Franchisee shall pay to the Company, the Company's then-current charge for each of Franchisee's licensed real estate agents who attends the orientation session. This fee is currently Forty-Five Dollars ($45) per person, but it may be increased in accordance with Paragraph 9.L.(ii).

V    Materials Bearing the Marks. Franchisee shall purchase all supplies bearing the "RE/MAX®" name, marks or related identifying materials from a source of supply approved by International. If the Franchisee chooses to use another source or supply to imprint the RE/MAX name, marks or related identifying materials, the materials must be only for that Franchisee's use and are not to be distributed for sale. Furthermore, the Franchisee is responsible for meeting all of International's specifications and requirements.

W    System Modification. If the System is modified, as provided in Paragraph 2 hereof, Franchisee agrees at his own expense to adopt, use and display any such modifications to the System by, for example, adopting new or modified trade names, trademarks, service marks or copyrighted materials. Franchisee shall also dispose of any obsolete materials and displays as directed by the Company.

X    Computer System. Franchisee shall have and maintain a fax machine, e-mail addresses for each licensed real estate agent, high-speed Internet access and computer hardware and software and any other equipment or systems prescribed by the Company for communication between or among the Office, other RE/MAX Affiliates, International or the Company, including the RE/MAX Satellite Network, RE/MAX Mainstreet, Microsoft Access or Excel, and any other systems adopted in the future. The computer system must have both hardware and software compatibility with all communication and data reporting requirements of the Company and International. All information must be stored in a manner that is functionally equivalent, both in form and scope, to those standards defined in the RE/MAX® office management systems offered by International and the Company.

Y    RE/MAX Dispute Resolution System. Franchisee shall utilize and abide by any Dispute Resolution System, offered or designated by or through the Company, including, without limitation, those conducted under the rules of the American Arbitration Association.

Z..    Anti-Terrorism Laws. Franchisee and its owners acknowledge that the President of the United States of America has issued Executive Order 13224 (the *"Executive Order"*) prohibiting transactions with terrorists and terrorist organizations and that the government of the United States has adopted and may in the future adopt other anti-terrorism measures (the *"Anti-Terrorism Measures"*). The Company, therefore, requires certain certifications that the parties with whom it deals are not directly or indirectly involved in terrorism.

Accordingly, Franchisee and its owners certify that neither Franchisee nor any of its employees, licensed real estate agents or representatives nor any other person or entity associated with the Office is: (1) a person or entity listed in the Annex to the Executive Order; (2) a person or entity otherwise determined pursuant to the Executive Order to have committed acts of terrorism or to pose a significant risk of

7



committing acts of terrorism (such a person or entity and those persons and entities listed in the Annex to the Executive Order are referred to herein as **"Terrorists"**); (3) a person or entity who assists, sponsors or who supports Terrorists or acts of Terrorism (**"Sponsors of Terrorism"**); or (4) owned or controlled by Terrorists or Sponsors of Terrorism.

Furthermore, Franchisee and its owners covenant that neither Franchisee nor its owners, nor any of its employees, licensed real estate agents or representatives nor any other person or entity associated with the Office shall, during the term of this Agreement, become a person or entity described in clause (1), (2) or (3) above, or shall otherwise become a target of any Anti-Terrorism Measure. Should Franchisee or any of its owners, or any employee, licensed real estate agent, or any representative of the Office, violate this provision, the Company will have the right to immediately terminate this Agreement (See Subsection 7.A.(xii)).

AA. <u>Standards and Covenants Regarding Use of the Website</u>.  The Company has adopted a website for the Northern Illinois Region (the "Website") to advertise, market, and promote the RE/MAX system in the Northern Illinois Region.  Currently, the Company requires Franchisee to maintain webpages on the Website for the Office and for each licensed agent associated with the Office.  Franchisee agrees that it will comply with the requirements or rules established, from time to time, by the Company, International, or any third party vendor providing services related to the Website.  The Company reserves the right to modify or discontinue the URL of the Website, the operation of the Website, and the provision of webpages on the Website for the Office and Franchisee's licensed agents.  The Company may issue guidelines from time to time (including terms and conditions) governing Franchisee's and its licensed agents' use of the Website and other internet presence to address, among other things, competition, new legal developments concerning the internet, changes in technology and changes in supplier relationships.

Franchisee shall be responsible for the content of the webpages for the Office and Franchisee's licensed agents, and the Company shall be under no obligation to monitor or review such webpages.  Franchisee represents that any content included in the webpages of the Office or Franchisee's licensed agents (the "Content") will be accurate and not misleading and will not infringe any third party's rights.  Franchisee shall ensure that all Content and other use of the Website by Franchisee and its licensed agents shall comply with all applicable laws, ordinances and regulations (including, without limitation, local, state and federal laws and regulations relating to real estate transactions and real estate service businesses).  Further, all Content and other use of the Website by Franchisee and its licensed agents shall conform to the highest standards of lawful, ethical advertising and shall comply with the rules of ethical conduct established by the National Association of REALTORS, or other similar body.  However, notwithstanding the above, the Company shall have the right to remove any content from the webpages of the Office or Franchisee's licensed agents or elsewhere in the Website.  Franchisee hereby consents to the use and display on the Website of information regarding Franchisee, its licensed agents, and its and their real estate listings and agrees to share all listings that go to the Multiple Listing Service with all other Re/MAX offices in the Northern Illinois Region.

The Company will not maintain the webpages of the Office and Franchisee's licensed agents on the Website unless Franchisee is in full compliance with the Franchise Agreement and all standards and guidelines of International and the Company.  If Franchisee is in default of any obligation under the Franchise Agreement or such standards and guidelines, the Company may, in addition to its other remedies, remove the webpages of the Office and Franchisee's agents until Franchisee fully cures the default.  The Company will permanently remove the webpages of the Office and Franchisee's agents upon termination or expiration of the Franchise Agreement.

Franchisee will not adopt or participate in any URL that is confusingly similar to the URL of the Website as reasonably determined by the Company.

The Company, on behalf of itself and any third party vendors of services related to the Website, expressly disclaims any and all warranties of any nature relating to the Website or other services

8

provided by it or them, and specifically disclaims any representations or warranties of fitness for a particular purpose, merchantability or conformance to models or samples.

4.  **Obligations of the Company.**

    A.  The Company will make consulting services reasonably available to Franchisee at the Office relating to the operation of its real estate brokerage service business; provided, however, that the time and frequency of such services shall be subject to the discretion of the Company and that Franchisee shall pay to the Company the reasonable travel, lodging and related expenses incurred by reason of travel to the Office and a reasonable fee for any special or additional consultation requested by Franchisee or made necessary by Franchisee's failure to comply with this Agreement.

    B.  The Company will encourage the use of RE/MAX® real estate brokerage services on a regional basis by the public.

    C.  The Company will maintain reasonable oversight over Franchisee as often as the Company shall deem necessary, to assure compliance with the System and the Company standards as established in the System from time to time, and to provide guidance in the management and operation of the Office. The Company also monitors Franchisee's adherence to various quality controls established for the System. (Neither the Company nor International, however, exercise control over or attempt to influence the day-to-day activities or business methods of Franchisee nor do they assume responsibility for the actions of Franchisee.)

    D.  The Company will make available to Franchisee System operating procedures and guidelines, requirements for standardizing signs, letterheads, sales promotion and other similar materials.

5.  **Relationship of Parties.**  Franchisee is and shall be an independent contractor and nothing contained in this Agreement shall be construed to create a partnership or joint venture between the parties. Neither the Company nor Franchisee shall act as agent for the other or as guarantor or surety for the obligations of the other. Neither party shall be obligated for the debts or expenses of the other.

The conduct of Franchisee's business and the time and manner in which Franchisee shall obtain listings and sell properties shall be determined by his/her own judgment, subject only to applicable Illinois law, this Agreement, and the operating manual or guidelines issued by the Company, as they shall be adopted and published from time to time. Franchisee knows and understands that such standards and guidelines are not fixed and shall, from time to time, be modified or revised by the Company to reflect existing conditions in the highly competitive real estate brokerage services marketplace.

6.  **Term and Renewal.**

    A.  The term of this Agreement shall be for a period of five (5) years from the date hereof, unless sooner terminated according to the provisions of this Agreement.

    B.  Upon expiration of the term of this Agreement, if Franchisee has substantially complied with this Agreement during its term, and provided that:

        (1)  Franchisee maintains possession of and agrees to remodel and/or expand the Office, add or replace the furnishings and signs, and otherwise modify the Office as prescribed by the Company; or

        (2)  If Franchisee is unable to maintain possession of such premises, Franchisee secures substitute premises for which the Company has given its prior written approval and Franchisee agrees to

9



develop such substitute premises in compliance with the applicable standards utilized in the granting of RE/MAX® real estate brokerage service franchises;

then, subject to the terms and conditions set forth in this Paragraph 6, Franchisee shall have the right to renew the Franchise for the Office for an additional five (5) year period on the terms and conditions of the Company's then-current Franchise Agreement used in the sale of franchises for RE/MAX® real estate brokerage service offices.

C. . Franchisee agrees to give the Company written notice of his/her election to renew the Franchise not less than seven (7) months nor more than nine (9) months prior to the date of expiration of this Agreement. If Franchisee gives such notice, the Company will give Franchisee, no less than six (6) months prior to the expiration of this Agreement, written notice that:

    (1)  The Franchise will be renewed;

    (2)  The Franchise will be renewed on condition that those deficiencies of the Office, or in Franchisee's operation of the Office existing as of the date of the Company's notice or those identified by the Company on or before the expiration date, are corrected; or

    (3)  The Franchise will not be renewed based on the determination by the Company that there has not been substantial compliance with this Agreement by Franchisee.

Any notice by the Company of a renewal of the Franchise will:

    (1)  Describe the remodeling and/or other improvements or modifications required to bring the Office into compliance with then-applicable standards and specifications for RE/MAX® real estate brokerage service offices; and

    (2)  State the actions Franchisee must take to correct operating deficiencies, if any, and the time period in which such deficiencies must be corrected.

If the Company elects not to renew the Franchise, the Company's notice will describe the reasons for such decision. In addition to Franchisee's compliance with the requirements described in the Company's notice, Franchisee's right to renew the Franchise is subject to Franchisee's continued compliance with all of the terms and conditions of this Agreement through the date of expiration.

If the Company's notice states that Franchisee must cure certain deficiencies of the Office or its operation as a condition to the renewal of the Franchise, and Franchisee fails to cure said deficiencies within the prescribed time period or if Franchisee fails to timely execute the renewal Franchise Agreement, the Company shall have the right to: (1) extend the expiration date of this Agreement for such period of time as shall be necessary for the Company to comply with applicable law; or (2) extend the expiration date of this Agreement for such period of time as may be necessary in order for Franchisee to cure said deficiencies or execute the renewal Franchise Agreement; provided, however, the Company shall have the right to require Franchisee to pay any and all fees as required under the terms of the renewal Franchise Agreement during said extension period.

D. Franchisee must execute the form of Franchise Agreement and any ancillary agreements that the Company then customarily uses in connection with the granting of Franchises for RE/MAX® real estate brokerage service offices. In addition, Franchisee shall pay to the Company a fee equal to one-half of the initial franchise fee payable under the Company's standard Franchise Agreement being offered to new franchisees at the time of Franchisee's renewal. Franchisee further agrees to execute general releases in form satisfactory to the Company, of any and all claims against the Company and its affiliates and their respective officers, directors, employees, agents, successors and assigns. Failure by Franchisee to execute such agreement and releases and deliver them to the Company for its acceptance and execution within thirty (30) days after delivery thereof to Franchisee shall be deemed an election by Franchisee not to renew the Franchise.

10

E.   Prior to renewal of the Franchise, Franchisee must complete the RE/MAX® Broker/Owner Advanced Education Course ("Advanced Education Course") or, in lieu thereof, have satisfied requirements that the Company or International determines to be equivalent to such course. The Advanced Education Course may be offered periodically as a separate course during the term of this Agreement. The Advanced Education Course may be further developed and/or modified by International during the term of this Agreement. If, during the term of this Agreement, Franchisee has taken and completed all elements of the Advanced Education Course (and/or has completed other educational courses deemed by the Company or International to be equivalent to the Advanced Education Course) and demonstrated to the satisfaction of the Company and International that Franchisee has achieved the requisite level of managerial competence and understanding of the RE/MAX® concept and business methods, this requirement may be waived by the Company. Franchisee shall pay a training fee to International in connection with participating in the Advanced Education Course. In addition, Franchisee shall be responsible for all ancillary expenses incurred in attending the Advanced Education Course, including but not limited to, transportation, lodging, meals and related costs.

7.   **Termination.**  This Agreement may only be terminated as provided herein.  Termination shall not relieve Franchisee of any monetary obligations to the Company unless agreed in writing or provided herein.

A.   The Company shall have the right to terminate this Agreement effective upon delivery of notice to Franchisee if:

(i)   Franchisee has not selected and/or the Company (acting diligently) has not approved a location for the Office within ninety (90) days after the effective date;

(ii)   Franchisee fails to open the Office and commence business operations within one hundred eighty (180) days of the execution of this Agreement;

(iii)   Franchisee abandons, surrenders, fails to actively operate or transfers control of the operation of the Office or loses the right to occupy the Office premises;

(iv)   Franchisee fails to attend the first training program conducted by International after the execution of this Agreement or fails to send a designated manager under written contract with Franchisee, which contract shall contain such confidentiality and trade secret provisions as approved by the Company, within thirty (30) days after such manager assumes his or her duties;

(v)   Franchisee or its owners makes an unauthorized assignment of the Franchise or an ownership interest in Franchisee;

(vi)   Franchisee fails to pay when due any of the fees owed to the Company, International, the Sales Advisory Council or the Regional Broker/Owner Council under this Agreement or any other agreement and does not correct such failure within ten (10) days after written notice of such failure is delivered to Franchisee;

(vii)   Franchisee or any of its owners is convicted by a trial court or pleads no contest to a felony or other crime or offense or engages in any activity or practice which is unprofessional, dishonest, unethical, illegal or which otherwise reflects adversely upon or is disruptive to the reputation, public image or good will of the Company, Affiliates, RE/MAX® licensed agents or the System;

(viii)   Franchisee fails to meet and maintain the quotas concerning number of licensed agents as required by Paragraph 10.A, 10.B and 10.C herein;

(ix)   Franchisee becomes insolvent; or a receiver is appointed to take possession of Franchisee's business or property or any part thereof; or Franchisee shall make a general assignment for the benefit of creditors; or a judgment is obtained against Franchisee which remains unsatisfied for a period of more than thirty (30) days after all rights of appeal have been exhausted or waived;

11

(x)    Franchisee, or any entity under which the Franchise may be operated, shall become bankrupt, or shall become subject to any Chapter of the United States Bankruptcy Code, unless Franchisee or such entity shall timely undertake to reaffirm the obligations under this Agreement; timely comply with all conditions as legally may be imposed by the Company upon such an undertaking to reaffirm this Agreement; and timely comply with such other conditions and provide such assurances as may be required under relevant provisions of the United States Bankruptcy Code; provided, however, that the parties acknowledge that the Company has relied to a degree and in a manner material to this Agreement upon the personal promises of Franchisee to participate personally in the management and development of the Franchise, and, consequently, the parties agree that any attempt by any other party, including the trustee in bankruptcy or any third party to assume or to accept an assignment of this Agreement shall be void;

(xi)    Franchisee fails to cure any condition under this Agreement which materially impairs, or may materially impair, the goodwill associated with the RE/MAX trade name, trademarks, service marks, logo types or other commercial symbols within twenty-four (24) hours after Franchisee has received written notice to cure such conditions;

(xii)    Franchisee or any of its owners or anyone affiliated with the Office is determined to be a Terrorist or a Sponsor of Terrorism, or otherwise violates any provision of Section 3.X.;

(xiii)    The real estate license of Franchisee or any of its owners or any manager of the Office is suspended or revoked;

(xiv)    Franchisee fails to maintain required insurance, or fails to ensure that its licensed agents maintain required insurance, and does not correct such failure within ten (10) days after written notice of such failure is delivered to Franchisee;

(xv)    Franchisee fails to timely cure any notice of noncompliance from any federal, state, or local government agency;

(xvi)    Franchisee fails on three (3) or more occasions within any twelve (12) consecutive month period to comply with this Agreement or any standard, operating procedure, policy and guideline, whether or not such failures to comply are corrected after notice is given to you;

(xvii)    Franchisee fails to comply with any other provision of this Agreement or any policy or guideline prescribed by the Company and does not correct such failure within thirty (30) days after written notice of such failure to comply (which shall describe the action that Franchisee must take) is delivered to Franchisee; or

(xviii)    Franchisee (or any owner acting as manager of the Office) fails to transfer his/her interest within six (6) months of his/her death or disability as provided in Section 16 hereof.

B.    Termination of this Agreement by the Company shall not be an exclusive remedy and shall not in any way affect the rights of the Company to receive or collect fees or other amounts payable by Franchisee hereunder, to enforce the provisions of this Agreement against Franchisee, to seek and obtain damages and/or injunctive relief or to pursue any other remedy for breach of this Agreement by Franchisee.

## 8.  Rights and Obligations of the Company and Franchisee Upon Expiration or Termination of Agreement

12

A.   Franchisee agrees to pay the Company within fifteen (15) days after the effective date of expiration or termination of this Agreement, or such later date that the amounts due to the Company are determined, such continuing franchise fees, service fees, advertising contributions, and all other amounts owed to the Company which are then unpaid.

B.   Upon the expiration or termination of this Agreement, all rights of Franchisee hereunder shall terminate and Franchisee shall within five (5) days of the date of expiration or termination:

(1)   discontinue all use, imitation or duplication of all distinguishing characteristics of the System, including but not limited to, trade names, trademarks, service marks, membership marks, certification marks, copyrights, designs, slogans, logos, names, advertising copy or other printed or physical materials now or hereafter displayed, used or becoming a part of the System; and

(2)   cease and refrain from using in any manner, directly or indirectly, the System or any part thereof and Franchisee shall immediately cease and refrain from holding himself or herself out to the public in any way as a current or former member of the System, Franchisee, Affiliate or operator under the System; and

(3)   make or cause to be made, at his expense, such changes in signs, trade dress, operations, telephone numbers, buildings or other structures so as to distinguish Franchisee and the Office effectively from its former appearance and from other RE/MAX® real estate brokerage service offices and to avoid every possibility of any confusion by the public.  Such changes shall include a complete change in the trade name and trade dress from that under which Franchisee conducted his/her business while affiliated with the Company.  If Franchisee shall, upon request, fail or omit to make or cause to be made such changes within five (5) days, then the Company shall have the right to enter upon the premises, without liability, and to make, or cause to be made, such changes at the expense of Franchisee which expenses shall be paid by Franchisee upon demand; and

(4)   file the appropriate forms to abandon or withdraw any assumed or fictitious name certificate, or to change the name of his corporation, partnership or affiliate to eliminate any reference to the name "RE/MAX®"; and

(5)   return to the Company all manuals, bulletins, instruction sheets, forms, marks, designs, signs, printed matter and other materials obtained from, or loaned by, the Company or International under and pursuant to this Agreement, together with copies of same that may have been made by Franchisee, or that are in Franchisee's possession, custody or control.  If any of the above items are not returned to the Company, Franchisee shall be obligated to pay to the Company an amount not to exceed $2,000 for the cost of replacing such materials; and

(6)   notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use all telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and all classified and other directory listings relating to the office and to authorize transfer of these to the Company or its designee.  Franchisee hereby acknowledges that the Company has the sole right to, and interest in, all telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and directory listings relating to any RE/MAX® marks whether or not previously owned or used by Franchisee, and Franchisee hereby authorizes the Company to direct the telephone company and all listing agencies to transfer all telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and directory listings to the Company or its designee.  Franchisee further acknowledges that if Franchisee fails to comply with any of the foregoing obligations, the telephone company and all listing agencies may accept a copy of this provision and the Company's direction as evidence of the Company's exclusive rights in the telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and directory listings and its authority to direct any such transfer.  Upon execution of this Agreement, Franchisee agrees to execute the form of pre-approved authorization which is attached as Exhibit B directing the telephone company and any listing agencies to transfer all telephone numbers,

13

licensed agents' direct inside dial numbers, facsimile numbers and directory listings to the Company, upon the occurrence of any such termination or expiration. Franchisee agrees to sign any additional forms of authorization or pre-authorization prescribed by the Company. Franchisee also agrees to provide the Company with its most current telephone bill within five (5) days following expiration or termination of this Agreement; and

(7)  refrain from adopting or using in connection with, or in connection with the name of, any subsequent business, any trade name, trademark, service mark, trade dress, slogan or logo of the Company or International, including but not limited to the RE/MAX® red-over-white-over-blue trade dress, the term "RE/MAX®" or any term or trade dress deemed by the Company or International to be confusingly similar to such term or trade dress, or any other term or trade dress which may have the effect of creating confusion or question regarding Franchisee's affiliation with the RE/MAX® organization, including without limitation any name or term with the prefix "RE" or the suffix "MAX". Franchisee further agrees to refrain from the use of the colors red, white and blue in any three-color identity scheme, from the use of the red-over-white-over-blue horizontal bar design, from use of a hot air balloon or a hot air balloon symbol and from the use of the term "above the crowd" or any other three-word phrase beginning with "above" or ending with "crowd"; and

(8)  cancel or, at the Company's option, assign to the Company or its designee any electronic address, domain name, URLs or websites which displays any Mark or that identifies Franchisee as associated with the Company or the RE/MAX real estate brokerage service. Upon execution of this Agreement, Franchisee agrees to execute the pre-approved authorization which is attached as Exhibit C directing the assignment and transfer to the Company of all domain names, URL's or websites adopted or associated with the Office. Franchisee agrees to sign any additional forms of authorization or pre-authorization prescribed by the Company; and

(9)  in the event Franchisee continues to operate a real estate brokerage office at the premises of the Office, obtain a new Multiple Listing Service identification number. Franchisee understands and agrees that all historical sales data maintained by the Multiple Listing Service while Franchisee operated its RE/MAX Office shall be and remain the property of the Company including, without limitation, for market shares and other reporting purposes.

C.  The termination or expiration of this Agreement shall be without prejudice to the Company's right to enforce any obligations of Franchisee under this Agreement, which obligations shall survive termination or expiration. Further, Franchisee shall at all times, for a period of three (3) years following any termination or expiration of this Agreement, keep the Company advised of Franchisee's current business and residential addresses and telephone numbers as well as the business address and telephone number of Franchisee's employer, if any. Franchisee shall also obtain a three (3) year extended reporting endorsement on Franchisee's errors and omissions insurance and provide the Company with evidence thereof within five (5) days of the date of termination or expiration of this Agreement.

D.  In order to facilitate an orderly and efficient transition and to preserve the goodwill associated with the RE/MAX name and RE/MAX marks in the event of termination or expiration of this Agreement, Franchisee agrees that the Company or any Affiliate shall have the right to contact and communicate personally with any or all of Franchisee's licensed agents if Franchisee elects not to renew (either by notifying the Company of Franchisee's intent not to renew or by failing to provide the Company with notice of Franchisee's intentions regarding renewal) or if the Company elects not to renew as herein provided, or, in the case of termination, after a notice of default or termination has been delivered to Franchisee (including during any period of time Franchisee may have to cure any such defaults) for purposes of soliciting and/or discussing with them their options for continued affiliation with the Company and/other RE/MAX offices.

14

(3) Grandfather Status for Certain Existing Agents and Related Fees.

Franchisee shall not be obligated to pay a Service Fee on (or charge a Broker Service Fee to) any "Existing Agents" (i.e., a licensed agent who affiliated with the Office on or before August 1, 2002) who have previously been assigned "Grandfather Status" pursuant to requirements and guidelines established by the Company. All Existing Agents who were assigned Grandfather Status shall retain Grandfather Status for as long as the agent remains with the Office and Franchisee complies with all such requirements and guidelines. If there are extraordinary circumstances which cause a licensed agent to move to the Office from another RE/MAX office, Franchisee may submit a request to the Company to grant that licensed agent Grandfather Status with the Office. The Company may grant or decline such a request in its discretion. For each licensed real estate agent of the Office who has been assigned "Grandfather Status," Franchisee will pay to the Company a monthly fee equal to the greater of: (i) Twenty Five Dollars ($25) or (ii) one-fifth of the amount that Franchisee charged the licensed agent in lieu of the Broker Service Fee whether or not Franchisee actually collects such fee. The Company recommends that, in lieu of the Broker Service Fee, Franchisee charge each licensed agent with Grandfather Status a fee of $125 per month.

D.    Transaction Fees.

Franchisee shall pay the Company as a "Transaction Fee" an amount equal to twenty percent (20%) of all revenue, other than the commission-based Broker Service Fee revenue, retained by Franchisee from all closed real estate transactions handled by the Office. Transaction Fees shall be calculated on any and all monies, however characterized, and from whatever source, retained by Franchisee as a result of closed real estate transactions including, without limitation, Franchisee's licensed real estate agents and their customers and clients.

E.    Advertising Fees.

Within five (5) days after the end of each calendar month, throughout this Agreement, Franchisee shall deliver to the Company on a monthly basis a fee of Ninety-Five Dollars ($95) by a check payable to the RE/MAX® Franchisees' Advertising Escrow Account for each licensed real estate agent (including Franchisee's Broker/Owner(s) and Manager) Franchisee has under contract, to be used in the Regional Institutional Advertising Fund. The Company shall have the duty to promptly deliver the check to the American Community Bank and Trust, Woodstock, Illinois (or successor escrowee designated by the Company), for deposit into the Escrow Account.

The Company may increase the advertising fee from time to time as it deems in the best interests of the Northern Illinois Region and the System. The Company has the discretion to allocate these funds for maintenance and administration of the fund and the preparation and placement of local or regional advertising materials, programs, public relations and other brand-building activities. The Company may remit a portion of these fees to International, or its designee for national advertising and promotion.

F.    Initiation Fee and Annual Dues.

The Company recommends that Franchisee charge each licensed real estate agent an initiation fee.

Franchisee shall pay International annual dues in the amount of Three Hundred Ninety Dollars ($390) for each licensed real estate agent under contract with Franchisee, subject to periodic increase by International. The first payment shall be made to and received by International within five (5) days after the effective date of the licensed real estate agent's affiliation with Franchisee. Successive annual payments will be charged directly to the licensed real estate agent by International and shall be due and payable to International on or before each anniversary of the effective date of the licensed agent's affiliation with Franchisee. Franchisee is ultimately liable for payment of the annual dues.

16

G.  Sales Advisory Council Fee.

On or before October 1 of each calendar year, Franchisee shall pay to the Company an annual contribution to the Sales Advisory Council. Currently, this contribution equals Twenty Four Dollars ($24) for each licensed real estate agent in Franchisee's Office, including the Broker/Owner and/or Manager. Such amount may be increased from time to time by the Sales Advisory Council.

H.  Regional Broker/Owner Council Membership Fee.

Within thirty (30) days of the date of this Agreement, Franchisee shall pay the Company an initial membership fee of One Hundred Fifty Dollars ($150) to join the Council. The Council may impose special assessments upon its members, including Franchisee, but such assessments may be imposed only upon a majority vote of all of the Council's members present at a scheduled meeting.

I.  Technology Compliance Deposit.

Simultaneously with the execution of this Agreement, Franchisee shall deposit with the Company the sum of One Thousand Dollars ($1,000), which sum shall be held by the Company to guaranty compliance with the Company's technology requirements as specified herein. If, within six (6) months from the date of this Agreement, Franchisee provides the Company with proof of compliance, then the Company shall refund the full amount of the compliance deposit to Franchisee. Franchisee shall be considered in compliance with the Company's technology requirements for purposes of receiving a refund if Franchisee provides the Company with timely documentation of the following: (1) Franchisee has acquired and installed computer software and hardware according to the Company's then-current requirements (as specified in the operations manual or elsewhere in writing); (2) Franchisee has equipped the Office with high-speed access to the Internet; (3) Franchisee has established its information on the Website and complied with the Company's guidelines regarding websites; (4) Franchisee has access to RE/MAX Mainstreet; (5) Franchisee has installed all required RSN equipment and has signed an RSN Satellite Network Service Agreement; and (6) Franchisee has an email address for each licensed real estate agent in accordance with the Company's policies. If Franchisee fails to provide proof of compliance to the Company as outlined above within six (6) months from the execution date of this Agreement, then, in addition to all other rights the Company has under this Agreement, Franchisee shall forfeit said deposit to the Company. Nothing in this paragraph shall be construed to limit the Company's right to enforce the computer system and related requirements of this Agreement.

J.  Regional Website Fee

The Company hereby authorizes Franchisee to charge its licensed real estate agents a fee for the Website. The amount Franchisee charges each licensed agent is referred to herein as a "Website Fee." The Company recommends that the Website Fee that Franchisee charges be thirty dollars ($30) a month per agent. The Company may, from time to time, set a maximum dollar amount that Franchisee may charge its agents as a Website Fee.

Franchisee agrees to pay to the Company a "Regional Website Fee" equal to thirty dollars ($30) a month per licensed agent (for each licensed agent who was associated with the Office during any part of the applicable month). All Regional Website Fees shall be due and payable to the Company at the same time and in the same manner as the Continuing Franchise Fee. Franchisee understands and agrees that Franchisee's failure to charge and collect the Website Fees from its licensed agents does not relieve Franchisee of Franchisee's obligation to remit payments of Regional Website Fees to the Company in a timely manner as herein provided.

17

K.  Branch Office Fee.

If Franchisee wishes to open a branch office in its Protected Area, Franchisee must (i) obtain the written consent of the Company, (ii) sign a Franchise Agreement and Branch Office Addendum, and (iii) pay a non-refundable fee equal to one-half of the then-current, standard initial franchise fee.

L.  Other Provisions Regarding Fees.

With respect to the fees described in this Paragraph 9:

(i)  Franchisee shall pay a late penalty of twenty percent (20%) of any amounts due which are received after the fifth of each month in which they become due.  Franchisee shall pay interest on all amounts due at the rate prescribed in Paragraph 3.N. hereof.  Franchisee shall pay all costs of collection, including reasonable attorneys' fees.  Notwithstanding the foregoing, Franchisee shall not be assessed a late penalty if payment of all amounts have been properly placed in the mail and receipted via overnight courier on the fourth (4th) day of the month on which the payment is due. All payments (except the Advertising Fee payable to the RE/MAX® Franchisee's Advertising Escrow Account and the annual dues payable to International) shall be payable directly to the Company at 2205 Point Boulevard, Suite 100, Elgin, Illinois 60123, or such other location as the Company shall designate;

(ii)  all fees referred to herein shall be remitted by Franchisee whether or not Franchisee has received payment therefor from the licensed real estate agent(s);

(iii)  the Company shall have the right to increase all fees referred to herein and the amount of such increase will not exceed, whichever is greater: (1) ten percent (10%) of the amount of such fees as of the date of such increase; or (2) the percentage increase in the Consumer Price Index for All Urban Consumers published by the U.S. Department of Labor, Bureau of Labor Statistics, for the one (1) year period preceding the date of such increase in fees.  The Company shall have the right to increase such fees only once in any calendar year.  The restrictions contained in this Paragraph 9.L.(iii) shall not apply to increases in advertising fees payable under Paragraph 9.E. hereof.

(iv)  In the event that Franchisee defaults in the performance of his/her obligations under this Agreement, Franchisee will pay to the Company, upon demand, the costs and expenses, including reasonable attorneys fees, incurred by the Company as a result of enforcing the provisions of this Agreement.

(v)  If Franchisee fails to make any payments to the Company or International as required under this Agreement, then, in addition to the late charges and interest as set forth above, the Company and International shall have the right to suspend, during such period of delinquency, any and all benefits and services afforded to Franchisee as a RE/MAX franchisee including but not limited to: placement in the printed RE/MAX Referral Roster, the RE/MAX CD Roster and the Website and other websites; subscriptions to the RE/MAX Times and RSN Guide; eligibility for International's performance awards; eligibility to receive referrals from RE/MAX International Relocation Services, Inc. and International's Referral Department; and rights to register, attend or participate in any conventions and conferences organized by the Company or International.  Suspension of these or any other benefits shall not be an exclusive remedy and shall not in any way affect the Company's rights to receive or collect all outstanding fees, dues and other amounts Franchisee owes or to terminate this Agreement because of Franchisee's failure to make payments required under this Agreement.

Franchisee agrees that he/she will not, on grounds of alleged non-performance by the Company or by International of any of their obligations hereunder, withhold payment of any fees or other amounts due the Company.  All fees paid by Franchisee are, unless otherwise specifically provided for herein, not refundable.

18

10. <u>**Quota.**</u> Franchisee shall have the following numbers of licensed real estate agents in Franchisee's Office:

    A.   A minimum of ten (10) licensed real estate agents by the end of the twelfth (12th) month after the effective date of this Agreement and each month thereafter through the twenty-fourth (24th) month after the date of this Agreement.

    B.   A minimum of twenty (20) licensed real estate agents by the end of the twenty-fourth (24th) month after the effective date of this Agreement and each month thereafter through the thirty-sixth (36th) month after the date of this Agreement.

    C.   A minimum of thirty (30) licensed real estate agents by the end of the thirty-sixth (36th) month after the effective date of this Agreement and each month thereafter through the remainder of the term of this Agreement.

Licensed real estate agents who have been affiliated with the RE/MAX network of real estate offices at anytime during the six (6) month period prior to their affiliation with Franchisee will not be counted towards the satisfaction of Franchisee's quota requirement unless the office at which they were affiliated immediately prior to their affiliation with Franchisee was closed or transferred to Franchisee, or the Company previously counted such licensed real estate agents toward the satisfaction of Franchisee's quota requirement.

Franchisee's failure to meet said quotas constitutes grounds for termination of this Agreement. In the Company's sole discretion, Franchisee may be excused from complying with said quotas upon written approval from the Company. Notwithstanding such approval by the Company, Franchisee shall not be excused from paying continuing franchise fees for the number of licensed real estate agents stipulated in Paragraph 10.A, 10.B and 10.C herein.

11. <u>**Notices.**</u> Any notice required to be given under the provisions of this Agreement shall be given in writing by hand or by registered or certified mail postage prepaid, or Federal Express or other form of bona fide and reputable overnight courier service requiring a signature on delivery, and addressed to the respective individuals as hereinafter set forth following the signatures hereto of the respective parties to this Agreement or to such other address as either party hereto shall designate by such notice. Any such notice shall be effective as of the time it is delivered by hand or deposited in the mails or, in the case of Federal Express or other overnight courier, when deposited with the courier service.

    By executing this Agreement, Franchisee authorizes the Company and International to communicate with Franchisee electronically, including via electronic mail and facsimile and, unless a written communication is required, to communicate with Franchisee via telephone, notwithstanding whether any or all of Franchisee's telephone numbers appear on a federal or state Do-Not-Call or similar registry.

12. <u>**Waiver.**</u> No terms of this Agreement shall be held to have been waived by any act or knowledge of either party hereto, its agents or employees, except by instrument in writing duly executed by such party. If at any time either party shall waive its rights, due to any breach of any of the provisions of this Agreement, then such waiver is not to be construed as a continuing waiver of other breaches of same or other provisions of this Agreement.

13. <u>**Legal Construction.**</u> This Agreement shall be governed by and construed in accordance with the statutes, laws and decisions of the State of Illinois whose courts shall have jurisdiction over any actions arising under this Agreement. Should any portion or provision of this Agreement be deemed invalid or void at law, at the option of the Company, this Agreement may be terminated upon notice by the Company, or such provisions may be declared by the Company to be of no force or effect and this Agreement construed as though it had not been inserted herein and the remainder of this Agreement shall remain in full force and effect. Section 41 of the Illinois

19



Franchise Disclosure Act states that "any condition, stipulation, or provision purporting to bind any person acquiring any franchise, to waive compliance with any provision of this Act is void."

**14. Binding Effect.** This Agreement and the franchise hereby granted shall inure to the benefit of and be binding upon the Company, its successors and assigns; and upon Franchisee, its successors and assigns, and shall be enforceable within law or equity by specific performance, injunctions or otherwise. It is hereby agreed and understood that "Franchisee", as the term is used herein, shall mean and refer to the individuals executing this Agreement and the business entity to be formed by such individuals to operate and conduct the franchise granted herein and that both said individuals and entity formed shall perform, be bound by and observe the covenants, conditions and agreements created hereunder.

**15. Assignment and Transfer.** This Agreement and the franchise hereby granted shall not be assignable by Franchisee (including an ownership interest in Franchisee), in whole or in part, except as consented to and approved in writing by the Company, which consent and approval shall not be unreasonably withheld and any unauthorized assignment hereof shall be deemed void and grounds for termination of this Agreement by the Company. Franchisee must deliver to the Company current, accurate financial statements and other documents sufficient to enable the Company to determine and approve or disapprove (in its judgment) the character, credit worthiness, business experience, professional credentials and ethical background of the proposed assignee or transferee. In addition, all of the following conditions must be met prior to, or concurrently with, the effective date of assignment: (1) Franchisee must pay all amounts owed under this Agreement which are then due and unpaid; (2) Franchisee must submit all reports and statements to the extent that Franchisee has failed to previously submit such reports and statements; (3) Franchisee must return to the Company all operations manuals or materials loaned by the Company or International to Franchisee; (4) Franchisee (and its owners if Franchisee is a corporation, limited liability company or other approved entity) must execute a mutual general release together with the Company, in form satisfactory to the Company, of any and all claims against each other and their respective officers, directors, employees and agents; (5) Franchisee (and its owners if Franchisee is a corporation, limited liability company or other approved entity) must execute a non-competition covenant in favor of the Company and the assignee agreeing that, for a period of two (2) years, commencing on the effective date of the assignment, he/she and they will not have any interest as an owner, partner, director, officer, employee, consultant, representative or agent, or in any other capacity, in any real estate brokerage service business similar to the System that operates within a ten (10) mile radius of the Office; (6) The lease for the Office is assigned to the transferee or a new lease is entered into between the landlord and the transferee for the Office; (7) Franchisee obtains a three (3) year extended reporting period endorsement on Franchisee's errors and omission insurance; and (8) the proposed assignment and transfer shall be reduced to writing and presented to the Company in documents properly drawn and organized, devoid of ambiguities and inconsistencies and otherwise in form sufficient to make the proposed assignment and transfer legally enforceable and free from liability exposure or legal expense exposure to either Franchisee or the Company. In addition, the assignee shall be required to execute the then current form of franchise agreement used by the Company and shall be required to attend the training program described in Paragraph 3R hereof. Franchisee shall have no right to grant any subfranchises hereunder and issuance of such subfranchise shall be deemed void and grounds for termination of this Agreement by the Company.

In the event Franchisee desires to do business as a corporation, limited liability company or other approved entity, the Company will give its written consent to do so and to assign this Agreement to such corporation, limited liability company or other approved entity under the following terms and conditions:

(1) All individuals executing this Agreement shall remain personally liable for the performance of all obligations under this Agreement, irrespective of the formation of the approved entity.

(2) The approved entity shall be legally authorized to do business in, or be incorporated or organized in, Illinois and shall, at all times, maintain itself in good standing in Illinois.

20

(3)  The approved entity shall not be engaged in any business endeavor whatsoever other than that which is primarily concerned with ownership and operation of a real estate brokerage business as provided in this Agreement.

(4)  The individuals executing this Agreement own or control one hundred percent (100%) of the voting power of and, in the aggregate, one hundred percent (100%) of all ownership interests in the approved entity, and agree to retain such ownership and/or control.

(5)  The articles of incorporation, by-laws, or other organizational documents of the approved entity shall include the following restrictive clause with respect to its stock or other documents evidencing an ownership interest in the approved entity. The following clause shall also be emblazoned as a legend on each stock certificate issued by the approved entity (or other documents evidencing an ownership interest in the approved entity) and shall be a part of any and all other agreements necessary in order to make the restrictions effective:

> "The transfer of an ownership interest in this entity is subject to the terms and conditions of the Franchise Agreement between this entity and Roaring Fork Capital Partners, Inc. dba RE/MAX Northern Illinois. These restrictions prohibit transfer without the prior written approval of Roaring Fork Capital Partners, Inc."

(6)  The capitalization of the approved entity shall have been approved in writing by the Company, and for such purposes, the Company shall have been provided with copies of the approved entity's articles of incorporation or organization, by-laws, organizational meeting minutes, company-stockholder "buy-sell" agreement, and any other relevant documents.

(7)  The name and trade dress of the approved entity shall not contain any words, phrases, clauses, geometric designs or colored bars, etc. which, are the same as, derivatives of, or deceptively or confusingly similar to the trademarks, service marks, trade dress, slogans or trade names of RE/MAX International, Inc., including but not limited to, "RE/MAX Northern Illinois", "RE/MAX International, Inc.", "RE/MAX International", "RE/MAX of America, Inc.", "RE/MAX of America", "RE/MAX, Inc.", "RE/MAX®", "Above the Crowd", "And Still on The Rise", "For All You're Worth", "Tons of Money", "Take A Step Above the Crowd", "When You Get the Facts . . . It's RE/MAX®", "It's the Experience", "The Real Estate Superstars", the commercial symbol of the "RE/MAX® hot air balloon design" colored red-over-white-over-blue, or the red-over-white-over-blue horizontal bar design. Furthermore, the name shall not contain any whimsical, suggestive, coined or arbitrarily spelled words that might conceivably become known service marks or trademarks and that might conceivably detract from or consequently denigrate the distinctiveness of the term "RE/MAX®" or the RE/MAX® marks.

Individuals desiring to do business as a corporation, limited liability company or other approved entity shall submit to the Company in writing a statement including appropriate evidence of compliance with all of the requirements of Section 15 hereof. Written consent to so operate as a corporation, limited liability company or other approved entity shall be promptly given by the Company in the event of compliance with the above requirements. A copy of all organizational documents shall be submitted to the Company upon request. Nothing in this Agreement shall be construed as permitting Franchisee to assign the rights, duties and obligations contained in this Agreement to a corporation, limited liability company or other approved entity without proper assignment.

If this Agreement is assigned to a corporation, limited liability company or other approved entity as herein provided or if the Franchise is operated through a corporation, limited liability company or other approved entity, the Company shall have the right to require that the owners enter into a buy/sell agreement among themselves in a form and containing such terms as the Company prescribes.

If a whole or partial transfer is permitted by the Company, a transfer fee of Two Thousand Dollars ($2,000) plus administrative and legal fees, will be charged. In addition to the Company's other rights and remedies hereunder, upon any unauthorized transfer of ownership in the Franchise, the Company may impose a charge upon

21



Franchisee in an amount determined by the Company which shall not be greater than Ten Thousand Dollars ($10,000).

This Agreement is fully transferable by the Company and inures to the benefit of any transferee or other legal successors to the Company's interest herein.

### 16. Death or Disability of Franchisee.

Upon the death or permanent disability of Franchisee (or any owner acting as manager of the Office), the executor, administrator, conservator or other personal representative of such person shall transfer his or her interest to a third party approved by the Company within six (6) months thereof. Such transfer, including without limitation, transfers by devise or inheritance, shall be subject to the same conditions as any lifetime transfer. Failure to so dispose of such interest within said period of time shall constitute a breach of this Agreement. The Company's consent to a transfer of any interest is subject to the restrictions of Paragraph 15 of this Agreement and shall not constitute a waiver of any claims it may have against the assignor nor shall it be deemed a waiver of the Company's right to demand exact compliance with any of the terms or conditions of the Franchise Agreement by the assignee.

Upon the death or permanent disability of Franchisee (or any owner acting as manager of the Office), the executor, administrator, conservator or other personal representative of such person, shall appoint a competent manager within a reasonable time, not to exceed thirty (30) days from the date of death or permanent disability. The appointment of such manager shall be subject to the Company's prior written approval, and such manager shall, if requested by the Company, attend and satisfactorily complete a training program. If the office is not being managed by a Company-approved manager within thirty (30) days after the date of death or permanent disability, the Company may, but shall not be required to, appoint a manager to maintain the operations of the Office for and on behalf of said person's estate until an approved assignee shall be able to assume the management and operations of the Office. The Company's appointment of a manager for the office shall not relieve Franchisee of his/her obligations under this Agreement, and the Company shall not be liable for any debts, losses, costs or expenses incurred in the operation of the Office or to any creditor of Franchisee for any products, materials, supplies or services purchased by the Office during any period of time in which it is managed by the Company-appointed manager. The Company shall have the right to charge a reasonable fee for such management services and to cease providing such management services at any time.

### 17. The Company's Right of First Refusal. 
If Franchisee or its owner(s) shall at any time determine to sell the Franchise, the Office, any interest in the Franchise or an ownership interest in Franchisee, Franchisee or its owner(s) shall obtain a bona fide, executed written offer from a responsible and fully disclosed purchaser and shall submit an exact copy of such offer to the Company which shall, for a period of thirty (30) days from the date of delivery of such offer, have the right, exercisable by written notice to Franchisee or its owner(s), to purchase the Franchise, the Office or an interest therein or ownership interest in Franchisee for the price and on the terms and conditions contained in such offer; provided, that the Company may substitute cash for any form of payment proposed in such offer and shall have not less than thirty (30) days to prepare for closing. If the Company does not exercise its right of first refusal, Franchisee or its owner(s) may complete the sale to such purchaser pursuant to and on the terms of such offer, subject to the Company's approval of the purchaser as provided herein, which approval shall not be unreasonably withheld. If the sale to such purchaser is not completed within one hundred twenty (120) days after delivery of such offer to the Company or there is a material change in the terms of the sale, the Company shall again have the right of first refusal herein provided.

### 18. Covenant Not to Compete. 
Franchisee agrees that, upon termination or expiration of this Agreement, for a period of two (2) years commencing on the effective date of such termination or expiration, neither Franchisee nor his or her spouse (nor its owners or their spouses, if Franchisee is a corporation, limited liability company or other approved entity) will have any interest as an owner, partner, director, officer, employee, consultant, representative or agent or in any other capacity, in any real estate brokerage service business similar to the RE/MAX System or

22

to offices operated under the System (except as permitted under any other RE/MAX® franchise agreement or as a licensed agent of a RE/MAX® real estate brokerage service office) that operates at or within a ten (10) mile radius of the Office.

**19.  Agreement and Amendments.**  This Agreement is the exclusive and entire agreement between the parties and supersedes any previous agreements or understandings between the parties.  This Agreement may not be amended, changed, revised or altered, except by an instrument in writing signed by the parties.

**20.  Arbitration.**  The Company shall have the right to enforce by judicial process the obligations of Franchisee under Paragraphs 3.O., 8 and 18 of this Agreement.  The prevailing party in any such legal proceeding, or in any proceeding seeking temporary or preliminary relief to enforce the provisions of Paragraphs 3.O., 8 or 18 hereof or any other provisions hereof, shall be entitled to its costs and expenses, including reasonable attorney's fees.  Except insofar as the Company elects to enforce this Agreement by judicial process as herein provided, any controversy, claim or dispute arising out of or relating to this Agreement or any breach thereof, or the relationship of the parties, shall be submitted for arbitration to the Chicago office of the American Arbitration Association on demand of either party.  Such arbitration proceeding will be conducted in Chicago, Illinois by a panel of one (1) arbitrator in accordance with the then current commercial arbitration rules of the American Arbitration Association.  The award and decision of the arbitrator shall be conclusive and binding upon all parties thereto and judgment upon the award may be entered in any court having jurisdiction thereof. The prevailing party in any such arbitration proceeding shall be entitled to recover the costs of arbitration and the costs of enforcing the award and decision of the arbitrator, including, without limitation, filing fees, court costs, attorneys' fees, expert witness fees and arbitrators' fees.  The Company and Franchisee agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between the Company (and its shareholders, officers, directors, agents, and/or employees) and Franchisee (and/or Franchisee's owners, guarantors, affiliates, and/or employees) may not be consolidated with any other arbitration proceeding between the Company and any other person.

**21.  Limitation on Claims.**  Except for claims arising from amounts owed by Franchisee to the Company or otherwise due under this Agreement, any and all claims arising out of or relating to this Agreement or the relationship between the parties hereto shall be barred unless a judicial or arbitration proceeding is commenced within one (1) year from the date Franchisee or the Company knew of the facts giving rise to such claim or claims.

**22.  Acknowledgments.**  Franchisee acknowledges that he/she has read this Agreement and the Company's Franchise Offering Circular, and he/she understands and accepts the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain the Company's high standards of quality and service and the uniformity of those standards at each RE/MAX® real estate brokerage service office and thereby to protect and preserve the goodwill of the RE/MAX® name and marks.  Franchisee expressly acknowledges and understands that the success of Franchisee in owning and operating a RE/MAX® real estate brokerage service office is speculative and will depend on many factors including, to a large extent, the independent business ability and personal efforts of Franchisee and its owners who are responsible for, and intend to devote their full time and efforts to, the management and development of the Office.

Franchisee represents to the Company, as an inducement to its entering into this Agreement, that all statements in Franchisee's application for the Franchise are accurate and complete and that Franchisee has made no misrepresentations or material omissions in obtaining the Franchise.  The Company has approved Franchisee's application in reliance upon all of Franchisee's representations.

23

**23.  Additional Information Regarding Franchisee.**    The address where Franchisee's financial and other records are maintained is:

6000 S. Pulaski, Chicago, Illinois  60629

The broker of record for the Office is:  Walter M. Zubricki.

The manager of the Office is:  Walter M. Zubricki.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

ROARING FORK CAPITAL PARTNERS, INC.:
D/B/A RE/MAX NORTHERN ILLINOIS

FRANCHISEE:

By: _____
James M. Merrion, Regional Director

By: _____
Walter M. Zubricki

Execution Date: ____6/28/05____

Execution Date: ____6-28-2005____

30561424.4
2005 FRANCHISE AGREEMENT

## GUARANTY

For value received, in consideration for and as an inducement for the Company to enter into the above Franchise Agreement with Franchisee, the undersigned personally guarantees to the Company, its successors and assigns the full performance and observance of all of the covenants, conditions and agreements, therein provided (including the non-competition, transfer and arbitration requirements) to be performed and observed by Franchisee and the undersigned, individually, as an original party thereto. The undersigned further covenants and agrees that this personal guaranty shall remain and continue in full force and effect as to any renewal, modification or extension of this Franchise Agreement. The undersigned agree(s) that the undersigned's liability under this Guaranty shall be direct and immediate, joint and several, and shall not be contingent upon pursuit by the Company of any other remedies against Franchisee or any other person.

_____
Walter M. Zubricki

Execution Date: 6-28-2005

**Exhibit A**
**To Franchise Agreement**

The Protected Area is that geographic location described by the boundary markings delineated by a solid line enclosing the territory. In the event said boundary is a street or roadway, the territory extends to the center of that street.

RE/MAX Home Center



ACCEPTED AND AGREED TO this 2nd day of July, 2005

ROARING FORK CAPITAL PARTNERS, INC.:
D/B/A RE/MAX NORTHERN ILLINOIS

By: _____
James M. Merrion, Regional Director

FRANCHISEE:

By: _____
Walter M. Zubricki

6-28-2005

A-1

**Exhibit B**
**To Franchise Agreement**

**FORM LETTER ASSIGNING TELEPHONE NUMBER**

_____, 20_____

_____

_____

_____

To Whom It May Concern:

Walter M. Zubricki ("Individual") and RE/MAX Home Center ("Franchisee") release, assign, transfer and convey to Roaring Fork Capital Partners, Inc. d/b/a RE/MAX Northern Illinois ("RE/MAX"), all rights, title and interest, if any, which they have, either jointly or individually, in telephone number (773) 735-6000.   Individual and Franchisee authorize the telephone company to transfer, assign and convey telephone number (773) 735-6000 to RE/MAX, effective immediately.  Individual and Franchisee appoint RE/MAX as their true and lawful attorney-in-fact to direct the telephone company to transfer, assign and convey telephone number (773) 735-6000 to RE/MAX and to execute such documents and take such actions, if any, as may be necessary to effectuate the transfer, assignment and conveyance of said telephone number.

_____
Walter M. Zubricki, Individual

6-28-2005

Center Holding Company

By: _____
Walter M. Zubricki, President

6-28-2005

A-1

**Exhibit C**
**To Franchise Agreement**

**FORM LETTER ASSIGNING DOMAIN NAMES, URLS AND WEBSITES**

_____, 20____

_____

_____

_____

To Whom It May Concern:

Walter M. Zubricki ("Individual") and RE/MAX Home Center ("Franchisee") release, assign, transfer and convey to Roaring Fork Capital Partners, Inc. d/b/a RE/MAX Northern Illinois ("RE/MAX"), all rights, title and interest, if any, which they have, either jointly or individually, in all domain names, URLs and websites adopted or associated with the Office. Individual and Franchisee authorize the domain name registrar or other appropriate authority to transfer, assign and convey all such domain names, URLs and websites to RE/MAX, effective immediately. Individual and Franchisee appoint RE/MAX as their true and lawful attorney-in-fact to direct the domain name registrar or other appropriate authority to transfer, assign and convey all such domain names, URLs and websites to RE/MAX and to execute such documents and take such actions, if any, as may be necessary to effectuate the transfer, assignment and conveyance of all such domain names, URLs and websites.

_____
Walter M. Zubricki, Individual

6-28-2005

Center Holding Company

By: _____
Walter M. Zubricki, President

6-28-2005

B-1

**DEPOSITOR SIGNATURE PAGE**

**RE/MAX FRANCHISEES ADVERTISING ESCROW ACCOUNT AGREEMENT**

RE/MAX Home Center
6000 S. Pulaski
Chicago, IL  60629

BY: _____
    Walter M. Zubricki

Executed  6-28-2005

## ESCROW AGREEMENT

**THIS ESCROW AGREMENT is** entered into on March 31, 2005 by and between American Community Bank and Trust (hereinafter referred to as "Escrow Agent") and the Franchisees of ROARING FORK CAPITAL PARTNERS, INC. doing business as **RE/MAX NORTHERN ILLINOIS**, a Colorado Corporation ("RE/MAX"), each of whom is named on a separate signature page appearing at the end of this Agreement (hereinafter singularly referred to as "Depositor").

## RECITALS

**WHEREAS,** Each Depositor is a franchisee of RE/MAX under a franchise agreement (hereinafter referred to as "Franchise Agreement").

**WHEREAS** The Franchise Agreement provides for an advertising fee (hereinafter referred to as "Advertising Fee") to be paid to an Escrow Account known as the RE/MAX Franchisees' Advertising Escrow Account, (hereinafter referred to as "Escrow Account").

**WHEREAS** The Advertising Fee is used to pay for the cooperative advertising for all the Depositors.

**WHEREAS** This purpose of the Escrow Account is to facilitate the receipt and disbursement of the Advertising Fees and is not for the benefit of those persons who are payees of the funds in the Escrow Account.

**NOW, THEREFORE,** the parties agree as follows:

1.  **Deposits.**
    The Escrow Agent shall accept for deposit into the Escrow Account checks representing the Advertising Fees from the Depositors. The Escrow Account shall be non-interest bearing. A request shall be made of the Internal Revenue Service for a tax identification number for the Escrow Account.

2.  **Disbursements.**
    The Escrow Agent shall from time to time disburse all or part of the funds in the Escrow Account pursuant to the written instructions of RE/MAX.

3.  **Account Records.**
    The Escrow Agent shall furnish copies of all Escrow Account cancelled checks and bank statements to RE/MAX on a monthly basis.

4.  **Change in Depositors.**
    Depositors may be added and deleted from this Agreement from time to time.

5.  **Indemnification of Escrow Agent.**
    The Escrow Agent shall have the right to indemnify itself from the funds in the Escrow Account from attorney's fees incurred in connection with this Agreement, all claims, demands, and suits brought against it and arising out of its actions or failure to act hereunder, except for its negligence.

6.  **No Third Party Beneficiaries.**
    In no event shall any third party be a third-party beneficiary of this Agreement.

Initials

7. **Owners of Escrow Funds.**
All funds in the Escrow Account, until disbursed pursuant to Paragraph 2 of this Agreement, shall be the property of the Depositors.

8. **Disposition on Termination.**
Upon termination of this Escrow Account, the balance in the Escrow Account shall be disbursed as instructed by RE/MAX in writing.

9. **No Fee.**
The Escrow Agent shall receive no fee for performing its duties hereunder.

10. **Termination.**
The Agreement may be terminated by the Escrow Agent giving thirty (30) days notice to the Depositors and by RE/MAX on behalf of the Depositors, giving thirty (30) days notice to the Escrow Agent.

11. **Notice.**
All notices shall be in writing and shall be served on the parties at the addresses stated below. The mailing of a notice by registered or certified mail, return receipt requested, shall be effective notice as of the date of mailing.

If to Escrow Agent:
Ms. Charle Zanck, Chief Executive Officer
American Community Bank and Trust
1290 Lake Avenue
P.O. Box 1720
Woodstock, IL 60098

If to Depositor:
c/o RE/MAX Northern Illinois
2205 Point Boulevard, Suite 100
Elgin, IL 60123

12. **Binding Effect.**
This Agreement is binding upon and insures to the benefit of Escrow Agent and Depositors, there successors, assigns, heirs, administrators and representatives.

13. **Governing Law.**
This Agreement shall be construed under and governed by the laws of the State of Illinois.

14. **Singular and Plural.**
The plural shall include the singular, and the singular the plural, as the context requires.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement the day and year first above written.

Roaring Fork Capital Partners, Inc.                    American Community Bank and Trust
d/b/a RE/MAX Northern Illinois


By: _____          By: _____
James M. Merrion, Regional Director                  Charle Zanck, Chief Executive Officer

Initials

ADDENDUM TO FRANCHISE AGREEMENT dated July 2, 2005
by and between ROARING FORK CAPITAL PARTNERS, INC.
doing business as RE/MAX NORTHERN ILLINOIS (the "Company")
and Walter M. Zubricki
doing business as RE/MAX Home Center (the "Franchisee")
(hereinafter referred to as the "Franchise Agreement")

This Addendum is being executed to amend and/or clarify certain terms and conditions of the Franchise Agreement applicable to the renewal of Franchisee's franchise as follows:

1.    Paragraph 3E of the Franchise Agreement (regarding signage) is hereby amended to read as follows:

"E.  Franchisee will maintain the previously approved exterior sign at the Office premises during the term of this Agreement."

2.    Paragraph 3S of the Franchise Agreement (regarding Office opening) is hereby amended to read as follows:

"S.  Franchisee agrees that the Office shall continue to be open and operating with a minimum of 1200 square feet of office space, and it shall be equipped with furniture, phones and office equipment and staffed by a broker of record and a full-time secretary."

3.    Paragraph 3T of the Franchise Agreement (regarding training) is hereby amended to read as follows:

"T.  All managers or other responsible brokers appointed by Franchisee shall be under written contract with Franchisee, which contract shall contain such confidentiality and trade secret provisions as approved by the Company. All managers or other responsible brokers appointed by Franchisee must attend the training program conducted by RE/MAX International, Inc. within thirty (30) days of their appointment.   The Company retains the right to require that Franchisee's manager or other responsible broker attend refresher training courses."

4.    Paragraph 6A of the Franchise Agreement (regarding the term of the agreement) is amended to read as follows:

"A.  The effective date of the Franchise Agreement shall be July 2, 2005.  The expiration date of the Franchise Agreement shall be July 1, 2010."

5.    Paragraphs 7A (i) and (ii) of the Franchise Agreement (regarding failure to select a location and open the Office) are hereby deleted in their entirety.

6.    Paragraph 7A (iv) of the Franchise Agreement (regarding the Company's right to terminate the Franchise Agreement) is hereby amended to read as follows:

"(iv)  Franchisee fails to send a designated manager under written contract with Franchisee, which contract shall contain such confidentiality and trade secret provisions as approved by the Company, to the training program conducted by RE/MAX International, Inc. within thirty (30) days after such manager assumes his or her duties;"

7.    Paragraph 9A of the Franchise Agreement (entitled "Initial Franchise Fee") is re-captioned "Fee Due Upon Signing This Agreement", and is hereby amended to read as follows:

"A. **Fee Due Upon Signing This Agreement.** Because this Agreement is being executed upon a renewal of an expiring franchise agreement, Franchisee is not required to pay the standard initial fee upon signing this Agreement. However, Franchisee shall pay (in cash or cashier's check) a renewal fee upon signing this Agreement in the amount of $10,500.00. No rights or privileges under this Agreement shall exist until the renewal fee is paid. The renewal fee payment shall become the sole property of the Company upon payment and it shall not be refunded in any event."

8.    Paragraph 9B of the Franchise Agreement (entitled "Continuing Franchise Fee") is hereby amended to read as follows:

"B. **Continuing Franchise Fee.**

Within five (5) days after the end of each calendar month, throughout this Agreement, Franchisee shall pay the Company as a continuing franchise fee for this franchise, an amount equal to $110 for each licensed real estate agent under contract by or representing Franchisee during any part of the preceding calendar month (prorated) or one-fifth (1/5) of the monthly management fee charged to each licensed real estate agent under contract by or representing Franchisee during any part of the preceding calendar month (prorated), whichever is higher. Franchisee shall charge each licensed real estate agent a monthly management fee, which the Company currently suggests, but does not require, be in the amount of $550. The management fee represents compensation for the Franchisee's time in managing the office as well as the Franchisee's return on investment that the Franchisee makes to establish the Office. Notwithstanding the number of licensed real estate agents in Franchisee's Office, Franchisee shall pay to the Company a minimum continuing franchise fees as follows:

(i)    for the first (1st) to the twelfth (12th) months after the effective date of this Agreement, the minimum continuing franchise fee shall be four thousand four hundred dollars ($4,400.00) per month;

(ii)    For the thirteenth (13th) to the twenty-fourth (24th) months after the effective date of this Agreement, the minimum continuing franchise fee shall be five thousand five hundred dollars ($5,500.00) per month; and

(iii)    By the end of the twenty-fourth (24th) month after the effective date of this Agreement and each month thereafter during the term of the Agreement, the minimum continuing franchise fee shall be six thousand six hundred dollars ($6,600.00) per month.

The continuing franchise fees described in this paragraph represent an increase in the continuing franchise fees paid by the Franchisee during the prior franchise term.

9.    Paragraph 9H of the Franchise Agreement (regarding initial membership fee in Broker/Owner Council) is amended to read as follows:

The Council may impose special assessments upon its members, including Franchisee, but such assessments may be imposed only upon a majority vote of all of the Council's members present at a scheduled meeting.

10.    The following sentence is added to the end of Paragraph 9I of the Franchise Agreement (entitled "Technology Compliance Deposit"):

"The Company shall waive the technology compliance deposit if Franchisee can demonstrate compliance with the Company's technology requirements prior to renewal."

11. Paragraph 10 of the Franchise Agreement is hereby amended to read as follows:

"10. <u>Quota</u>.  Franchisee shall have the following numbers of licensed real estate agents in Franchisee's Office:

    A. A minimum of <u>forty</u> (40) licensed real estate agents as of the effective date of the Agreement and each month thereafter through the twelfth (12th) month after the effective date of this Agreement; and

    B. A minimum of <u>fifty</u> (50) licensed real estate agents by the end of the twelfth (12th) month after the effective date of this Agreement and each month thereafter through the twenty-fourth (24th) month after the date of this Agreement; and

    C. A minimum of <u>sixty</u> (60) licensed real estate agents by the end of the twenty-fourth (24th) month after the effective date of this Agreement and each month thereafter through the remainder of the term of this Agreement.

Licensed real estate agents who have been affiliated with the RE/MAX network of real estate offices at anytime during the 6 month period prior to their affiliation with Franchisee will not be counted towards the satisfaction of Franchisee's quota requirement unless the office at which they were affiliated immediately prior to their affiliation with Franchisee was closed or transferred to Franchisee, or the Company previously counted such licensed real estate agents toward the satisfaction of Franchisee's quota requirement.

Franchisee's failure to meet said quotas constitutes grounds for termination of this Agreement.  In the Company's sole discretion, Franchisee may be excused from complying with said quotas upon written approval from the Company. Notwithstanding such approval by the Company, Franchisee shall not be excused from paying continuing franchise fees for the number of licensed real estate agents stipulated herein."

    13.   In the event the terms of this Addendum conflict with the terms of the Franchise Agreement, the terms set forth herein shall govern.

IN WITNESS WHEREOF, the parties have executed this Addendum.

ROARING FORK CAPITAL PARTNERS, INC.
D/B/A RE/MAX NORTHERN ILLINOIS

FRANCHISEE:

By: _____
     James M. Merrion, Regional Director

By: _____
     Walter M. Zubricki

Execution Date: ____6/28/05____

Execution Date: ____6-78-2005____

## ASSIGNMENT TO CORPORATION AGREEMENT

THIS AGREEMENT is made and entered into this 2nd day of July, 2005 by and among Roaring Fork Capital Partners, Inc., a Colorado corporation ("RE/MAX") doing business as **RE/MAX Northern Illinois**, Center Holding Company, an Illinois corporation (the "Company") and Walter M. Zubricki, who constitutes the sole shareholder of the Company (the "Shareholder").

## W I T N E S S E T H:

WHEREAS, the Shareholder as Franchisee and RE/MAX as Franchisor entered into a franchise agreement dated July 2, 2005 (the "Franchise Agreement"), the terms and conditions of which are incorporated herein by this reference, for the operation of a RE/MAX real estate business(s) located at:

6000 S. Pulaski, Chicago, Illinois  60629

WHEREAS, the Shareholder wishes to assign all of the right, title and interest in, to and under the Franchise Agreement to the Company, all in accordance with the provisions of the Franchise Agreement;

WHEREAS, the Shareholder, in order to induce RE/MAX's consent to such assignment of the Franchise Agreement, is willing to guarantee the Company's performance under the Franchise Agreement and to remain personally bound by certain provisions of the Franchise Agreement; and

WHEREAS, the Shareholder owns all of the issued and outstanding shares of capital stock of the Company as follows:

| Shareholder | Percentage Ownership |
|---|---|
| Walter M. Zubricki | 100% |

NOW, THEREFORE, in consideration of their mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged:

1.    Recitals.  The parties hereto agree that the recitals hereof are hereby incorporated as agreements and understandings.

2.    Assignment.  As of the date hereof, the Shareholder hereby assigns to the Company all of the right, title and interest in, to and under the Franchise Agreement.

3.    Acceptance and Assumption.  The Company hereby accepts the assignment by the Shareholder of all of the right, title and interest in, to and under the Franchise Agreement, and further hereby assumes all the liabilities, agreements, commitments, duties and obligations of the Shareholder under the Franchise Agreement and, further, agrees to faithfully perform, observe and fulfill all of the

agreements, commitments, duties and obligations of the Shareholder under the Franchise Agreement on and after the date hereof with the same force and effect as if the Franchise Agreements were originally written with the Company as Franchisee.

4.    <u>Representations and Warranties</u>.  The Shareholder and the Company hereby represent and warrant that the Shareholder owns all of the issued and outstanding shares of capital stock of the Company as set forth in the recitals above.  The Shareholder and the Company hereby represent and warrant that the Articles of Incorporation, By-Laws and other organizational documents of the Company shall recite that the issuance and transfer of any interest in the Company is restricted by the terms of the Franchise Agreement and all issued and outstanding stock certificates of the Company shall bear the following legend:  "The transfer of this stock is subject to the terms and conditions of the Franchise Agreement between this corporation and Roaring Fork Capital Partners, Inc. dba RE/MAX Northern Illinois.  These restrictions prohibit transfer without the prior written approval of Roaring Fork Capital Partners, Inc."  The Shareholder and the Company shall submit copies of all corporate documents to RE/MAX upon request.  The Shareholder and the Company hereby represent and warrant that the Company shall not conduct or operate any business other than the business required to be conducted pursuant to the Franchise Agreement, without the prior written approval of RE/MAX.

5.    <u>Personal Guarantee of Shareholder</u>.  The Shareholder hereby:

(a)    Guarantees absolutely and unconditionally at all times the prompt and full payment of all monies due under the Franchise Agreement, and the prompt and full performance of all of the obligations of the Company under the Franchise Agreement, all regardless of the ability, or inability, of the Company to pay monies due under, or to perform the obligations contained in, the Franchise Agreement;

(b)    Agrees to pay all costs, expenses and reasonable attorneys' fees paid or incurred by RE/MAX or by its successors or assigns, in prosecuting any suit against the Company or against the Shareholder, or in enforcing any rights under the Franchise Agreement or this Agreement, except as may otherwise be specifically provided by the Franchise Agreement;

(c)    Waives presentment, demand, notice of any default and all other notices, protests and notice of protest with respect to the Company's failure to perform under the Franchise Agreement;

(d)    Waives any right the Shareholder may have to require that an action be brought against the Company or any other person as a condition of liability;

(e)    Waives all rights to payments and claims for reimbursement or subrogation which any of the Shareholder may have against the Company arising as a result of the Shareholder's execution of and performance under this Agreement;

(f)    Agrees that:

(i)    Any extension or extensions of time of payment of any sum payable under the Franchise Agreement, or of the time for performance of any obligation of the Company under the Franchise Agreement,

(ii)    Any indulgence or indulgences in any payment required of the Company under the Franchise Agreement or in the performance of any obligation of the Company under the Franchise Agreement, or

(iii)    Any failure or failures or omission or omissions to enforce any rights against the Company under the Franchise Agreement or to exercise diligence with respect to the enforcement of any such rights, shall not in any way or manner release, discharge, affect or impair the liabilities and obligations of Shareholder, and that, except as otherwise herein provided, the liabilities and obligations of

~3/2004 Assignment
CHGO1:30414873.v3 [4/8/05]

2

Shareholder under this guarantee shall be released and discharged only upon and by the prompt performance of all obligations under the Franchise Agreement and the prompt and full payment of monies due under the Franchise Agreement, together with all costs, expenses and reasonable attorneys' fees incurred in enforcing the obligations under the Franchise Agreement or in collecting monies due thereunder or in prosecuting any suit in connection therewith or in enforcing this guarantee.

(g)    Agrees that it shall not be necessary to pursue any remedy of any kind whatsoever against the Company under the Franchise Agreement, or under any other guarantee or other instrument as a prerequisite to enforcing the obligations of Shareholder under this guarantee;

(h)    Agrees that RE/MAX may, without notice to anyone, sell or assign any or all of the Franchise Agreement, or any part thereof, and in such event and to the extent of such assignment, this guarantee shall inure to the benefit of each and every immediate or remote assignee or holder of the Franchise Agreement, as fully as if herein specifically named; and

(i)    Agrees that this guarantee shall be binding upon Shareholder and upon the respective successors and assigns.

6.    Covenants of Shareholder. The Shareholder does hereby agree to be personally bound by the terms and conditions of the Franchise Agreement, including without limitation, the confidentiality and in-term and post-term covenants not to compete contained therein.

7.    Consent. RE/MAX hereby consents to the assignment and assumption of the Franchise Agreement, all in reliance on the representations, agreements, covenants and warranties of the Company and Shareholder set forth above.

8.    Breach of Franchise Agreement. The parties agree that a violation by the Shareholder or the Company of any of the terms and conditions of this Agreement shall constitute a violation of the Franchise Agreement entitling RE/MAX to all remedies thereunder.

9.    Governing Law. This Agreement shall be governed by the laws of the State of Illinois.

10.    Successors and Assigns. This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their heirs, executors, administrators, successors and assigns.

~3/2004 Assignment
CHGO1:30414873.v3 |4/8/05

3

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed.

ROARING FORK CAPITAL PARTNERS, INC.
d/b/a RE/MAX NORTHERN ILLINOIS
　a Colorado corporation

CENTER HOLDING COMPANY
an Illinois corporation

By: _____
　　James M. Merrion, Regional Director

By: _____
　　Walter M. Zubricki, President

ATTEST:

_____
Walter M. Zubricki, Secretary

_____
Walter M. Zubricki, Individually

Execution Date: __6/28/05__

Execution Date: __6-28-2005__