UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROARING FORK CAPITAL PARTNERS, INC. d/b/a RE/MAX NORTHERN ILLINOIS, <br><br> Plaintiff, <br><br> v. <br><br> WALTER M. ZUBRICKI and CENTER HOLDING COMPANY, <br><br> Defendants. | Case No. 08cv5077 <br><br> Honorable Judge Darrah <br><br> Magistrate Judge Cox |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Roaring Fork Capital Partners, Inc. d/b/a RE/MAX Northern Illinois ("RE/MAX Regional"), by its attorneys, respectfully submits this memorandum of law in support of its motion, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for entry of an Order preliminarily enjoining Defendants Walter M. Zubricki ("Zubricki") and Center Holding Company ("Center Holding") (collectively, "Defendants") from further breaching their post-termination obligations under their franchise agreement with RE/MAX Regional.

## PRELIMINARY STATEMENT

This action arises out of a written franchise agreement between RE/MAX Regional and Defendant Center Holding pursuant to which Center Holding was granted the right to operate a RE/MAX real estate brokerage office in Chicago, Illinois. After Center Holding and its owner and guarantor, Defendant Zubricki, repeatedly failed to pay various franchise fees to RE/MAX Regional and failed to cure those monetary defaults despite acknowledging their existence, RE/MAX Regional terminated the franchise agreement. However, in breach of their post-termination obligations, Defendants continue to use the RE/MAX name, marks and trade dress in connection with the real estate brokerage business they operate out of the same location as their

former RE/MAX business, and continue to use the same trade name, telephone numbers and website address associated with their former RE/MAX business.

RE/MAX Regional brings this motion for preliminary injunction to enjoin Defendants' continued unauthorized use of the RE/MAX name and marks and to enforce Defendants' other post-termination obligations under the Franchise Agreement.  For the reasons set forth below, RE/MAX Regional's motion should be granted in all respects.

## STATEMENT OF BACKGROUND FACTS

### A.    The Parties And Their Written Franchise Agreement

RE/MAX Regional grants licenses to qualified persons to operate RE/MAX real estate brokerage offices in the northern portion of the State of Illinois and to utilize RE/MAX International's distinctive trademarks, trade names, logos and uniform system in the operation of those real estate brokerage offices.  (Declaration of James Merrion ("Merrion Decl.") ¶ 3.) RE/MAX franchisees provide services primarily to individuals selling and buying residential properties.  RE/MAX Regional currently has 150 franchised RE/MAX offices throughout Northern Illinois. (*Id.*)

One of the distinguishing features of the RE/MAX franchise system is a "high commission" concept.  Under this concept, rather than splitting commissions with the brokerage firm, agents typically pay a monthly management fee and their respective share of fixed and variable expenses, personal expenses and broker service fees, and in return they keep 95% or more of the commissions generated from sales that they originate.  Other distinguishing characteristics of the RE/MAX franchise system include the RE/MAX name and marks, distinctive sales and promotional materials, a website lead system, and a uniform system for the operation of a real estate brokerage office. (*Id.* ¶ 4.)

To identify the source, origin and sponsorship of RE/MAX brokerage offices and the services they offer, and to distinguish those brokerage offices and services from other real estate brokerage businesses, RE/MAX International and RE/MAX Regional have extensively used the RE/MAX trademarks and trade names and have extensively advertised and promoted RE/MAX brokerage service offices and the services they offer under the RE/MAX trade names and trademarks throughout the United States, including Northern Illinois. As a result of such efforts, the brokerage services offered by RE/MAX International, RE/MAX Regional and their franchisees under the RE/MAX trade names and trademarks have met with widespread public approval and have established demand and goodwill among consumers throughout the United States, including Northern Illinois. (*Id.* ¶ 5.)

On or about July 2, 2005, RE/MAX Regional entered into a written renewal franchise agreement (the "Franchise Agreement") with Zubricki, pursuant to which RE/MAX Regional granted Zubricki the exclusive right to operate a RE/MAX real estate brokerage service office at 6000 S. Pulaski, in Chicago, Illinois (the "Office") within a defined territory, for a term of five years.[1]    At the same time, Zubricki and RE/MAX Regional executed an Assignment to Corporation Agreement (the "Assignment"), by which Zubricki assigned all of his right, title and interest in the Franchise Agreement to Center Holding Company ("Center Holding"), which assumed all of Zubricki's obligations under the Franchise Agreement. Under the Assignment, Zubricki, who owned 100% of the shares of Center Holding, agreed to personally and unconditionally guarantee and remain bound by all of Center Holding's obligations under the Franchise Agreement.[2] (*Id.* ¶ 6.)

---

[1]    A copy of the Franchise Agreement is attached to the Complaint as Exhibit A.

[2]    A copy of the Assignment is attached to the Complaint as Exhibit B.

The Franchise Agreement required Zubricki to operate his franchised RE/MAX business under the trade name "RE/MAX Home Center," and to display the RE/MAX distinctive trademarks and service marks, including "RE/MAX," "Above the Crowd," and a hot air balloon colored red over white over blue with the RE/MAX logo on it, in connection with the operation of his business. (Franchise Agreement, Preamble and § 3.D.) The Franchise Agreement also required, in Section 9, that Zubricki pay, on a monthly basis, various franchise fees to RE/MAX Regional, including continuing franchise fees, which includes management fees, advertising fees and website fees based on the number of real estate agents working in the Office, as well as broker service fees representing a percentage of the commissions generated by all of Zubricki's agents. (*Id.* § 9.) The Franchise Agreement further established, in Section 10, minimum quotas of licensed real estate agents that were required to be licensed and affiliated with the Office throughout the term of the Franchise Agreement. (*Id.* § 10.) Under a renewal addendum to the Franchise Agreement, Zubricki's quota was set at 40 agents during the first year of the Agreement, 50 agents during the second year, and 60 agents by the beginning of the third year and for each month thereafter through the remainder of the five-year term of the Agreement. (*Id.*, Addendum § 11.) In October 2007, in an effort to address Zubricki's concerns about the softness of the residential real estate market in his territory, RE/MAX Regional agreed to substantially reduce Zubricki's quota from 60 agents to 39 agents for a period of 24 months retroactive to July 2007. As a result of this quota reduction, Zubricki's monthly continuing franchise fees were substantially reduced as well. (Merrion Decl. ¶ 9.)

The Franchise Agreement also provided that the franchise could be terminated if Zubricki failed to pay when due any fees owed to RE/MAX Regional and did not correct such failure within ten (10) days after written notice was delivered to him. (Franchise Agreement § 7.A.(vii).) Zubricki further agreed in the Franchise Agreement that he would take certain

actions and refrain from taking certain actions immediately upon termination of the Agreement.

These included the following:

(a)     to discontinue all use of the RE/MAX name, trademarks, service marks and all other distinguishing characteristics of the RE/MAX system;

(b)     to refrain from holding himself out to the public as a current or former RE/MAX franchisee;

(c)     to make "such changes in signs, trade dress, operations, telephone numbers, buildings or other structures so as to distinguish franchisee and the Office effectively from its former appearance and from other RE/MAX real estate brokerage service offices and to avoid every possibility of any confusion by the public," including making a "complete change in the trade name and trade dress from that under which franchisee conducted his/her business while affiliated with [RE/MAX Regional]";

(d)     to notify the telephone company and all directory listing agencies of the termination of Zubricki's right to use all telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and all classified and other directory listings, and to authorize the transfer of those numbers to RE/MAX Regional or its designee;

(e)     to provide RE/MAX Regional with his most current telephone bill within five days following termination;

(f)     to cancel or, at RE/MAX Regional's option, assign to RE/MAX or its designee, any electronic address, domain name, URLs or websites displaying the RE/MAX trademarks or identifying Zubricki as associated with RE/MAX or the RE/MAX brokerage business;

(g)     to return to RE/MAX Regional all manuals, bulletins, signs and any other materials obtained from or loaned by RE/MAX Regional or RE/MAX International; and

(h)     to obtain new Multiple Listing Service identification numbers for any real estate brokerage business operated by Zubricki following termination.

(*Id.* § 8.) At the time Zubricki entered into the Franchise Agreement, he acknowledged as part of

that Agreement that "[RE/MAX Regional] has the sole right to, and interest in, all telephone

numbers and directory listings relating to any RE/MAX marks whether or not previously owned

or used by Franchisee," and he authorized RE/MAX Regional to "direct the telephone company

and all listing agencies to transfer all telephone numbers, licensed agents' direct inside dial

numbers, facsimile numbers and directory listings to the Company or its designee." (*Id.* § 8.B.(6).)

In addition, at the time he entered into the Franchise Agreement, Zubricki executed a pre-approved authorization form (Exhibit B to the Franchise Agreement), which directed the telephone company and any listing agencies to transfer to RE/MAX Regional, immediately upon termination, all of Zubricki's right, title and interest to the telephone number (773) 735-6000, which is the general number that Zubricki used in the operation of his franchised RE/MAX business. (Merrion Decl. ¶ 13.) Under the Franchise Agreement, Zubricki also agreed to sign any additional authorization forms relating to assignment to RE/MAX Regional of telephone numbers used in his RE/MAX business. (Franchise Agreement § 8.B.(6).) At the time he executed the Franchise Agreement, Zubricki also executed a pre-approved authorization form (Exhibit C to the Franchise Agreement), directing the domain name registrar or other appropriate authority to transfer to RE/MAX Regional immediately upon termination, all of Zubricki's right, title and interest to any domain names, URLs or websites adopted or associated with his franchised RE/MAX business. (Merrion Decl. ¶ 14.)

**B.     Defendants' Defaults And Termination Of The Franchise Agreement**

Beginning in October 2007, Zubricki failed to pay to RE/MAX Regional all of the monthly franchise fees and other fees and charges due under the Franchise Agreement. As a result, on January 17, 2008, RE/MAX Regional sent Zubricki a ten-day notice of default for failure to pay those fees. As reflected in that default notice, at the time Zubricki owed $6,470.02 in past due fees and charges. (*Id.* ¶ 15.) Although Zubricki did not pay the past due amounts within the ten-day period prescribed in the January 17, 2008 default notice, he promised to take steps promptly to address his default status and, as a result, RE/MAX Regional rescinded the notice of default on January 29, 2008. (*Id.* ¶ 16.)

Thereafter, several RE/MAX Regional representatives set up a number of meetings with Zubricki to attempt to address his failure and ability to pay his monthly financial obligations. However, despite numerous requests, Zubricki did not furnish RE/MAX Regional with his complete financial statements required under the Franchise Agreement, nor did he make himself available so that RE/MAX Regional could assist him in addressing his financial defaults. As a result, on March 19, 2008, RE/MAX Regional sent a second ten-day notice of default to Zubricki for failure to pay continuing franchise fees, advertising fees and other fees. As reflected in that default notice, Zubricki's past due account had grown to $21,176.54. (*Id.* ¶ 17.)

RE/MAX Regional subsequently agreed to extend the cure period for the March 19, 2008 default notice to April 3, 2008 at Zubricki's request. On April 3, a RE/MAX Regional representative met in person with Zubricki and reached an agreement with him to resolve his past due account and to reduce his monthly continuing franchise fees and other fees going forward. Under that agreement, Zubricki agreed, among other things, to sign a promissory note to RE/MAX Regional providing for 12 monthly payments beginning August 1, 2008 covering all amounts then due and owing, which totaled approximately $36,000 at the time. RE/MAX Regional agreed to further reduce Zubricki's quota of real estate agents from 39 to 20 for the remainder of the term of the Franchise Agreement in exchange for a reversion of his protected territory, and to reduce his continuing minimum franchise fees from $4,290 to $2,200 per month for the remainder of the term. (*Id.* ¶ 18.)

Following the April 3 meeting, RE/MAX Regional representatives made repeated attempts to arrange for Zubricki to sign the necessary paperwork to memorialize the agreement reached during that meeting, but were unsuccessful. On April 16, a RE/MAX Regional representative called Zubricki's office and was informed by Zubricki's manager (Christopher Makowski) that Zubricki had suffered a head injury shortly after the April 3 meeting requiring

hospitalization and rehabilitation. Thereafter, RE/MAX Regional representatives communicated with Zubricki's office manager and Zubricki's wife periodically to attempt to resolve the financial defaults while Zubricki recovered. RE/MAX Regional received no cooperation during this time period or after Zubricki returned to work at the Office. After Zubricki had ignored a letter RE/MAX Regional sent to him on July 2, 2008 enclosing the paperwork for the April 3 agreement, RE/MAX Regional sent a third ten-day notice of default to Zubricki on July 15, 2008 for failure to pay continuing franchise fees, advertising fees and other fees. As reflected in the July 15, 2008 notice of default, Zubricki's past due balance as of that time totaled $47,084.70. (*Id.* ¶ 19.)

When Zubricki did not cure the monetary defaults cited in the July 15, 2008 notice of default within 10 days, RE/MAX Regional sent Zubricki a letter on July 30, 2008, notifying him that he had one final opportunity to contact RE/MAX Regional and make arrangements to cure his monetary default. RE/MAX Regional informed Zubricki in that letter that if the default was not cured, the Franchise Agreement would be terminated on August 14, 2008. (*Id.* ¶ 20.) Despite several attempts by RE/MAX Regional representatives to contact Zubricki, he did not pay the past due amounts identified in the July 15, 2008 default notice or even contact RE/MAX Regional to make arrangements to cure the default. As a result, on August 14, 2008, RE/MAX Regional sent a letter to Zubricki notifying him that his Franchise Agreement was terminated effective immediately. In that letter, RE/MAX Regional also informed Zubricki of his post-termination obligations under Sections 8 and 18 of the Franchise Agreement. (*Id.* ¶ 21.)

## C.     Defendants' Breaches Of Their Post-Termination Obligations

Despite termination of the Franchise Agreement, Defendants continue to use the name RE/MAX in connection with the operation of a real estate brokerage business at the same location as their former franchised RE/MAX business, and continues to operate the business

under the trade name "Home Center Realty." Exterior signage at the business continues to display the names "RE/MAX" and "Home Center Realty." (*Id.* ¶ 23.)

In addition, Defendants continue to use the telephone number (773) 735-6000 and the facsimile number (773) 284-3850 in conjunction with their real estate business as well as the direct inside dial numbers of all of the licensed agents previously associated with their RE/MAX business. The telephone number (773) 735-6000 is still featured in directory listings along with the names "RE/MAX" and "Home Center Realty." The direct inside dial numbers of the licensed agents are featured on the individual agents' business cards, on "For Sale" signs posted at properties listed by the agents in Defendants' brokerage office, on the website www.rxhc.com maintained by Defendants for their real estate brokerage business, and on promotional and advertising materials utilized by Defendants' business. All of these examples of uses of the individual agents' direct inside dial numbers also display the RE/MAX name and logo. (*Id.* ¶ 24.) On several occasions after August 15, 2008, and most recently on August 29, 2008, when a RE/MAX Regional representative dialed the number (773) 735-6000, the individual answering the phone identified the business as "Home Center Realty." (*Id.* ¶ 26.)

In addition, certain online directories, including www.yellowpages.com, www.yahoo.com's yellow pages website, www.yellowbook.com, www.dexknows.com, still contain listings for Defendants' former RE/MAX franchised business under the name "RE/MAX Home Center" along with the phone number (773) 735-6000. (*Id.* ¶ 25.) Defendants' real estate brokerage business also continues to be listed under the name "RE/MAX Home Center" along with the telephone number (773) 735-6000 and, in some cases, the fax number as well, on at least two real-estate-specific online directories, www.realtor.com and www.illinoisrealtor.org. (*Id.* ¶ 27.)

Defendants continue to use the website www.rxhc.com associated with their former RE/MAX brokerage business. The website mentions the name RE/MAX in a number of places, identifies the name of the business as "Home Center Realty," refers to the business as a "100% commission concept," contains a photograph of Defendants' office on South Pulaski in Chicago displaying the RE/MAX exterior signage and the RE/MAX hot air balloon, and lists the general office telephone number (773) 735-6000 and each of the individual agents' direct inside dial numbers. (*Id.* ¶ 28.)

Defendants also continue to use the same Multiple Listing Service ("MLS") identification numbers, 28004, 12465 and 60332, that were used by their former RE/MAX franchised business. Unless Defendants obtain new MLS identification numbers as required by the Franchise Agreement, all of the MLS historical data for transactions handled by Defendants' brokerage office while it was an authorized RE/MAX franchise would be credited to Defendants' new real estate brokerage business and not to RE/MAX Regional, which in turn would cause RE/MAX Regional's market share numbers to be misstated and misleading to the public. (*Id.* ¶ 30.)

Defendants have also not returned to RE/MAX Regional various RE/MAX training manuals, a promotional six-foot cold air balloon, and other materials belonging to RE/MAX Regional as required by the Franchise Agreement. (*Id.* ¶ 29.)

On August 20, 2008, RE/MAX Regional sent a letter to Zubricki demanding that he cease and desist from violating his post-term obligations under the Franchise Agreement as described above. On August 21, 2008, when a RE/MAX Regional representative went to Zubricki's office to attempt to hand-deliver a copy of the August 20 cease and desist letter, Zubricki told him that he intended to continue to do business under the name "Home Center Realty" and that he had no intentions of releasing his URL address or the telephone or fax numbers to RE/MAX Regional.

Since that time, Zubricki has continued to ignore RE/MAX Regional's requests to cease and desist. (*Id.* ¶ 31.)

## ARGUMENT

### A.    Legal Standards for Preliminary Injunction

The factors that a court must weigh in assessing a motion for a preliminary injunction are well-settled. "As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992) (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986)). A likelihood of success means that the party has a "better than negligible chance" of succeeding on the merits. *Washington v. Indiana High Sch. Ath.* Ass'n, 181 F.3d 840, 845-46 (7th Cir. 1999). If the moving party satisfies these prerequisites, the court must then consider: (3) the irreparable harm to the movant if preliminary relief is denied, balanced against the irreparable harm to the non-movant if such relief is granted; and (4) the public interest in granting or denying preliminary relief. *Abbott Labs*, 971 F.2d at 11-12. Sitting "as would a chancellor in equity," the court then "weighs" all four factors using a sliding scale approach: "the more likely it is the [movant] will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the [movant] will succeed, the more the balance need weigh toward its side." *Id.* at 12. Application of this test to the case at bar clearly supports the grant of preliminary injunctive relief.[3]

### B.    RE/MAX Regional Has A Substantial Likelihood Of Prevailing On The Merits Of Its Claim for Breach of the Franchise Agreement

---

[3] Section 20 of the Franchise Agreement requires arbitration of all disputes between the parties but contains an express carve-out for actions by RE/MAX Regional to enforce Defendants' post-termination obligations.

RE/MAX Regional has a strong likelihood of prevailing on its breach of contract claim premised on Defendants' breaches of their post-termination obligations under the Franchise Agreement. Under that Agreement, Defendants agreed that in the event of termination they would, among other things, cease displaying the RE/MAX name, trademarks, logos and distinctive trade dress, transfer their telephone and fax numbers and website address to RE/MAX Regional, adopt a completely new name for their business and obtain new MLS identification numbers. (Franchise Agreement § 8.) Defendants have breached each of these contractual obligations. (Merrion Decl., ¶¶ 23-30.) Moreover, there is no question that RE/MAX Regional had the right to terminate the Franchise Agreement based on Defendants' repeated monetary defaults and their failure to cure those defaults. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1308 (11th Cir. 1998).

## C.   Defendants' Continuing Breaches Will Irreparably Harm RE/MAX Regional

Defendants' refusal to abide by their post-termination obligations threatens RE/MAX Regional with irreparable harm, and therefore the issuance of preliminary injunctive relief is warranted. It is well-established that when a terminated franchisee continues to use the trademarks or trade names of its former franchisor in the operation of a same or similar business – particularly when that business is operated at the same location as the former franchised business – consumers are likely to be confused as to the source and sponsorship of the terminated franchisee's business. *See, e.g., RE/MAX North Central, Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492-93 (11th Cir. 1983).

Having demonstrated the inevitable confusion that will arise from Defendants' continued efforts to hold themselves out as a RE/MAX franchised business, the irreparable injury that RE/MAX Regional will suffer unless preliminary injunctive relief is granted follows as a matter of course. Once a likelihood of confusion is established, irreparable harm is presumed. *See, e.g.,*

*RE/MAX North Central*, 272 F.3d at 432; *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992) (holding that use of a former franchisor's proprietary marks "amounts to irreparable injury as a matter of law"); *Club Gene & Georgetti Ltd. Partnership v. La Luna Enters., Inc.*, 889 F. Supp. 324, 327 (N.D. Ill. 1995) ("The lack of an adequate remedy at law and irreparable harm are generally presumed in trademark infringement cases.") Because Defendants are now outside of RE/MAX Regional's franchise system, RE/MAX Regional is no longer able to control the nature and quality of the services provided by Defendants' real estate brokerage business to the public in association with the RE/MAX trademarks and trade names. As a result, Defendants' continued use of these trademarks and trade names threatens to irreparably harm RE/MAX Regional. *See RE/MAX North Central*, 272 F.3d at 432.

Defendants' unauthorized use of the RE/MAX trademarks, trade names and logos also diverts business away from RE/MAX Regional's authorized franchisees, and that loss of profits and revenues cannot be readily ascertained. (Merrion Decl. ¶ 32.) Finally, Defendants' conduct, if not enjoined, threatens the RE/MAX Regional franchise system as a whole. If Defendants are allowed to continue to violate their contractual obligations with impunity, the message will be sent through the RE/MAX Regional franchise system that RE/MAX Regional's franchise agreements (i) provide no protection to other franchisees, and (ii) may be disregarded at will. (*Id.* ¶ ¶ 34.) *See Quizno's Corp. v. Kampendahl*, 2002 WL 1012997, at *7 (N.D. Ill. May 20, 2002); *Rita's Water Ice Franchising Corp. v. DBI Investment Corp.*, 1996 WL 165518, at *5 (E.D. Pa. Apr. 8, 1996). Such harms are irreparable.

Defendants' continued use of telephone numbers, fax numbers and websites associated with RE/MAX's trademarks and trade names is also likely to cause confusion in the minds of consumers who are trying to reach an authorized RE/MAX franchisee and will likewise result in lost business to RE/MAX Regional, loss of goodwill and harm to the franchise system as a

whole. This also constitutes irreparable harm, warranting preliminary injunctive relief. *See, e.g.,*

*The Quizno's Master, LLC v. Kadriu,* 2005 WL 948825, at *6 (N.D. Ill. Apr. 11, 2005)

(enjoining former franchisor's use of telephone numbers); *Molly Maid, Inc. v. Carlson,* 2008 WL

2620109 at *4-5 (E.D. Mich. July 1, 2008) (same); *Cottman Transmission Systems, LLC v.*

*Wolfsgruber,* 2008 WL 2620133 at *5-6 (E.D. Pa. June 30, 2008) (same); *Cottman Transmission*

*Systems, Inc. v. Melody,* 851 F. Supp. 660, 674 (E.D. Pa. 1994) (same).

**D.    The Irreparable Injury To RE/MAX Regional Greatly Outweighs Any Threatened Harm To Defendants**

The irreparable injury to RE/MAX Regional if a preliminary injunction is not granted

substantially outweighs any threatened harm to Defendants. As noted above, if Defendants'

conduct is not enjoined, RE/MAX Regional will suffer irreparable harm to its franchise system

and goodwill, and will continue to lose revenues and profits. (Merrion Decl. ¶¶ 32-34.) Any

harm Defendants might suffer due to the issuance of an injunction, by contrast, would be solely

the result of their willful breaches of their express contractual commitments. As such,

Defendants are entitled to little equitable consideration. *Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.,*

834 F. Supp. 683, 693 (D.N.J. 1993). Moreover, Defendants are free to continue operating a real

estate brokerage business, and to do so at the same location as their former RE/MAX office. The

only restriction on that business is that it cannot be operated as a "high commission" brokerage

office characteristic of the RE/MAX system or be associated in any way with the RE/MAX

trademarks or trade names, including utilizing telephone numbers, fax numbers or websites

formerly associated with their RE/MAX franchise. Thus, Defendants' hardship is minimal when

compared to the threat to RE/MAX Regional. *See, e.g., RE/MAX North Central,* 272 F.3d at

432-33 (holding that balance of harms weighed in franchisor's favor because "the injunction

allows ([the franchisee] to maintain her same office and listings and to work as an independent

real estate agent or select another real estate company to contract with"); *Dunkin' Donuts, Inc. v.*

*Benita Corp.*, 1998 WL 67613 at \*6 (N.D. Ill. Feb. 10, 1998) (holding that balance of hardships weighed in franchisor's favor because "grant of a preliminary injunction would only preliminarily enjoin Benita from operating a donut shop using Dunkin' Donuts' marks, trade name, and trade dress" but not a doughnut shop "using a different mark, trade name, and trade dress").

Finally, under the Seventh Circuit's sliding scale approach to preliminary injunctions, because RE/MAX Regional has demonstrated a very substantial likelihood of prevailing on the merits of its breach of contract claim, the balance of harms need not tip decidedly in its favor for preliminary injunctive relief to be granted. *See Abbott Labs*, 971 F.2d at 12.

### E. The Public Interest Will Be Furthered By The Issuance Of A Preliminary Injunction

Finally, the public interest will be served by eliminating the potential confusion which now exists as a result of Defendants' decision to continue holding themselves out as a RE/MAX franchised business. *See, e.g. RE/MAX North Central*, 272 F.3d at 433 ("[T]he public also has an interest in knowing with whom they do business and whether or not the agent is a franchisee of a given real estate corporation."); *see also Club Gene & Georgetti L.P.*, 889 F. Supp. at 327 (observing that "the public interest will be best served by avoiding confusion").

### Conclusion

For the foregoing reasons, RE/MAX Regional's Motion for a Preliminary Injunction should be granted.

Respectfully submitted,

**ROARING FORK CAPITAL PARTNERS, INC.
d/b/a RE/MAX NORTHERN ILLINOIS**

s/John F. Verhey (06199571)
DLA Piper LLP (US)
203 N. LaSalle, Suite 1900
Chicago, IL, 60601
(312) 368-4044