## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **ROARING FORK CAPITAL PARTNERS, INC. d/b/a RE/MAX NORTHERN ILLINOIS,** | |
| Plaintiff, | Case No. 08cv5077 |
| v. | Honorable Judge Darrah |
| **WALTER M. ZUBRICKI and CENTER HOLDING COMPANY,** | Magistrate Judge Cox |
| Defendants. | |

## DECLARATION OF JAMES M. MERRION

I, James M. Merrion, declare as follows:

1.     I am the Regional Director of Roaring Fork Capital Partners, Inc. d/b/a RE/MAX Northern Illinois ("RE/MAX Regional"), the plaintiff in this matter, and have been so employed since January 5, 2003.  In my role as Regional Director of RE/MAX Regional, a sub-franchisor of RE/MAX International, Inc. ("RE/MAX International"), I am responsible for overseeing the operations of the regional office of RE/MAX Regional in Elgin, Illinois.

2.     I make this Declaration on personal knowledge in support of RE/MAX Regional's Motion for Preliminary Injunction.  If called as a witness to testify in this matter, I would be competent to testify to all facts set forth herein.

3.     RE/MAX Regional is a Colorado corporation with its principal place of business located in Denver, Colorado.  Pursuant to an agreement with RE/MAX International, RE/MAX Regional has the exclusive right to grant licenses to qualified persons to operate RE/MAX real estate brokerage offices in the northern portion of the State of Illinois and to utilize RE/MAX International's distinctive trademarks, trade names, logos and uniform system in the operation of

those real estate brokerage offices. RE/MAX franchisees provide services primarily to individuals selling and buying residential properties. RE/MAX Regional currently has 150 franchised RE/MAX offices throughout Northern Illinois.

4.      One of the distinguishing features of the RE/MAX franchise system is a "high commission" concept. Under this concept, rather than splitting commissions with the brokerage firm, agents typically pay a monthly management fee and their respective share of fixed and variable expenses, personal expenses and broker service fees, and in return they keep 95% or more of the commissions generated from sales that they originate. Other distinguishing characteristics of the RE/MAX franchise system include, but are not limited to, the RE/MAX name and marks, distinctive sales and promotional materials, a website lead system, and a uniform system for the operation of a real estate brokerage service office.

5.      To identify the source, origin and sponsorship of RE/MAX brokerage service offices and the services they offer, and to distinguish those brokerage service offices and services from other real estate brokerage businesses, RE/MAX International and RE/MAX Regional have extensively used the RE/MAX trademarks and trade names and have extensively advertised and promoted RE/MAX brokerage service offices and the services they offer under the RE/MAX trade names and trademarks throughout the United States, including Northern Illinois. As a result of such efforts, the brokerage services offered by RE/MAX International, RE/MAX Regional and their franchisees under the RE/MAX trade names and trademarks have met with widespread public approval and have established demand and goodwill among consumers throughout the United States, including Northern Illinois.

6.      On or about July 2, 2005, RE/MAX Regional entered into a written renewal franchise agreement (the "Franchise Agreement") with Walter M. Zubricki ("Zubricki"), pursuant to which RE/MAX Regional granted Zubricki the exclusive right to operate a RE/MAX

real estate brokerage service office at 6000 S. Pulaski, in Chicago, Illinois (the "Office") within a defined territory for a term of five years. At the same time, Zubricki and RE/MAX Regional executed an Assignment to Corporation Agreement (the "Assignment"), by which Zubricki assigned all of his right, title and interest in the Franchise Agreement to Center Holding Company ("Center Holding"), which assumed all of Zubricki's obligations under the Franchise Agreement. Under the Assignment, Zubricki, who owned 100% of the shares of Center Holding, agreed to personally and unconditionally guarantee and remain bound by all of Center Holding's obligations under the Franchise Agreement. True and correct copies of the Franchise Agreement (including exhibits and an addendum) and the Assignment are attached hereto as Exhibits A and B, respectively.

7.      The Franchise Agreement required Zubricki to operate his franchised RE/MAX business under the trade name "RE/MAX Home Center," and to display the RE/MAX distinctive trademarks and service marks, including "RE/MAX," "Above the Crowd," and a hot air balloon colored red over white over blue with the RE/MAX logo on it, in connection with the operation of his business.

8.      The Franchise Agreement also required, in Section 9, that Zubricki pay, on a monthly basis, various franchise fees to RE/MAX Regional, including continuing franchise fees which includes management fees, advertising fees and website fees based on the number of real estate agents working in the Office, as well as broker service fees representing a percentage of the commissions generated by all of Zubricki's agents. The Franchise Agreement further established, in Section 10, minimum quotas of licensed real estate agents that were required to be licensed and affiliated with the Office throughout the term of the Franchise Agreement. Under a renewal addendum to the Franchise Agreement, Zubricki's quota was set at 40 agents during the first year of the Agreement, 50 agents during the second year, and 60 agents by the beginning of

the third year and for each month thereafter through the remainder of the five-year term of the Agreement.

9.    In October 2007, in an effort to address Zubricki's concerns about the softness of the residential real estate market in his territory, RE/MAX Regional agreed to substantially reduce Zubricki's quota from 60 agents to 39 agents for a period of 24 months retroactive to July 2007. As a result of this quota reduction, Zubricki's monthly continuing franchise fees were substantially reduced as well. This quota reduction was memorialized in an Amendment to Franchise Agreement dated July 2, 2007 ("Amendment"). A true and correct copy of the Amendment is attached hereto as Exhibit C.

10.    The Franchise Agreement further provided, in Section 7A.(vi), that the franchise could be terminated if Zubricki failed to pay when due any fees owed to RE/MAX Regional and did not correct such failure within ten (10) days after written notice was delivered to him.

11.    Zubricki further agreed, in Section 8 of the Franchise Agreement, that he would take certain actions and refrain from taking certain actions immediately upon termination of the Agreement. These included the following:

    (a)    to discontinue all use of the RE/MAX name, trademarks, service marks and all other distinguishing characteristics of the RE/MAX system;

    (b)    to refrain from holding himself out to the public as a current or former RE/MAX franchisee;

    (c)    to make "such changes in signs, trade dress, operations, telephone numbers, buildings or other structures so as to distinguish franchisee and the Office effectively from its former appearance and from other RE/MAX real estate brokerage service offices and to avoid every possibility of any confusion by the public," including making a "complete change in the trade name and trade dress from that under which franchisee conducted his/her business while affiliated with [RE/MAX Regional]";

    (d)    to notify the telephone company and all directory listing agencies of the termination of Zubricki's right to use all telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and all classified

and other directory listings, and to authorize the transfer of those numbers to RE/MAX Regional or its designee;

(e)    to provide RE/MAX Regional with his most current telephone bill within five days following termination;

(f)    to cancel or, at RE/MAX Regional's option, assign to RE/MAX or its designee, any electronic address, domain name, URLs or websites displaying the RE/MAX trademarks or identifying Zubricki as associated with RE/MAX or the RE/MAX brokerage business;

(g)    to return to RE/MAX Regional all manuals, bulletins, signs and any other materials obtained from or loaned by RE/MAX Regional or RE/MAX International; and

(h)    to obtain new Multiple Listing Service identification numbers for any real estate brokerage business operated by Zubricki following termination.

12.    At the time Zubricki entered into the Franchise Agreement, he acknowledged as part of that Agreement that "[RE/MAX Regional] has the sole right to, and interest in, all telephone numbers and directory listings relating to any RE/MAX marks whether or not previously owned or used by Franchisee," and he authorized RE/MAX Regional to "direct the telephone company and all listing agencies to transfer all telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and directory listings to the Company or its designee."

13.    In addition, at the time he entered into the Franchise Agreement, Zubricki executed a pre-approved authorization form (Exhibit B to the Franchise Agreement), which directed the telephone company and any listing agencies to transfer to RE/MAX Regional, immediately upon termination, all of Zubricki's right, title and interest to the telephone number (773) 735-6000, which is the general number that Zubricki used in the operation of his franchised RE/MAX business. Under the Franchise Agreement, Zubricki also agreed to sign any additional authorization forms relating to assignment to RE/MAX Regional of telephone numbers used in his RE/MAX business.

14.    At the time he executed the Franchise Agreement, Zubricki also executed a pre-approved authorization form (Exhibit C to the Franchise Agreement), directing the domain name registrar or other appropriate authority to transfer to RE/MAX Regional immediately upon termination, all of Zubricki's right, title and interest to any domain names, URLs or websites adopted or associated with his franchised RE/MAX business.

15.    Beginning in October 2007, Zubricki failed to pay to RE/MAX Regional all of the monthly franchise fees and other fees and charges due under the Franchise Agreement. As a result, on January 17, 2008, RE/MAX Regional sent Zubricki a ten-day notice of default for failure to pay those fees. As reflected in that default notice, at the time Zubricki owed $6,470.02 in past due fees and charges. A true and correct copy of the January 17, 2008 notice of default is attached hereto as Exhibit D.

16.    Although Zubricki did not pay the past due amounts within the ten-day period prescribed in the January 17, 2008 default notice, he promised to take steps promptly to address his default status and, as a result, RE/MAX Regional rescinded the notice of default on January 29, 2008.

17.    Thereafter, I and several other RE/MAX Regional representatives set up a number of meetings with Zubricki to attempt to address his failure and ability to pay his monthly financial obligations. However, despite numerous requests, Zubricki did not furnish RE/MAX Regional with his complete financial statements required under the Franchise Agreement, nor did he make himself available so that RE/MAX Regional could assist him in addressing his financial defaults. As a result, on March 19, 2008, RE/MAX Regional sent a second ten-day notice of default to Zubricki for failure to pay continuing franchise fees, advertising fees and other fees. As reflected in that default notice, Zubricki's past due account had grown to $21,176.54. A true and correct copy of the March 19, 2008 notice of default is attached hereto as Exhibit E.

18.     RE/MAX Regional subsequently agreed to extend the cure period for the March 19, 2008 default notice to April 3, 2008 at Zubricki's request. On April 3, I met in person with Zubricki and reached an agreement with him to resolve his past due account and to reduce his monthly continuing franchise fees and other fees going forward. Under that agreement, Zubricki agreed, among other things, to sign a promissory note to RE/MAX Regional providing for 12 monthly payments beginning August 1, 2008 covering all amounts then due and owing, which totaled approximately $36,000 at the time. RE/MAX Regional agreed to further reduce Zubricki's quota of real estate agents from 39 to 20 for the remainder of the term of the Franchise Agreement in exchange for a reversion of his protected territory, and to reduce his continuing minimum franchise fees from $4,290 to $2,200 per month for the remainder of the term.

19.     Following the April 3 meeting, I and other RE/MAX Regional representatives made repeated attempts to arrange for Zubricki to sign the necessary paperwork to memorialize the agreement reached during that meeting, but were unsuccessful. On April 16, I called Zubricki's office and was informed by Zubricki's manager (Christopher Makowski) that Zubricki had suffered a head injury shortly after the April 3 meeting requiring hospitalization and rehabilitation. Thereafter, I and several other RE/MAX Regional representatives communicated with Zubricki's office manager and Zubricki's wife periodically to attempt to resolve the financial defaults while Zubricki recovered. RE/MAX Regional received no cooperation during this time period or after Zubricki returned to work at the Office. After Zubricki had ignored a letter RE/MAX Regional sent to him on July 2, 2008 enclosing the paperwork for the April 3 agreement, RE/MAX Regional sent a third ten-day notice of default to Zubricki on July 15, 2008 for failure to pay continuing franchise fees, advertising fees and other fees. As reflected in the July 15, 2008 notice of default, Zubricki's past due balance as of that

time totaled $47,084.70.  A true and correct copy of the July 15, 2008 notice of default is attached hereto as Exhibit F.

20.    When Zubricki did not cure the monetary defaults cited in the July 15, 2008 notice of default within 10 days, RE/MAX Regional sent Zubricki a letter on July 30, 2008, notifying him that he had one final opportunity to contact RE/MAX Regional and make arrangements to cure his monetary default.  RE/MAX Regional informed Zubricki in that letter that if the default was not cured, the Franchise Agreement would be terminated on August 14, 2008.  A true and correct copy of the July 30, 2008 letter is attached hereto as Exhibit G.

21.    Despite several attempts by RE/MAX Regional to contact Zubricki, he did not pay the past due amounts identified in the July 15, 2008 default notice or even contact RE/MAX Regional to make arrangements to cure the default.  As a result, on August 14, 2008, RE/MAX Regional sent a letter to Zubricki notifying him that his Franchise Agreement was terminated effective immediately.   In that letter, RE/MAX Regional also informed Zubricki of his post-termination obligations under Sections 8 and 18 of the Franchise Agreement.  A true and correct copy of the August 14, 2008 termination notice is attached hereto as Exhibit H.

22.    Zubricki has done little or nothing to comply with his post-termination obligations under the Franchise Agreement.

23.    Zubricki continues to use the name RE/MAX in connection with the operation of a real estate brokerage business at the same location as his former franchised RE/MAX business, and continues to operate the business under the trade name "Home Center Realty."  Exterior signage at the business continues to display the names "RE/MAX" and "Home Center Realty." Attached as Exhibit I is a picture I took of the exterior signage on August 21, 2008 at Zubricki's business at 6000 S. Pulaski, Chicago, Illinois, reflecting use of the names "RE/MAX" and

"Home Center Realty." On August 29, 2008, another RE/MAX Regional staff member took photos of the exterior of Zubricki's office with the same results.

24.    In addition, Zubricki continues to use the telephone number (773) 735-6000 and the facsimile number (773) 284-3850 in conjunction with his real estate business as well as the direct inside dial numbers of all of the licensed agents previously associated with his RE/MAX business. The telephone number (773) 735-6000 is still featured in directory listings along with the names "RE/MAX" and "Home Center Realty." The direct inside dial numbers of the licensed agents are featured on the individual agents' business cards, on "For Sale" signs posted at properties listed by the agents in Zubricki's brokerage office, on the website www.rxhc.com maintained by Zubricki for his real estate brokerage business, and on promotional and advertising materials utilized by Zubricki's business. All of these examples of uses of the individual agents' direct inside dial numbers also display the RE/MAX name and logo. A complete list of the agents' direct inside dial numbers is attached hereto as Exhibit J.

25.    On or about August 28, 2008, I accessed a number of  online directories, including    www.yellowpages.com,    www.yahoo.com's    yellow    pages    website, www.yellowbook.com, www.dexknows.com, and searched for RE/MAX Home Center listings in Chicago. In each case, I found that Zubricki's former RE/MAX franchised business is still listed under the name "RE/MAX Home Center" along with the phone number (773) 735-6000. True and correct copies of the listings for the online directories identified above are attached hereto as Group Exhibit K.

26.    On several occasions after August 15, 2008, and most recently on August 29, 2008, I dialed the number (773) 735-6000 and the individual answering the phone identified the business as "Home Center Realty."

27.     Zubricki's real estate brokerage business continues to be listed under the name "RE/MAX Home Center" along with the telephone number (773) 735-6000 and, in some cases, the fax number as well, on at least two real-estate-specific online directories, www.realtor.com and www.illinoisrealtor.org.   True and correct copies of these listings are attached hereto as Group Exhibit L.

28.     In addition, Zubricki continues to use the website www.rxhc.com associated with his former RE/MAX brokerage business.  The website mentions the name RE/MAX in a number of places, identifies the name of the business as "Home Center Realty," refers to the business as a "100% commission concept," contains a photograph of Zubricki's office displaying the RE/MAX exterior signage and the RE/MAX hot air balloon, and lists the general office telephone number (773) 735-6000 and each of the individual agents' direct inside dial numbers. True and correct copies of representative pages of the website, as it existed on August 29, 2008, are attached hereto as Exhibit M.

29.     Zubricki has also not returned to RE/MAX Regional various RE/MAX training manuals, a promotional six-foot cold air balloon, and other materials belonging to RE/MAX Regional as required by his Franchise Agreement.

30.     Zubricki continues to use the same Multiple Listing Service ("MLS") identification numbers, 28004, 12465 and 60332, that were used by his former RE/MAX franchised business.  Unless Zubricki obtains new MLS identification numbers as required by the Franchise Agreement, all of the historical data for transactions handled by Zubricki's office while it was an authorized RE/MAX franchise would be credited to Zubricki's new real estate brokerage business and not to RE/MAX Regional, which in turn would cause RE/MAX Regional's market share numbers to be misstated and misleading to the public.  The MLS identification numbers should remain as RE/MAX Home Center identification numbers in the

MLS and Zubricki should obtain new MLS identification numbers for his new business so that the integrity of the RE/MAX Regional transaction data will be preserved.

31.    On August 20, 2008, RE/MAX Regional sent a letter to Zubricki demanding that he cease and desist from violating his post-term obligations under the Franchise Agreement as described above.  On August 21, 2008, I made an in-person (unannounced) visit to Zubricki's office in an attempt to hand-deliver the August 20 cease and desist letter to him.  Zubricki told me at that time that he intended to continue to do business under the name "Home Center Realty" and  that he had no intentions of releasing the URL address or telephone and fax numbers to RE/MAX Regional.  He said he did not want to see or talk to me or anyone else from RE/MAX Regional again and asked me to leave, and I obliged.  Since that time, Zubricki has continued to ignore RE/MAX Regional's requests to cease and desist from violating his post-termination obligations.  A true and correct copy of RE/MAX's August 20, 2008 cease and desist letter is attached hereto as Exhibit N.

32.    As noted above, customers who utilize online directories to find the listing for Zubricki's former RE/MAX franchise are directed to the telephone number (773) 735-6000. That number, however, does not direct those customers to an authorized RE/MAX real estate office.  Instead, customers are misdirected to Zubricki's current real estate brokerage business. As a result, business intended for an authorized RE/MAX real estate brokerage office is being diverted to Zubricki.  Likewise, customers who call one of the individual agents' direct inside dial numbers intending to reach an agent affiliated with an authorized RE/MAX franchised brokerage office will instead be misdirected to Zubricki's current real estate business.   In addition to causing an indeterminate loss of sales, customers will inevitably be led to believe that Zubricki's current real estate brokerage business is somehow associated with or sponsored by

RE/MAX International or RE/MAX Regional, when it is not, causing potential damage to the goodwill associated with the RE/MAX trademark and trade names that is incalculable.

33.     Zubricki's continued use of the RE/MAX trade names and logos is without the license, permission or consent of RE/MAX International or RE/MAX Regional and has caused or is likely to cause mistake, confusion, or deception in the minds of the public as to the source, affiliation and sponsorship of Zubricki's current business operation.

34.     Permitting a former RE/MAX franchisee to use the RE/MAX name and logos and otherwise not comply with its post-termination obligations may also encourage other RE/MAX Regional franchisees to ignore their franchise obligations.   RE/MAX Regional cannot be compensated by money damages for this potential injury to its franchise system.

I solemnly affirm under penalty of perjury pursuant to Fed. R. Civ. P. 43(b) that the foregoing statements are true and correct.

Executed on September 5, 2008.

_____
JAMES M. MERRION

**Franchise Agreement**

THIS AGREEMENT entered into at Elgin, Illinois, this 2<u>nd</u> day of July, 2005, hereinafter referred to as the "effective date", by and between ROARING FORK CAPITAL PARTNERS, INC., a Colorado corporation doing business as RE/MAX Northern Illinois whose address is 2205 Point Boulevard, Suite 100, Elgin, Illinois 60123, hereinafter referred to as the "Company", and <u>Walter M. Zubricki</u> whose address is <u>22 South Birchwood, Palos Park, Illinois 60464,</u> hereinafter referred to as "Franchisee" and who shall conduct business under the trade name of <u>RE/MAX Home Center</u>. Franchisee shall not use any other trade name in the conduct of the business without the prior written consent of the Company.

## W I T N E S S E T H:

WHEREAS, RE/MAX International, Inc., a Colorado corporation (hereinafter referred to as "International"), owns and has developed and promoted a system (hereinafter referred to as the "System") for providing high quality real estate brokerage services to the general public, has devised policies and techniques for the operation of the System and has developed and promoted the System and the name "RE/MAX" for the advantage of the Company and its franchisees, hereinafter referred to as "Affiliates". The distinguishing characteristics of the System and of the real estate brokerage services provided, all of which shall constitute trade secrets, include, but are not limited to, the following:

1. A high commission concept;

2. Common use and promotion of the service marks " RE/MAX®", "Above the Crowd", a hot air balloon colored red, white and blue with the RE/MAX® logo on it and distinctive red-over-white-over-blue colored horizontal bar design associated with the real estate brokerage service;

3. Distinctive sales materials associated with the RE/MAX® real estate brokerage service;

4. Distinctive RE/MAX® promotional materials used hereafter by the Company or its Affiliates as part of the System;

5. Approved supplies and other materials used in the offices of the Company or its Affiliates as part of the System;

6. International and regional centralized advertising and public relations services;

7. Recommended procedures for operation of offices under the RE/MAX® System, publicity and record keeping;

8. A standardized uniform system for operation of a real estate brokerage service office in accordance with ethical standards and policies, efficiency, quality and courtesy.

WHEREAS, International granted to the Company the exclusive right to franchise the System to others, and the names and marks related thereto, in the northern portion of the State of Illinois, including Mercer, Henry, Bureau, Putnam, LaSalle, Grundy and Kankakee counties, and all counties to the north thereof in the State of Illinois, hereinafter referred to as the "Northern Illinois Region."

WHEREAS, Franchisee, is familiar with the Company and its operation, represents that he/she has dealt in many varied business transactions in the past which have been of greater amount and complexity than involved in this transaction and has been furnished all desired information regarding the Company, its System and its Affiliates.

1

WHEREAS, Franchisee desires to be licensed to use the System in a real estate brokerage service business and to become an Affiliate of the Company in a national network of such businesses under the terms and conditions contained in this Agreement.

WHEREAS, all parties acknowledge the importance of continuing goodwill toward the System, maintaining distinctive and high quality real estate brokerage services and performing this Agreement according to its terms.

IT IS AGREED:

**1.    License.**  Franchisee has applied for a license to operate a RE/MAX® real estate brokerage service office and such application has been approved by the Company in reliance upon all of the representations made therein. The Company hereby grants to Franchisee a license to use the System and to establish and operate a RE/MAX® real estate brokerage service office at and only at 6000 S. Pulaski, Chicago, Illinois 60629 (the "Office"). The location of the Office must be approved in advance by the Company. If the location of the Office has not been selected and approved as of the effective date, and the parties cannot agree on a mutually acceptable location within ninety (90) days after the effective date, then it will be deemed to be a failure of a material condition precedent, entitling the Company to terminate this Agreement.

Except as otherwise provided herein, unless this Agreement expires or is terminated and so long as Franchisee is not in default under this Agreement, the Company shall not operate or grant a franchise for the operation of another RE/MAX® real estate brokerage service office offering residential real estate brokerage services, to be located within the protected area (the "Protected Area") identified in Exhibit A to this Agreement (if applicable). The Company expressly retains all other rights, including without limitation the sole and unlimited right (a) to operate or grant franchises for the operation of real estate brokerage offices at or from locations outside the Protected Area, and (b) to operate or grant franchises for the operation of "Commercial Real Estate Offices" at or from locations within or outside the Protected Area. The term "Commercial Real Estate Office" shall mean a real estate office that is restricted from engaging in any real estate activities involving real property on which is located residential structures containing four dwelling units or less; provided however, that a Commercial Real Estate Office shall be permitted to engage in real estate activities with respect to single-family residential dwelling units owned personally by individuals affiliated with the Commercial Real Estate Office or by such individuals' family members.

For purposes of this Agreement, the terms "licensed real estate agent" or "licensed agent" shall mean each person who possesses a real estate license issued by the state that is assigned to or registered with the Office (or any branch office), and includes, without limitation, Franchisee, Franchisee's owners and any managers, sales associates, broker associates, brokers, licensed assistants, and the broker of record of the Office.

**2.    Name, Trade Secrets and Goodwill.**  This license authorizes Franchisee to use the System, the RE/MAX® name, service marks, trade secrets and goodwill, and any improvements and modifications of these items, for the purpose of operating a real estate brokerage service business and for no other purpose. It is expressly agreed that ownership, right and title to the System, the RE/MAX® name, service marks, trade secrets and goodwill, and any improvements and modifications of these items, remain solely in International and the Company and are provided to and revealed to Franchisee in confidence. Franchisee agrees to keep all such items in confidence and not disclose them to any person without the consent of the Company and except as provided in this Agreement. The initial name or any subsequent name under which Franchisee proposes to do business must receive the prior written approval of International and the Company.

Franchisee agrees not to use the RE/MAX® name, service marks, trade secrets and goodwill, and any modifications of these items in connection with the performance, sale, endorsement or promotion of any other services or products, including any services or products ancillary to the operation of the Office, or in any other manner not expressly authorized by the Company. Further, Franchisee agrees not to use the same in connection with any business practice that is contrary to those standards set forth in this Agreement or prescribed by the Company or International from time to time in operating procedures and guidelines.

2

The Company and/or International may change the System or any part of the System at any time and, as changed, it shall remain the System referred to in this Agreement. Any improvements in the System developed by Franchisee shall become the sole and exclusive property of the Company which shall have the right to adopt or modify them without compensation to Franchisee.

Franchisee acknowledges the exclusive right of the Company and/or International to use the System and to grant franchises to others to use the System in the conduct of real estate brokerage services in other areas. Franchisee agrees not to infringe upon, use or imitate the System or any part of the System, except under written license from the Company.

3.   **Obligations of Franchisee.**

A.   Management.  The Office shall at all times be managed by Franchisee, an owner of Franchisee or a manager approved by the Company.  The person managing the Office shall at all times hold a real estate broker license and meet all other requirements imposed by state law.  Franchisee and its owners shall comply in all respects with all legal requirements applicable to the formation, organization, ownership, and operation of real estate brokerage offices imposed by state law.  Additionally, unless otherwise approved in writing by the Company, Franchisee, or an owner of at least 25% of the ownership interests of Franchisee, if Franchise is a corporation, limited liability company, partnership or other business entity, will hold a valid real estate broker license within 6 months of purchasing the franchise. The Company shall have the right to impose reasonable requirements on the ownership and structure of any approved entity acting as Franchisee.

B.   Service Standards.  Franchisee will maintain high ethical standards in the conduct of its real estate brokerage business; will maintain the Office in a clean and orderly manner; will provide efficient, courteous and high quality real estate brokerage service to the public, of the same high quality and distinguishing characteristics as provided at the Company's Affiliates' offices so that the real estate brokerage business operated under this Agreement will help to create and maintain goodwill among the public for the System on an international basis; will not engage in any acts or activities that may disrupt or discredit the RE/MAX® System, its operations, or the Company, or that may detract from or tend to undermine the growth of the RE/MAX® organization; and will act under a duty of loyalty in support and furtherance of the RE/MAX® concept and RE/MAX® organizations; and will maintain a proper attitude toward the public, the Company, and other Affiliates.

C.   Industry Group Memberships and Compliance With Law.  Franchisee will join and remain a member in good standing and comply with the codes and by-laws of (i) the local Board of REALTORS, (ii) where applicable, the local Multiple Listing Service, and (iii) the National Association of REALTORS; and will comply with all local, state and federal laws, ordinances, rules and regulations relating to his/her real estate brokerage business, and will not engage in any activity or practice which results or may be anticipated to result in litigation or public criticism of the Company or its business.

D.   Display of Marks.  Franchisee will feature in the operation of its real estate service business and in all materials and advertising the distinguishing characteristics of the System as prescribed by the Company or by International in the RE/MAX office operations materials or in specific guidelines issued from time to time by the Company or International.

E.   Signs.  Franchisee will prepare a drawing or depiction of the style and design of an exterior office sign and submit such materials to the Company for International's approval.  Exterior office signage must include the phrase, "Each RE/MAX® office is independently owned and operated," or "independently owned and operated." After such approval, Franchisee will erect an exterior sign, subject to local codes, at the Office premises.

3

F.    <u>Independent Businesses</u>. Franchisee will, in the use of the distinguishing characteristics of the System, identify Franchisee as being the independent owner of the Office under franchise from the Company, and disclose that the Company and its Affiliates are part of a national network of independently owned and operated real estate service offices. Franchisee further agrees that it will not use the RE/MAX® name or any name or mark related thereto as part of any corporate name. However, Franchisee agrees to obtain such fictitious or assumed name registrations as may be required under applicable law.

G.    <u>Promotion of the System</u>. Franchisee will use every reasonable means to promote the use of the System on a national basis by the general public; and will not permit the advertising of any other real estate office on the Office premises, except that of another Affiliate in good standing as part of the System or, except through participation in the Multiple Listing Service.

H.    <u>Examination and Audit</u>. Franchisee will permit regular inspection at reasonable times by agents or representatives of the Company of all books and records (including supporting accounting data), procedures and services of Franchisee, client escrow accounts and bank records to determine compliance with this Agreement and applicable law. Franchisee shall maintain readily available for inspection by the Company, and shall furnish to the Company upon the request, exact copies of all Franchisee's federal and state tax returns as reflect the operation of the business. In addition, Franchisee, at his/her expense, shall furnish to the Company (and its agents) for inspection or audit such forms, reports, records, financial statements and other information as the Company may require. Franchisee shall retain for three (3) years copies of Franchisee's financial statements (including a balance sheet and profit and loss statement) and Franchisee's federal and state tax returns for inspection by the Company.

In the event an examination or audit of Franchisee shall disclose an understatement of payments due the Company, Franchisee shall pay to the Company, within fifteen (15) days after receipt of the examination or audit report, the full amount of payments plus late penalty (at the rate and on the terms as provided in Paragraph 9.L.(i) hereof) from the date originally due until the date of payment. Further, in the event such examination or audit is made necessary by the failure of Franchisee to furnish reports, supporting records, financial statements or other documents or information, as required by this Agreement, or failure to furnish such reports, records, financial statements, documents or information on a timely basis or if any examination or audit discloses any deficiencies on any client or customer escrow account, or if an understatement of payments due the Company for any month is determined by any such examination or audit to be greater than three percent (3%), Franchisee shall reimburse the Company for the costs of such audit or examination, including, without limitation, the charges of any independent accountants and the travel expenses, room and board and compensation of employees of the Company. The foregoing remedies shall be in addition to all other remedies and rights of the Company hereunder or under applicable law.

I.    <u>Compliance With System Standards</u>. Franchisee will strictly observe the most current rules of operation established by the Company, including specific guidelines issued by the Company from time to time, and those contained in the RE/MAX office operations materials. It is understood and agreed that such rules are an integral part of the System and that adherence to such rules by Franchisee is a material consideration for execution of this Agreement.

J.    <u>Insurance</u>. Franchisee agrees to maintain and keep in force, at its own expense, forms of insurance including but not limited to, general public liability insurance against claims for bodily injury, personal injury, death or property damage; automobile liability insurance; errors and omissions insurance; and worker's compensation insurance. Such insurance shall be in such minimum amounts and with such approved insurance companies as shall be required by the Company, naming the Company and International as additional insureds. Franchisee will, prior to conducting business under this Agreement and on a yearly basis thereafter, deliver certificates of insurance to the Company evidencing that such insurance is in full force and effect. Each insurance policy must provide the Company with thirty (30) days' advance written notice of any material modification, cancellation or expiration of the policy.

4

Additionally, Franchisee agrees to require its licensed agents to maintain, at their expense, general liability insurance, automobile liability insurance and errors and omissions insurance, in such minimum amounts and with such approved insurance companies as shall be required by the Company, naming Franchisee, the Company and International as additional insureds. Each insurance policy must provide Franchisee with thirty (30) days' advance written notice of any material modification, cancellation or expiration of the policy. Annually, Franchisee shall provide to the Company a signed certification in a form prescribed by the Company that evidences compliance with the above requirements

The Company may from time to time increase the minimum amount of coverage required under any policy of insurance, and require different or additional kinds of insurance to reflect inflation, identification or new risks, changes in law or standards of liability, higher damage awards or other relevant changes in circumstances. Franchisee shall at any time fail or refuse to maintain in effect any insurance coverage required by the Company, or to furnish satisfactory evidence of such insurance, the Company may, at the Company's option and in addition to any other rights and remedies under this Agreement, obtain such insurance coverage on behalf of Franchisee. Franchisee agrees to fully cooperate with the Company in their efforts to obtain such insurance policies, promptly execute any and all forms or instruments required to obtain any such insurance, allow any inspections of the premises of the Office which are required to obtain such insurance, and pay the Company, on demand, any costs and premiums incurred by the Company.

Franchisee acknowledges and agrees that the insurance requirements prescribed hereunder are the minimum requirements established by the Company for RE/MAX offices operating in the Northern Illinois Region, that the coverage and limits prescribed may not be sufficient to cover all claims made against Franchisee and that Franchisee may want to consult with his/her professional advisors to determine whether additional coverage or higher limits are appropriate based upon, among other things, the nature or size of the business conducted by Franchisee hereunder.

K.   Indemnification.  Franchisee will assume sole and entire responsibility for fines, suits, proceedings, claims or damages relating to or arising out of his/her business, including any costs, expenses or liability by reason of any loss of life or injuries and claimed injuries to persons or property sustained in connection with the operation of his/her real estate brokerage service business and the Office, and agrees to indemnify and to hold the Company harmless from any and all liability or expenses that may be so incurred, including reasonable attorney's fees and costs in defense of any such claims.

L.   Reports.  Within five (5) days after the close of each calendar month, Franchisee will file with the Company a financial statement in the form prescribed by the Company showing commissions paid, total income from all sources, costs of operations, shared office expenses, operating results, and monthly gross sales and revenues for such monthly period.  Such monthly statement shall identify (in the form the Company specifies) the identity of each licensed agent.  If the Company does not receive such monthly statement by the close of business on the tenth (10th) day of the month, Franchisee shall pay to the Company One Hundred Dollars ($100) per day until the Company receives the monthly statement. In addition, sixty (60) days after the close of Franchisee's fiscal year, as used for federal income tax purposes, Franchisee will file with the Company a financial statement showing the balance sheet and the results of operation for the year, including gross sales and revenues for said year. Franchisee shall also provide the Company all listing detail, if requested. Franchisee shall notify the Company in writing of any and all changes in management fees, broker service fees, shared office expenses or advertising fees within thirty (30) days of any such change. Franchisee further agrees to file with the Company any other such reports as the Company from time to time may request in the form prescribed by the Company. Franchisee shall adopt, at his/her expense, a standardized and computerized bookkeeping system approved by the Company.

M.   Transferring Licensed Agents.  Prior to engaging or allowing any person to act as a licensed agent of the office, Franchisee agrees to verify that such person does not have any outstanding obligations to International, the Company or the RE/MAX real estate office with which he or she was previously affiliated, if any.  If it is determined that the licensed agent does have any such outstanding obligations,

5

Franchisee shall require the licensed agent to satisfy all such obligations prior to engaging or allowing the licensed agent to act as a licensed agent of the Office.

N.  Services Offered by the Office.  Franchisee agrees that Franchisee's sole and exclusive business conducted in or from the Office shall be real estate brokerage services operated exclusively pursuant to the terms and conditions of this license and the System.

O.  Interest.  Franchisee shall promptly pay to the Company all sums due for supplies ordered and any fees due hereunder and agrees to pay the Company interest on any amount not paid when due at the rate of 1.5% per month or the highest legal rate, whichever is lower.

P.  Exclusive Relationship.  Neither Franchisee nor his or her spouse nor any immediate family member of Franchisee or his or her spouse (nor the owners of Franchisee or their spouses or the immediate family members of the owners or their spouses, if Franchisee is a corporation or other approved entity) will, during the term of this Agreement, operate, manage, own or have an interest, direct or indirect, in any real estate brokerage service business other than the business to be operated under this Agreement without the prior written consent of the Company. The term "real estate brokerage service business" for purposes of this prohibition shall be broadly defined to include the purchase, sale, leasing, management, investment counseling, syndication, development, financing, appraisal and/or respecting commercial or residential real estate or any interest therein, as agents for third parties.  Franchisee agrees that the Company's written consent to continue or enter into other businesses may be revoked at any time in the Company's sole discretion and may be made contingent upon:  amendment of this Agreement; immediate or future acquisition by the Company or International of a franchise covering such business; and/or termination or expiration of this Agreement.

Q   Broker/Owner Council.  Franchisee agrees to join, maintain membership at his expense, regularly attend meetings and actively participate in the Broker/Owner Council as the Company may establish and to abide by all rules and regulations as may be established for the Broker/Owner Council, including any decision reached in accordance with the rules and regulations of the Council. Franchisee shall attend at least seventy-five percent (75%) of all Broker/Owner Council meetings conducted each year.  The Broker/Owner Council is a group comprised of all Affiliates within the Northern Illinois Region who meet on a regular basis throughout the year to discuss common issues that affect them and to exchange ideas on topics such as education, advertising, public relations, communications and current issues affecting the real estate industry.

R   Quality Control.  Franchisee will make every effort to protect, maintain and advance the RE/MAX trade name and service mark and the System, as standing for and having a secondary meaning of real estate offices operated solely under the System, and shall prevent limitations and infringements upon them. Franchisee agrees to strictly adhere to the quality control standards established by the Company. Franchisee agrees to assume responsibility for each licensed agent's compliance with all such standards.

S   Opening.  Franchisee agrees that an Office location approved by the Company shall be secured no later than ninety (90) days after the effective date of this Agreement and that the Office shall be opened and operating (with a minimum of 1200 square feet of office space, equipped with furniture, phones and office equipment and staffed by a broker of record and a full-time secretary) no later than one hundred eighty (180) days from the date hereof or within such other time period as is approved in writing by the Company. The Company may condition any extension of the date by which Franchisee must open the Office hereunder upon Franchisee's agreement to commence paying minimum continuing franchise fees as provided in Section 9.B. hereof.  In the event Franchisee has used a telephone number in any business previously operated by Franchisee, Franchisee shall establish and use a new principal business telephone number for the Office which is different from the telephone number previously used.

T   Training.  Franchisee shall send its manager or other responsible broker to the training program conducted by International in Greenwood Village, Colorado (or such other location designated by the

6

Company) within thirty (30) days of the execution of this Agreement, but in any event before opening the Office. Prior to attendance at the training program, such manager shall be under written contract with Franchisee, which contract shall contain such confidentiality and trade secret provisions as approved by the Company. All managers subsequently appointed by Franchisee must also attend the International training session within thirty (30) days of their appointment. The Company retains the right to require that Franchisee's manager or other responsible broker attend refresher training courses.

U    Orientation. Franchisee will attend the orientation program conducted by the Company at its offices (or at such other location the Company designates within ninety (90) days of execution of this Agreement). Franchisee should ensure that each licensed real estate agent attends the orientation session or receives equivalent orientation within ninety (90) days after the licensed real estate agent joins the Office. The orientation session is intended to provide licensed real estate agents with the history of the RE/MAX organization and the Northern Illinois Region, the resources available in the RE/MAX System and information about the Website. Franchisee shall pay to the Company, the Company's then-current charge for each of Franchisee's licensed real estate agents who attends the orientation session. This fee is currently Forty-Five Dollars ($45) per person, but it may be increased in accordance with Paragraph 9.L.(ii).

V    Materials Bearing the Marks. Franchisee shall purchase all supplies bearing the "RE/MAX®" name, marks or related identifying materials from a source of supply approved by International. If the Franchisee chooses to use another source or supply to imprint the RE/MAX name, marks or related identifying materials, the materials must be only for that Franchisee's use and are not to be distributed for sale. Furthermore, the Franchisee is responsible for meeting all of International's specifications and requirements.

W   System Modification. If the System is modified, as provided in Paragraph 2 hereof, Franchisee agrees at his own expense to adopt, use and display any such modifications to the System by, for example, adopting new or modified trade names, trademarks, service marks or copyrighted materials. Franchisee shall also dispose of any obsolete materials and displays as directed by the Company.

X    Computer System. Franchisee shall have and maintain a fax machine, e-mail addresses for each licensed real estate agent, high-speed Internet access and computer hardware and software and any other equipment or systems prescribed by the Company for communication between or among the Office, other RE/MAX Affiliates, International or the Company, including the RE/MAX Satellite Network, RE/MAX Mainstreet, Microsoft Access or Excel, and any other systems adopted in the future. The computer system must have both hardware and software compatibility with all communication and data reporting requirements of the Company and International. All information must be stored in a manner that is functionally equivalent, both in form and scope, to those standards defined in the RE/MAX® office management systems offered by International and the Company.

Y    RE/MAX Dispute Resolution System. Franchisee shall utilize and abide by any Dispute Resolution System, offered or designated by or through the Company, including, without limitation, those conducted under the rules of the American Arbitration Association.

Z..   Anti-Terrorism Laws. Franchisee and its owners acknowledge that the President of the United States of America has issued Executive Order 13224 (the *"Executive Order"*) prohibiting transactions with terrorists and terrorist organizations and that the government of the United States has adopted and may in the future adopt other anti-terrorism measures (the *"Anti-Terrorism Measures"*). The Company, therefore, requires certain certifications that the parties with whom it deals are not directly or indirectly involved in terrorism.

Accordingly, Franchisee and its owners certify that neither Franchisee nor any of its employees, licensed real estate agents or representatives nor any other person or entity associated with the Office is: (1) a person or entity listed in the Annex to the Executive Order; (2) a person or entity otherwise determined pursuant to the Executive Order to have committed acts of terrorism or to pose a significant risk of

7



committing acts of terrorism (such a person or entity and those persons and entities listed in the Annex to the Executive Order are referred to herein as **"Terrorists"**); (3) a person or entity who assists, sponsors or who supports Terrorists or acts of Terrorism (**"Sponsors of Terrorism"**); or (4) owned or controlled by Terrorists or Sponsors of Terrorism.

Furthermore, Franchisee and its owners covenant that neither Franchisee nor its owners, nor any of its employees, licensed real estate agents or representatives nor any other person or entity associated with the Office shall, during the term of this Agreement, become a person or entity described in clause (1), (2) or (3) above, or shall otherwise become a target of any Anti-Terrorism Measure. Should Franchisee or any of its owners, or any employee, licensed real estate agent, or any representative of the Office, violate this provision, the Company will have the right to immediately terminate this Agreement (See Subsection 7.A.(xii)).

AA. <u>Standards and Covenants Regarding Use of the Website</u>. The Company has adopted a website for the Northern Illinois Region (the "Website") to advertise, market, and promote the RE/MAX system in the Northern Illinois Region. Currently, the Company requires Franchisee to maintain webpages on the Website for the Office and for each licensed agent associated with the Office. Franchisee agrees that it will comply with the requirements or rules established, from time to time, by the Company, International, or any third party vendor providing services related to the Website. The Company reserves the right to modify or discontinue the URL of the Website, the operation of the Website, and the provision of webpages on the Website for the Office and Franchisee's licensed agents. The Company may issue guidelines from time to time (including terms and conditions) governing Franchisee's and its licensed agents' use of the Website and other internet presence to address, among other things, competition, new legal developments concerning the internet, changes in technology and changes in supplier relationships.

Franchisee shall be responsible for the content of the webpages for the Office and Franchisee's licensed agents, and the Company shall be under no obligation to monitor or review such webpages. Franchisee represents that any content included in the webpages of the Office or Franchisee's licensed agents (the "Content") will be accurate and not misleading and will not infringe any third party's rights. Franchisee shall ensure that all Content and other use of the Website by Franchisee and its licensed agents shall comply with all applicable laws, ordinances and regulations (including, without limitation, local, state and federal laws and regulations relating to real estate transactions and real estate service businesses). Further, all Content and other use of the Website by Franchisee and its licensed agents shall conform to the highest standards of lawful, ethical advertising and shall comply with the rules of ethical conduct established by the National Association of REALTORS, or other similar body. However, notwithstanding the above, the Company shall have the right to remove any content from the webpages of the Office or Franchisee's licensed agents or elsewhere in the Website. Franchisee hereby consents to the use and display on the Website of information regarding Franchisee, its licensed agents, and its and their real estate listings and agrees to share all listings that go to the Multiple Listing Service with all other Re/MAX offices in the Northern Illinois Region.

The Company will not maintain the webpages of the Office and Franchisee's licensed agents on the Website unless Franchisee is in full compliance with the Franchise Agreement and all standards and guidelines of International and the Company. If Franchisee is in default of any obligation under the Franchise Agreement or such standards and guidelines, the Company may, in addition to its other remedies, remove the webpages of the Office and Franchisee's agents until Franchisee fully cures the default. The Company will permanently remove the webpages of the Office and Franchisee's agents upon termination or expiration of the Franchise Agreement.

Franchisee will not adopt or participate in any URL that is confusingly similar to the URL of the Website as reasonably determined by the Company.

The Company, on behalf of itself and any third party vendors of services related to the Website, expressly disclaims any and all warranties of any nature relating to the Website or other services

8

provided by it or them, and specifically disclaims any representations or warranties of fitness for a particular purpose, merchantability or conformance to models or samples.

4.    **Obligations of the Company.**

    A.    The Company will make consulting services reasonably available to Franchisee at the Office relating to the operation of its real estate brokerage service business; provided, however, that the time and frequency of such services shall be subject to the discretion of the Company and that Franchisee shall pay to the Company the reasonable travel, lodging and related expenses incurred by reason of travel to the Office and a reasonable fee for any special or additional consultation requested by Franchisee or made necessary by Franchisee's failure to comply with this Agreement.

    B.    The Company will encourage the use of RE/MAX® real estate brokerage services on a regional basis by the public.

    C.    The Company will maintain reasonable oversight over Franchisee as often as the Company shall deem necessary, to assure compliance with the System and the Company standards as established in the System from time to time, and to provide guidance in the management and operation of the Office. The Company also monitors Franchisee's adherence to various quality controls established for the System. (Neither the Company nor International, however, exercise control over or attempt to influence the day-to-day activities or business methods of Franchisee nor do they assume responsibility for the actions of Franchisee.)

    D.    The Company will make available to Franchisee System operating procedures and guidelines, requirements for standardizing signs, letterheads, sales promotion and other similar materials.

5.    **Relationship of Parties.**  Franchisee is and shall be an independent contractor and nothing contained in this Agreement shall be construed to create a partnership or joint venture between the parties. Neither the Company nor Franchisee shall act as agent for the other or as guarantor or surety for the obligations of the other. Neither party shall be obligated for the debts or expenses of the other.

The conduct of Franchisee's business and the time and manner in which Franchisee shall obtain listings and sell properties shall be determined by his/her own judgment, subject only to applicable Illinois law, this Agreement, and the operating manual or guidelines issued by the Company, as they shall be adopted and published from time to time. Franchisee knows and understands that such standards and guidelines are not fixed and shall, from time to time, be modified or revised by the Company to reflect existing conditions in the highly competitive real estate brokerage services marketplace.

6.    **Term and Renewal.**

    A.    The term of this Agreement shall be for a period of five (5) years from the date hereof, unless sooner terminated according to the provisions of this Agreement.

    B.    Upon expiration of the term of this Agreement, if Franchisee has substantially complied with this Agreement during its term, and provided that:

        (1)    Franchisee maintains possession of and agrees to remodel and/or expand the Office, add or replace the furnishings and signs, and otherwise modify the Office as prescribed by the Company; or

        (2)    If Franchisee is unable to maintain possession of such premises, Franchisee secures substitute premises for which the Company has given its prior written approval and Franchisee agrees to

9



develop such substitute premises in compliance with the applicable standards utilized in the granting of RE/MAX® real estate brokerage service franchises;

then, subject to the terms and conditions set forth in this Paragraph 6, Franchisee shall have the right to renew the Franchise for the Office for an additional five (5) year period on the terms and conditions of the Company's then-current Franchise Agreement used in the sale of franchises for RE/MAX® real estate brokerage service offices.

C.  .  Franchisee agrees to give the Company written notice of his/her election to renew the Franchise not less than seven (7) months nor more than nine (9) months prior to the date of expiration of this Agreement.   If Franchisee gives such notice, the Company will give Franchisee, no less than six (6) months prior to the expiration of this Agreement, written notice that:

(1)   The Franchise will be renewed;

(2)   The Franchise will be renewed on condition that those deficiencies of the Office, or in Franchisee's operation of the Office existing as of the date of the Company's notice or those identified by the Company on or before the expiration date, are corrected; or

(3)   The Franchise will not be renewed based on the determination by the Company that there has not been substantial compliance with this Agreement by Franchisee.

Any notice by the Company of a renewal of the Franchise will:

(1)   Describe the remodeling and/or other improvements or modifications required to bring the Office into compliance with then-applicable standards and specifications for RE/MAX® real estate brokerage service offices; and

(2)   State the actions Franchisee must take to correct operating deficiencies, if any, and the time period in which such deficiencies must be corrected.

If the Company elects not to renew the Franchise, the Company's notice will describe the reasons for such decision.   In addition to Franchisee's compliance with the requirements described in the Company's notice, Franchisee's right to renew the Franchise is subject to Franchisee's continued compliance with all of the terms and conditions of this Agreement through the date of expiration.

If the Company's notice states that Franchisee must cure certain deficiencies of the Office or its operation as a condition to the renewal of the Franchise, and Franchisee fails to cure said deficiencies within the prescribed time period or if Franchisee fails to timely execute the renewal Franchise Agreement, the Company shall have the right to:  (1) extend the expiration date of this Agreement for such period of time as shall be necessary for the Company to comply with applicable law; or (2) extend the expiration date of this Agreement for such period of time as may be necessary in order for Franchisee to cure said deficiencies or execute the renewal Franchise Agreement; provided, however, the Company shall have the right to require Franchisee to pay any and all fees as required under the terms of the renewal Franchise Agreement during said extension period.

D.   Franchisee must execute the form of Franchise Agreement and any ancillary agreements that the Company then customarily uses in connection with the granting of Franchises for RE/MAX® real estate brokerage service offices.   In addition, Franchisee shall pay to the Company a fee equal to one-half of the initial franchise fee payable under the Company's standard Franchise Agreement being offered to new franchisees at the time of Franchisee's renewal.  Franchisee further agrees to execute general releases in form satisfactory to the Company, of any and all claims against the Company and its affiliates and their respective officers, directors, employees, agents, successors and assigns.  Failure by Franchisee to execute such agreement and releases and deliver them to the Company for its acceptance and execution within thirty (30) days after delivery thereof to Franchisee shall be deemed an election by Franchisee not to renew the Franchise.

10

E.   Prior to renewal of the Franchise, Franchisee must complete the RE/MAX® Broker/Owner Advanced Education Course ("Advanced Education Course") or, in lieu thereof, have satisfied requirements that the Company or International determines to be equivalent to such course.  The Advanced Education Course may be offered periodically as a separate course during the term of this Agreement.  The Advanced Education Course may be further developed and/or modified by International during the term of this Agreement.  If, during the term of this Agreement, Franchisee has taken and completed all elements of the Advanced Education Course (and/or has completed other educational courses deemed by the Company or International to be equivalent to the Advanced Education Course) and demonstrated to the satisfaction of the Company and International that Franchisee has achieved the requisite level of managerial competence and understanding of the RE/MAX® concept and business methods, this requirement may be waived by the Company.  Franchisee shall pay a training fee to International in connection with participating in the Advanced Education Course.  In addition, Franchisee shall be responsible for all ancillary expenses incurred in attending the Advanced Education Course, including but not limited to, transportation, lodging, meals and related costs.

7.   **Termination.**  This Agreement may only be terminated as provided herein.  Termination shall not relieve Franchisee of any monetary obligations to the Company unless agreed in writing or provided herein.

A.   The Company shall have the right to terminate this Agreement effective upon delivery of notice to Franchisee if:

(i)   Franchisee has not selected and/or the Company (acting diligently) has not approved a location for the Office within ninety (90) days after the effective date;

(ii)   Franchisee fails to open the Office and commence business operations within one hundred eighty (180) days of the execution of this Agreement;

(iii)   Franchisee abandons, surrenders, fails to actively operate or transfers control of the operation of the Office or loses the right to occupy the Office premises;

(iv)   Franchisee fails to attend the first training program conducted by International after the execution of this Agreement or fails to send a designated manager under written contract with Franchisee, which contract shall contain such confidentiality and trade secret provisions as approved by the Company, within thirty (30) days after such manager assumes his or her duties;

(v)   Franchisee or its owners makes an unauthorized assignment of the Franchise or an ownership interest in Franchisee;

(vi)   Franchisee fails to pay when due any of the fees owed to the Company, International, the Sales Advisory Council or the Regional Broker/Owner Council under this Agreement or any other agreement and does not correct such failure within ten (10) days after written notice of such failure is delivered to Franchisee;

(vii)   Franchisee or any of its owners is convicted by a trial court or pleads no contest to a felony or other crime or offense or engages in any activity or practice which is unprofessional, dishonest, unethical, illegal or which otherwise reflects adversely upon or is disruptive to the reputation, public image or good will of the Company, Affiliates, RE/MAX® licensed agents or the System;

(viii)   Franchisee fails to meet and maintain the quotas concerning number of licensed agents as required by Paragraph 10.A, 10.B and 10.C herein;

(ix)   Franchisee becomes insolvent; or a receiver is appointed to take possession of Franchisee's business or property or any part thereof; or Franchisee shall make a general assignment for the benefit of creditors; or a judgment is obtained against Franchisee which remains unsatisfied for a period of more than thirty (30) days after all rights of appeal have been exhausted or waived;

11

(x)    Franchisee, or any entity under which the Franchise may be operated, shall become bankrupt, or shall become subject to any Chapter of the United States Bankruptcy Code, unless Franchisee or such entity shall timely undertake to reaffirm the obligations under this Agreement; timely comply with all conditions as legally may be imposed by the Company upon such an undertaking to reaffirm this Agreement; and timely comply with such other conditions and provide such assurances as may be required under relevant provisions of the United States Bankruptcy Code; provided, however, that the parties acknowledge that the Company has relied to a degree and in a manner material to this Agreement upon the personal promises of Franchisee to participate personally in the management and development of the Franchise, and, consequently, the parties agree that any attempt by any other party, including the trustee in bankruptcy or any third party to assume or to accept an assignment of this Agreement shall be void;

(xi)    Franchisee fails to cure any condition under this Agreement which materially impairs, or may materially impair, the goodwill associated with the RE/MAX trade name, trademarks, service marks, logo types or other commercial symbols within twenty-four (24) hours after Franchisee has received written notice to cure such conditions;

(xii)    Franchisee or any of its owners or anyone affiliated with the Office is determined to be a Terrorist or a Sponsor of Terrorism, or otherwise violates any provision of Section 3.X.;

(xiii)    The real estate license of Franchisee or any of its owners or any manager of the Office is suspended or revoked;

(xiv)    Franchisee fails to maintain required insurance, or fails to ensure that its licensed agents maintain required insurance, and does not correct such failure within ten (10) days after written notice of such failure is delivered to Franchisee;

(xv)    Franchisee fails to timely cure any notice of noncompliance from any federal, state, or local government agency;

(xvi)    Franchisee fails on three (3) or more occasions within any twelve (12) consecutive month period to comply with this Agreement or any standard, operating procedure, policy and guideline, whether or not such failures to comply are corrected after notice is given to you;

(xvii)    Franchisee fails to comply with any other provision of this Agreement or any policy or guideline prescribed by the Company and does not correct such failure within thirty (30) days after written notice of such failure to comply (which shall describe the action that Franchisee must take) is delivered to Franchisee; or

(xviii)    Franchisee (or any owner acting as manager of the Office) fails to transfer his/her interest within six (6) months of his/her death or disability as provided in Section 16 hereof.

B.    Termination of this Agreement by the Company shall not be an exclusive remedy and shall not in any way affect the rights of the Company to receive or collect fees or other amounts payable by Franchisee hereunder, to enforce the provisions of this Agreement against Franchisee, to seek and obtain damages and/or injunctive relief or to pursue any other remedy for breach of this Agreement by Franchisee.

**8.    Rights and Obligations of the Company and Franchisee Upon Expiration or Termination of Agreement**

30561424.4
2005 FRANCHISE AGREEMENT

A.   Franchisee agrees to pay the Company within fifteen (15) days after the effective date of expiration or termination of this Agreement, or such later date that the amounts due to the Company are determined, such continuing franchise fees, service fees, advertising contributions, and all other amounts owed to the Company which are then unpaid.

B.   Upon the expiration or termination of this Agreement, all rights of Franchisee hereunder shall terminate and Franchisee shall within five (5) days of the date of expiration or termination:

(1)   discontinue all use, imitation or duplication of all distinguishing characteristics of the System, including but not limited to, trade names, trademarks, service marks, membership marks, certification marks, copyrights, designs, slogans, logos, names, advertising copy or other printed or physical materials now or hereafter displayed, used or becoming a part of the System; and

(2)   cease and refrain from using in any manner, directly or indirectly, the System or any part thereof and Franchisee shall immediately cease and refrain from holding himself or herself out to the public in any way as a current or former member of the System, Franchisee, Affiliate or operator under the System; and

(3)   make or cause to be made, at his expense, such changes in signs, trade dress, operations, telephone numbers, buildings or other structures so as to distinguish Franchisee and the Office effectively from its former appearance and from other RE/MAX® real estate brokerage service offices and to avoid every possibility of any confusion by the public. Such changes shall include a complete change in the trade name and trade dress from that under which Franchisee conducted his/her business while affiliated with the Company. If Franchisee shall, upon request, fail or omit to make or cause to be made such changes within five (5) days, then the Company shall have the right to enter upon the premises, without liability, and to make, or cause to be made, such changes at the expense of Franchisee which expenses shall be paid by Franchisee upon demand; and

(4)   file the appropriate forms to abandon or withdraw any assumed or fictitious name certificate, or to change the name of his corporation, partnership or affiliate to eliminate any reference to the name "RE/MAX®"; and

(5)   return to the Company all manuals, bulletins, instruction sheets, forms, marks, designs, signs, printed matter and other materials obtained from, or loaned by, the Company or International under and pursuant to this Agreement, together with copies of same that may have been made by Franchisee, or that are in Franchisee's possession, custody or control. If any of the above items are not returned to the Company, Franchisee shall be obligated to pay to the Company an amount not to exceed $2,000 for the cost of replacing such materials; and

(6)   notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use all telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and all classified and other directory listings relating to the office and to authorize transfer of these to the Company or its designee. Franchisee hereby acknowledges that the Company has the sole right to, and interest in, all telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and directory listings relating to any RE/MAX® marks whether or not previously owned or used by Franchisee, and Franchisee hereby authorizes the Company to direct the telephone company and all listing agencies to transfer all telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and directory listings to the Company or its designee. Franchisee further acknowledges that if Franchisee fails to comply with any of the foregoing obligations, the telephone company and all listing agencies may accept a copy of this provision and the Company's direction as evidence of the Company's exclusive rights in the telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and directory listings and its authority to direct any such transfer. Upon execution of this Agreement, Franchisee agrees to execute the form of pre-approved authorization which is attached as Exhibit B directing the telephone company and any listing agencies to transfer all telephone numbers,

licensed agents' direct inside dial numbers, facsimile numbers and directory listings to the Company, upon the occurrence of any such termination or expiration. Franchisee agrees to sign any additional forms of authorization or pre-authorization prescribed by the Company. Franchisee also agrees to provide the Company with its most current telephone bill within five (5) days following expiration or termination of this Agreement; and

(7) refrain from adopting or using in connection with, or in connection with the name of, any subsequent business, any trade name, trademark, service mark, trade dress, slogan or logo of the Company or International, including but not limited to the RE/MAX® red-over-white-over-blue trade dress, the term "RE/MAX®" or any term or trade dress deemed by the Company or International to be confusingly similar to such term or trade dress, or any other term or trade dress which may have the effect of creating confusion or question regarding Franchisee's affiliation with the RE/MAX® organization, including without limitation any name or term with the prefix "RE" or the suffix "MAX". Franchisee further agrees to refrain from the use of the colors red, white and blue in any three-color identity scheme, from the use of the red-over-white-over-blue horizontal bar design, from use of a hot air balloon or a hot air balloon symbol and from the use of the term "above the crowd" or any other three-word phrase beginning with "above" or ending with "crowd"; and

(8) cancel or, at the Company's option, assign to the Company or its designee any electronic address, domain name, URLs or websites which displays any Mark or that identifies Franchisee as associated with the Company or the RE/MAX real estate brokerage service. Upon execution of this Agreement, Franchisee agrees to execute the pre-approved authorization which is attached as Exhibit C directing the assignment and transfer to the Company of all domain names, URL's or websites adopted or associated with the Office. Franchisee agrees to sign any additional forms of authorization or pre-authorization prescribed by the Company; and

(9) in the event Franchisee continues to operate a real estate brokerage office at the premises of the Office, obtain a new Multiple Listing Service identification number. Franchisee understands and agrees that all historical sales data maintained by the Multiple Listing Service while Franchisee operated its RE/MAX Office shall be and remain the property of the Company including, without limitation, for market shares and other reporting purposes.

C.   The termination or expiration of this Agreement shall be without prejudice to the Company's right to enforce any obligations of Franchisee under this Agreement, which obligations shall survive termination or expiration. Further, Franchisee shall at all times, for a period of three (3) years following any termination or expiration of this Agreement, keep the Company advised of Franchisee's current business and residential addresses and telephone numbers as well as the business address and telephone number of Franchisee's employer, if any. Franchisee shall also obtain a three (3) year extended reporting endorsement on Franchisee's errors and omissions insurance and provide the Company with evidence thereof within five (5) days of the date of termination or expiration of this Agreement.

D.   In order to facilitate an orderly and efficient transition and to preserve the goodwill associated with the RE/MAX name and RE/MAX marks in the event of termination or expiration of this Agreement, Franchisee agrees that the Company or any Affiliate shall have the right to contact and communicate personally with any or all of Franchisee's licensed agents if Franchisee elects not to renew (either by notifying the Company of Franchisee's intent not to renew or by failing to timely provide the Company with notice of Franchisee's intentions regarding renewal) or if the Company elects not to renew as herein provided, or, in the case of termination, after a notice of default or termination has been delivered to Franchisee (including during any period of time Franchisee may have to cure any such defaults) for purposes of soliciting and/or discussing with them their options for continued affiliation with the Company and/other RE/MAX offices.

14

(3) Grandfather Status for Certain Existing Agents and Related Fees.

Franchisee shall not be obligated to pay a Service Fee on (or charge a Broker Service Fee to) any "Existing Agents" (i.e., a licensed agent who affiliated with the Office on or before August 1, 2002) who have previously been assigned "Grandfather Status" pursuant to requirements and guidelines established by the Company. All Existing Agents who were assigned Grandfather Status shall retain Grandfather Status for as long as the agent remains with the Office and Franchisee complies with all such requirements and guidelines. If there are extraordinary circumstances which cause a licensed agent to move to the Office from another RE/MAX office, Franchisee may submit a request to the Company to grant that licensed agent Grandfather Status with the Office. The Company may grant or decline such a request in its discretion. For each licensed real estate agent of the Office who has been assigned "Grandfather Status," Franchisee will pay to the Company a monthly fee equal to the greater of: (i) Twenty Five Dollars ($25) or (ii) one-fifth of the amount that Franchisee charged the licensed agent in lieu of the Broker Service Fee whether or not Franchisee actually collects such fee. The Company recommends that, in lieu of the Broker Service Fee, Franchisee charge each licensed agent with Grandfather Status a fee of $125 per month.

D. Transaction Fees.

Franchisee shall pay the Company as a "Transaction Fee" an amount equal to twenty percent (20%) of all revenue, other than the commission-based Broker Service Fee revenue, retained by Franchisee from all closed real estate transactions handled by the Office. Transaction Fees shall be calculated on any and all monies, however characterized, and from whatever source, retained by Franchisee as a result of closed real estate transactions including, without limitation, Franchisee's licensed real estate agents and their customers and clients.

E. Advertising Fees.

Within five (5) days after the end of each calendar month, throughout this Agreement, Franchisee shall deliver to the Company on a monthly basis a fee of Ninety-Five Dollars ($95) by a check payable to the RE/MAX® Franchisees' Advertising Escrow Account for each licensed real estate agent (including Franchisee's Broker/Owner(s) and Manager) Franchisee has under contract, to be used in the Regional Institutional Advertising Fund. The Company shall have the duty to promptly deliver the check to the American Community Bank and Trust, Woodstock, Illinois (or successor escrowee designated by the Company), for deposit into the Escrow Account.

The Company may increase the advertising fee from time to time as it deems in the best interests of the Northern Illinois Region and the System. The Company has the discretion to allocate these funds for maintenance and administration of the fund and the preparation and placement of local or regional advertising materials, programs, public relations and other brand-building activities. The Company may remit a portion of these fees to International, or its designee for national advertising and promotion.

F. Initiation Fee and Annual Dues.

The Company recommends that Franchisee charge each licensed real estate agent an initiation fee.

Franchisee shall pay International annual dues in the amount of Three Hundred Ninety Dollars ($390) for each licensed real estate agent under contract with Franchisee, subject to periodic increase by International. The first payment shall be made to and received by International within five (5) days after the effective date of the licensed real estate agent's affiliation with Franchisee. Successive annual payments will be charged directly to the licensed real estate agent by International and shall be due and payable to International on or before each anniversary of the effective date of the licensed agent's affiliation with Franchisee. Franchisee is ultimately liable for payment of the annual dues.

16

G.   Sales Advisory Council Fee.

On or before October 1 of each calendar year, Franchisee shall pay to the Company an annual contribution to the Sales Advisory Council. Currently, this contribution equals Twenty Four Dollars ($24) for each licensed real estate agent in Franchisee's Office, including the Broker/Owner and/or Manager. Such amount may be increased from time to time by the Sales Advisory Council.

H.   Regional Broker/Owner Council Membership Fee.

Within thirty (30) days of the date of this Agreement, Franchisee shall pay the Company an initial membership fee of One Hundred Fifty Dollars ($150) to join the Council. The Council may impose special assessments upon its members, including Franchisee, but such assessments may be imposed only upon a majority vote of all of the Council's members present at a scheduled meeting.

I.   Technology Compliance Deposit.

Simultaneously with the execution of this Agreement, Franchisee shall deposit with the Company the sum of One Thousand Dollars ($1,000), which sum shall be held by the Company to guaranty compliance with the Company's technology requirements as specified herein. If, within six (6) months from the date of this Agreement, Franchisee provides the Company with proof of compliance, then the Company shall refund the full amount of the compliance deposit to Franchisee. Franchisee shall be considered in compliance with the Company's technology requirements for purposes of receiving a refund if Franchisee provides the Company with timely documentation of the following: (1) Franchisee has acquired and installed computer software and hardware according to the Company's then-current requirements (as specified in the operations manual or elsewhere in writing); (2) Franchisee has equipped the Office with high-speed access to the Internet; (3) Franchisee has established its information on the Website and complied with the Company's guidelines regarding websites; (4) Franchisee has access to RE/MAX Mainstreet; (5) Franchisee has installed all required RSN equipment and has signed an RSN Satellite Network Service Agreement; and (6) Franchisee has an email address for each licensed real estate agent in accordance with the Company's policies. If Franchisee fails to provide proof of compliance to the Company as outlined above within six (6) months from the execution date of this Agreement, then, in addition to all other rights the Company has under this Agreement, Franchisee shall forfeit said deposit to the Company. Nothing in this paragraph shall be construed to limit the Company's right to enforce the computer system and related requirements of this Agreement.

J.   Regional Website Fee.

The Company hereby authorizes Franchisee to charge its licensed real estate agents a fee for the Website. The amount Franchisee charges each licensed agent is referred to herein as a "Website Fee." The Company recommends that the Website Fee that Franchisee charges be thirty dollars ($30) a month per agent. The Company may, from time to time, set a maximum dollar amount that Franchisee may charge its agents as a Website Fee.

Franchisee agrees to pay to the Company a "Regional Website Fee" equal to thirty dollars ($30) a month per licensed agent (for each licensed agent who was associated with the Office during any part of the applicable month). All Regional Website Fees shall be due and payable to the Company at the same time and in the same manner as the Continuing Franchise Fee. Franchisee understands and agrees that Franchisee's failure to charge and collect the Website Fees from its licensed agents does not relieve Franchisee of Franchisee's obligation to remit payments of Regional Website Fees to the Company in a timely manner as herein provided.

K.   Branch Office Fee.

If Franchisee wishes to open a branch office in its Protected Area, Franchisee must (i) obtain the written consent of the Company, (ii) sign a Franchise Agreement and Branch Office Addendum, and (iii) pay a non-refundable fee equal to one-half of the then-current, standard initial franchise fee.

L.   Other Provisions Regarding Fees.

With respect to the fees described in this Paragraph 9:

(i)   Franchisee shall pay a late penalty of twenty percent (20%) of any amounts due which are received after the fifth of each month in which they become due. Franchisee shall pay interest on all amounts due at the rate prescribed in Paragraph 3.N. hereof. Franchisee shall pay all costs of collection, including reasonable attorneys' fees. Notwithstanding the foregoing, Franchisee shall not be assessed a late penalty if payment of all amounts have been properly placed in the mail and receipted via overnight courier on the fourth (4th) day of the month on which the payment is due. All payments (except the Advertising Fee payable to the RE/MAX® Franchisee's Advertising Escrow Account and the annual dues payable to International) shall be payable directly to the Company at 2205 Point Boulevard, Suite 100, Elgin, Illinois 60123, or such other location as the Company shall designate;

(ii)   all fees referred to herein shall be remitted by Franchisee whether or not Franchisee has received payment therefor from the licensed real estate agent(s);

(iii)   the Company shall have the right to increase all fees referred to herein and the amount of such increase will not exceed, whichever is greater: (1) ten percent (10%) of the amount of such fees as of the date of such increase; or (2) the percentage increase in the Consumer Price Index for All Urban Consumers published by the U.S. Department of Labor, Bureau of Labor Statistics, for the one (1) year period preceding the date of such increase in fees. The Company shall have the right to increase such fees only once in any calendar year. The restrictions contained in this Paragraph 9.L.(iii) shall not apply to increases in advertising fees payable under Paragraph 9.E. hereof.

(iv)   In the event that Franchisee defaults in the performance of his/her obligations under this Agreement, Franchisee will pay to the Company, upon demand, the costs and expenses, including reasonable attorneys fees, incurred by the Company as a result of enforcing the provisions of this Agreement.

(v)   If Franchisee fails to make any payments to the Company or International as required under this Agreement, then, in addition to the late charges and interest as set forth above, the Company and International shall have the right to suspend, during such period of delinquency, any and all benefits and services afforded to Franchisee as a RE/MAX franchisee including but not limited to: placement in the printed RE/MAX Referral Roster, the RE/MAX CD Roster and the Website and other websites; subscriptions to the RE/MAX Times and RSN Guide; eligibility for International's performance awards; eligibility to receive referrals from RE/MAX International Relocation Services, Inc. and International's Referral Department; and rights to register, attend or participate in any conventions and conferences organized by the Company or International. Suspension of these or any other benefits shall not be an exclusive remedy and shall not in any way affect the Company's rights to receive or collect all outstanding fees, dues and other amounts Franchisee owes or to terminate this Agreement because of Franchisee's failure to make payments required under this Agreement.

Franchisee agrees that he/she will not, on grounds of alleged non-performance by the Company or by International of any of their obligations hereunder, withhold payment of any fees or other amounts due the Company. All fees paid by Franchisee are, unless otherwise specifically provided for herein, not refundable.

18

10. **Quota.** Franchisee shall have the following numbers of licensed real estate agents in Franchisee's Office:

A.   A minimum of ten (10) licensed real estate agents by the end of the twelfth (12th) month after the effective date of this Agreement and each month thereafter through the twenty-fourth (24th) month after the date of this Agreement.

B.   A minimum of twenty (20) licensed real estate agents by the end of the twenty-fourth (24th) month after the effective date of this Agreement and each month thereafter through the thirty-sixth (36th) month after the date of this Agreement.

C.   A minimum of thirty (30) licensed real estate agents by the end of the thirty-sixth (36th) month after the effective date of this Agreement and each month thereafter through the remainder of the term of this Agreement.

Licensed real estate agents who have been affiliated with the RE/MAX network of real estate offices at anytime during the six (6) month period prior to their affiliation with Franchisee will not be counted towards the satisfaction of Franchisee's quota requirement unless the office at which they were affiliated immediately prior to their affiliation with Franchisee was closed or transferred to Franchisee, or the Company previously counted such licensed real estate agents toward the satisfaction of Franchisee's quota requirement.

Franchisee's failure to meet said quotas constitutes grounds for termination of this Agreement. In the Company's sole discretion, Franchisee may be excused from complying with said quotas upon written approval from the Company. Notwithstanding such approval by the Company, Franchisee shall not be excused from paying continuing franchise fees for the number of licensed real estate agents stipulated in Paragraph 10.A, 10.B and 10.C herein.

11. **Notices.** Any notice required to be given under the provisions of this Agreement shall be given in writing by hand or by registered or certified mail postage prepaid, or Federal Express or other form of bona fide and reputable overnight courier service requiring a signature on delivery, and addressed to the respective individuals as hereinafter set forth following the signatures hereto of the respective parties to this Agreement or to such other address as either party hereto shall designate by such notice. Any such notice shall be effective as of the time it is delivered by hand or deposited in the mails or, in the case of Federal Express or other overnight courier, when deposited with the courier service.

By executing this Agreement, Franchisee authorizes the Company and International to communicate with Franchisee electronically, including via electronic mail and facsimile and, unless a written communication is required, to communicate with Franchisee via telephone, notwithstanding whether any or all of Franchisee's telephone numbers appear on a federal or state Do-Not-Call or similar registry.

12. **Waiver.** No terms of this Agreement shall be held to have been waived by any act or knowledge of either party hereto, its agents or employees, except by instrument in writing duly executed by such party. If at any time either party shall waive its rights, due to any breach of any of the provisions of this Agreement, then such waiver is not to be construed as a continuing waiver of other breaches of same or other provisions of this Agreement.

13. **Legal Construction.** This Agreement shall be governed by and construed in accordance with the statutes, laws and decisions of the State of Illinois whose courts shall have jurisdiction over any actions arising under this Agreement. Should any portion or provision of this Agreement be deemed invalid or void at law, at the option of the Company, this Agreement may be terminated upon notice by the Company, or such provisions may be declared by the Company to be of no force or effect and this Agreement construed as though it had not been inserted herein and the remainder of this Agreement shall remain in full force and effect. Section 41 of the Illinois

19



Franchise Disclosure Act states that "any condition, stipulation, or provision purporting to bind any person acquiring any franchise, to waive compliance with any provision of this Act is void."

**14.  Binding Effect.**  This Agreement and the franchise hereby granted shall inure to the benefit of and be binding upon the Company, its successors and assigns; and upon Franchisee, its successors and assigns, and shall be enforceable within law or equity by specific performance, injunctions or otherwise.  It is hereby agreed and understood that "Franchisee", as the term is used herein, shall mean and refer to the individuals executing this Agreement and the business entity to be formed by such individuals to operate and conduct the franchise granted herein and that both said individuals and entity formed shall perform, be bound by and observe the covenants, conditions and agreements created hereunder.

**15.  Assignment and Transfer.**  This Agreement and the franchise hereby granted shall not be assignable by Franchisee (including an ownership interest in Franchisee), in whole or in part, except as consented to and approved in writing by the Company, which consent and approval shall not be unreasonably withheld and any unauthorized assignment hereof shall be deemed void and grounds for termination of this Agreement by the Company.  Franchisee must deliver to the Company current, accurate financial statements and other documents sufficient to enable the Company to determine and approve or disapprove (in its judgment) the character, credit worthiness, business experience, professional credentials and ethical background of the proposed assignee or transferee.  In addition, all of the following conditions must be met prior to, or concurrently with, the effective date of assignment: (1) Franchisee must pay all amounts owed under this Agreement which are then due and unpaid; (2) Franchisee must submit all reports and statements to the extent that Franchisee has failed to previously submit such reports and statements; (3) Franchisee must return to the Company all operations manuals or materials loaned by the Company or International to Franchisee; (4) Franchisee (and its owners if Franchisee is a corporation, limited liability company or other approved entity) must execute a mutual general release together with the Company, in form satisfactory to the Company, of any and all claims against each other and their respective officers, directors, employees and agents; (5) Franchisee (and its owners if Franchisee is a corporation, limited liability company or other approved entity) must execute a non-competition covenant in favor of the Company and the assignee agreeing that, for a period of two (2) years, commencing on the effective date of the assignment, he/she and they will not have any interest as an owner, partner, director, officer, employee, consultant, representative or agent, or in any other capacity, in any real estate brokerage service business similar to the System that operates within a ten (10) mile radius of the Office; (6) The lease for the Office is assigned to the transferee or a new lease is entered into between the landlord and the transferee for the Office; (7) Franchisee obtains a three (3) year extended reporting period endorsement on Franchisee's errors and omission insurance; and (8) the proposed assignment and transfer shall be reduced to writing and presented to the Company in documents properly drawn and organized, devoid of ambiguities and inconsistencies and otherwise in form sufficient to make the proposed assignment and transfer legally enforceable and free from liability exposure or legal expense exposure to either Franchisee or the Company.  In addition, the assignee shall be required to execute the then current form of franchise agreement used by the Company and shall be required to attend the training program described in Paragraph 3R hereof.  Franchisee shall have no right to grant any subfranchises hereunder and issuance of such subfranchise shall be deemed void and grounds for termination of this Agreement by the Company.

In the event Franchisee desires to do business as a corporation, limited liability company or other approved entity, the Company will give its written consent to do so and to assign this Agreement to such corporation, limited liability company or other approved entity under the following terms and conditions:

(1)  All individuals executing this Agreement shall remain personally liable for the performance of all obligations under this Agreement, irrespective of the formation of the approved entity.

(2)  The approved entity shall be legally authorized to do business in, or be incorporated or organized in, Illinois and shall, at all times, maintain itself in good standing in Illinois.

20



(3)  The approved entity shall not be engaged in any business endeavor whatsoever other than that which is primarily concerned with ownership and operation of a real estate brokerage business as provided in this Agreement.

(4)  The individuals executing this Agreement own or control one hundred percent (100%) of the voting power of and, in the aggregate, one hundred percent (100%) of all ownership interests in the approved entity, and agree to retain such ownership and/or control.

(5)  The articles of incorporation, by-laws, or other organizational documents of the approved entity shall include the following restrictive clause with respect to its stock or other documents evidencing an ownership interest in the approved entity. The following clause shall also be emblazoned as a legend on each stock certificate issued by the approved entity (or other documents evidencing an ownership interest in the approved entity) and shall be a part of any and all other agreements necessary in order to make the restrictions effective:

> "The transfer of an ownership interest in this entity is subject to the terms and conditions of the Franchise Agreement between this entity and Roaring Fork Capital Partners, Inc. dba RE/MAX Northern Illinois. These restrictions prohibit transfer without the prior written approval of Roaring Fork Capital Partners, Inc."

(6)  The capitalization of the approved entity shall have been approved in writing by the Company, and for such purposes, the Company shall have been provided with copies of the approved entity's articles of incorporation or organization, by-laws, organizational meeting minutes, company-stockholder "buy-sell" agreement, and any other relevant documents.

(7)  The name and trade dress of the approved entity shall not contain any words, phrases, clauses, geometric designs or colored bars, etc. which, are the same as, derivatives of, or deceptively or confusingly similar to the trademarks, service marks, trade dress, slogans or trade names of RE/MAX International, Inc., including but not limited to, "RE/MAX Northern Illinois", "RE/MAX International, Inc.", "RE/MAX International", "RE/MAX of America, Inc.", "RE/MAX of America", "RE/MAX, Inc.", "RE/MAX®", "Above the Crowd", "And Still on The Rise", "For All You're Worth", "Tons of Money", "Take A Step Above the Crowd", "When You Get the Facts . . . It's RE/MAX®", "It's the Experience", "The Real Estate Superstars", the commercial symbol of the "RE/MAX® hot air balloon design" colored red-over-white-over-blue, or the red-over-white-over-blue horizontal bar design. Furthermore, the name shall not contain any whimsical, suggestive, coined or arbitrarily spelled words that might conceivably become known service marks or trademarks and that might conceivably detract from or consequently denigrate the distinctiveness of the term "RE/MAX®" or the RE/MAX® marks.

Individuals desiring to do business as a corporation, limited liability company or other approved entity shall submit to the Company in writing a statement including appropriate evidence of compliance with all of the requirements of Section 15 hereof. Written consent to so operate as a corporation, limited liability company or other approved entity shall be promptly given by the Company in the event of compliance with the above requirements. A copy of all organizational documents shall be submitted to the Company upon request. Nothing in this Agreement shall be construed as permitting Franchisee to assign the rights, duties and obligations contained in this Agreement to a corporation, limited liability company or other approved entity without proper assignment.

If this Agreement is assigned to a corporation, limited liability company or other approved entity as herein provided or if the Franchise is operated through a corporation, limited liability company or other approved entity, the Company shall have the right to require that the owners enter into a buy/sell agreement among themselves in a form and containing such terms as the Company prescribes.

If a whole or partial transfer is permitted by the Company, a transfer fee of Two Thousand Dollars ($2,000) plus administrative and legal fees, will be charged. In addition to the Company's other rights and remedies hereunder, upon any unauthorized transfer of ownership in the Franchise, the Company may impose a charge upon



Franchisee in an amount determined by the Company which shall not be greater than Ten Thousand Dollars ($10,000).

This Agreement is fully transferable by the Company and inures to the benefit of any transferee or other legal successors to the Company's interest herein.

**16.  Death or Disability of Franchisee.**

Upon the death or permanent disability of Franchisee (or any owner acting as manager of the Office), the executor, administrator, conservator or other personal representative of such person shall transfer his or her interest to a third party approved by the Company within six (6) months thereof. Such transfer, including without limitation, transfers by devise or inheritance, shall be subject to the same conditions as any lifetime transfer. Failure to so dispose of such interest within said period of time shall constitute a breach of this Agreement. The Company's consent to a transfer of any interest is subject to the restrictions of Paragraph 15 of this Agreement and shall not constitute a waiver of any claims it may have against the assignor nor shall it be deemed a waiver of the Company's right to demand exact compliance with any of the terms or conditions of the Franchise Agreement by the assignee.

Upon the death or permanent disability of Franchisee (or any owner acting as manager of the Office), the executor, administrator, conservator or other personal representative of such person, shall appoint a competent manager within a reasonable time, not to exceed thirty (30) days from the date of death or permanent disability. The appointment of such manager shall be subject to the Company's prior written approval, and such manager shall, if requested by the Company, attend and satisfactorily complete a training program. If the office is not being managed by a Company-approved manager within thirty (30) days after the date of death or permanent disability, the Company may, but shall not be required to, appoint a manager to maintain the operations of the Office for and on behalf of said person's estate until an approved assignee shall be able to assume the management and operations of the Office. The Company's appointment of a manager for the office shall not relieve Franchisee of his/her obligations under this Agreement, and the Company shall not be liable for any debts, losses, costs or expenses incurred in the operation of the Office or to any creditor of Franchisee for any products, materials, supplies or services purchased by the Office during any period of time in which it is managed by the Company-appointed manager. The Company shall have the right to charge a reasonable fee for such management services and to cease providing such management services at any time.

**17.  The Company's Right of First Refusal.** If Franchisee or its owner(s) shall at any time determine to sell the Franchise, the Office, any interest in the Franchise or an ownership interest in Franchisee, Franchisee or its owner(s) shall obtain a bona fide, executed written offer from a responsible and fully disclosed purchaser and shall submit an exact copy of such offer to the Company which shall, for a period of thirty (30) days from the date of delivery of such offer, have the right, exercisable by written notice to Franchisee or its owner(s), to purchase the Franchise, the Office or an interest therein or ownership interest in Franchisee for the price and on the terms and conditions contained in such offer; provided, that the Company may substitute cash for any form of payment proposed in such offer and shall have not less than thirty (30) days to prepare for closing. If the Company does not exercise its right of first refusal, Franchisee or its owner(s) may complete the sale to such purchaser pursuant to and on the terms of such offer, subject to the Company's approval of the purchaser as provided herein, which approval shall not be unreasonably withheld. If the sale to such purchaser is not completed within one hundred twenty (120) days after delivery of such offer to the Company or there is a material change in the terms of the sale, the Company shall again have the right of first refusal herein provided.

**18.  Covenant Not to Compete.** Franchisee agrees that, upon termination or expiration of this Agreement, for a period of two (2) years commencing on the effective date of such termination or expiration, neither Franchisee nor his or her spouse (nor its owners or their spouses, if Franchisee is a corporation, limited liability company or other approved entity) will have any interest as an owner, partner, director, officer, employee, consultant, representative or agent or in any other capacity, in any real estate brokerage service business similar to the RE/MAX System or

22

to offices operated under the System (except as permitted under any other RE/MAX® franchise agreement or as a licensed agent of a RE/MAX® real estate brokerage service office) that operates at or within a ten (10) mile radius of the Office.

**19. Agreement and Amendments.** This Agreement is the exclusive and entire agreement between the parties and supersedes any previous agreements or understandings between the parties. This Agreement may not be amended, changed, revised or altered, except by an instrument in writing signed by the parties.

**20. Arbitration.** The Company shall have the right to enforce by judicial process the obligations of Franchisee under Paragraphs 3.O., 8 and 18 of this Agreement. The prevailing party in any such legal proceeding, or in any proceeding seeking temporary or preliminary relief to enforce the provisions of Paragraphs 3.O., 8 or 18 hereof or any other provisions hereof, shall be entitled to its costs and expenses, including reasonable attorney's fees. Except insofar as the Company elects to enforce this Agreement by judicial process as herein provided, any controversy, claim or dispute arising out of or relating to this Agreement or any breach thereof, or the relationship of the parties, shall be submitted for arbitration to the Chicago office of the American Arbitration Association on demand of either party. Such arbitration proceeding will be conducted in Chicago, Illinois by a panel of one (1) arbitrator in accordance with the then current commercial arbitration rules of the American Arbitration Association. The award and decision of the arbitrator shall be conclusive and binding upon all parties thereto and judgment upon the award may be entered in any court having jurisdiction thereof. The prevailing party in any such arbitration proceeding shall be entitled to recover the costs of arbitration and the costs of enforcing the award and decision of the arbitrator, including, without limitation, filing fees, court costs, attorneys' fees, expert witness fees and arbitrators' fees. The Company and Franchisee agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between the Company (and its shareholders, officers, directors, agents, and/or employees) and Franchisee (and/or Franchisee's owners, guarantors, affiliates, and/or employees) may not be consolidated with any other arbitration proceeding between the Company and any other person.

**21. Limitation on Claims.** Except for claims arising from amounts owed by Franchisee to the Company or otherwise due under this Agreement, any and all claims arising out of or relating to this Agreement or the relationship between the parties hereto shall be barred unless a judicial or arbitration proceeding is commenced within one (1) year from the date Franchisee or the Company knew of the facts giving rise to such claim or claims.

**22. Acknowledgments.** Franchisee acknowledges that he/she has read this Agreement and the Company's Franchise Offering Circular, and he/she understands and accepts the terms, conditions and covenants contained in this Agreement as being reasonably necessary to maintain the Company's high standards of quality and service and the uniformity of those standards at each RE/MAX® real estate brokerage service office and thereby to protect and preserve the goodwill of the RE/MAX® name and marks. Franchisee expressly acknowledges and understands that the success of Franchisee in owning and operating a RE/MAX® real estate brokerage service office is speculative and will depend on many factors including, to a large extent, the independent business ability and personal efforts of Franchisee and its owners who are responsible for, and intend to devote their full time and efforts to, the management and development of the Office.

Franchisee represents to the Company, as an inducement to its entering into this Agreement, that all statements in Franchisee's application for the Franchise are accurate and complete and that Franchisee has made no misrepresentations or material omissions in obtaining the Franchise. The Company has approved Franchisee's application in reliance upon all of Franchisee's representations.

23

**23. Additional Information Regarding Franchisee.** The address where Franchisee's financial and other records are maintained is:

6000 S. Pulaski, Chicago, Illinois  60629

The broker of record for the Office is:  Walter M. Zubricki.

The manager of the Office is:  Walter M. Zubricki.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

ROARING FORK CAPITAL PARTNERS, INC.:
D/B/A RE/MAX NORTHERN ILLINOIS

FRANCHISEE:

By: _____
    James M. Merrion, Regional Director

By: _____
    Walter M. Zubricki

Execution Date: _____6/28/05_____

Execution Date: _____6-28-2005_____

24

# GUARANTY

For value received, in consideration for and as an inducement for the Company to enter into the above Franchise Agreement with Franchisee, the undersigned personally guarantees to the Company, its successors and assigns the full performance and observance of all of the covenants, conditions and agreements, therein provided (including the non-competition, transfer and arbitration requirements) to be performed and observed by Franchisee and the undersigned, individually, as an original party thereto. The undersigned further covenants and agrees that this personal guaranty shall remain and continue in full force and effect as to any renewal, modification or extension of this Franchise Agreement. The undersigned agree(s) that the undersigned's liability under this Guaranty shall be direct and immediate, joint and several, and shall not be contingent upon pursuit by the Company of any other remedies against Franchisee or any other person.

_____
Walter M. Zubricki

Execution Date: _____

**Exhibit A**
**To Franchise Agreement**

The Protected Area is that geographic location described by the boundary markings delineated by a solid line enclosing the territory.  In the event said boundary is a street or roadway, the territory extends to the center of that street.

RE/MAX Home Center



ACCEPTED AND AGREED TO this 2nd day of July, 2005

ROARING FORK CAPITAL PARTNERS, INC.:
D/B/A RE/MAX NORTHERN ILLINOIS

By: _____
    James M. Merrion, Regional Director

FRANCHISEE:

By: _____
    Walter M. Zubricki

6-28-2005

A-1

**Exhibit B**
**To Franchise Agreement**

**FORM LETTER ASSIGNING TELEPHONE NUMBER**

_____, 20_____

_____

_____

_____

To Whom It May Concern:

Walter M. Zubricki ("Individual") and RE/MAX Home Center ("Franchisee") release, assign, transfer and convey to Roaring Fork Capital Partners, Inc. d/b/a RE/MAX Northern Illinois ("RE/MAX"), all rights, title and interest, if any, which they have, either jointly or individually, in telephone number (773) 735-6000.   Individual and Franchisee authorize the telephone company to transfer, assign and convey telephone number (773) 735-6000 to RE/MAX, effective immediately.  Individual and Franchisee appoint RE/MAX as their true and lawful attorney-in-fact to direct the telephone company to transfer, assign and convey telephone number (773) 735-6000 to RE/MAX and to execute such documents and take such actions, if any, as may be necessary to effectuate the transfer, assignment and conveyance of said telephone number.

_____
Walter M. Zubricki, Individual

6-28-2005

Center Holding Company

By:_____
Walter M. Zubricki, President

6-28-2005

A-1

**Exhibit C**
**To Franchise Agreement**

**FORM LETTER ASSIGNING DOMAIN NAMES, URLS AND WEBSITES**

_____, 20____

_____
_____
_____

To Whom It May Concern:

Walter M. Zubricki ("Individual") and RE/MAX Home Center ("Franchisee") release, assign, transfer and convey to Roaring Fork Capital Partners, Inc. d/b/a RE/MAX Northern Illinois ("RE/MAX"), all rights, title and interest, if any, which they have, either jointly or individually, in all domain names, URLs and websites adopted or associated with the Office. Individual and Franchisee authorize the domain name registrar or other appropriate authority to transfer, assign and convey all such domain names, URLs and websites to RE/MAX, effective immediately. Individual and Franchisee appoint RE/MAX as their true and lawful attorney-in-fact to direct the domain name registrar or other appropriate authority to transfer, assign and convey all such domain names, URLs and websites to RE/MAX and to execute such documents and take such actions, if any, as may be necessary to effectuate the transfer, assignment and conveyance of all such domain names, URLs and websites.

_____
Walter M. Zubricki, Individual

6-28-2005

Center Holding Company

By: _____
    Walter M. Zubricki, President

6-28-2005

B-1

30561424.4
2005 FRANCHISE AGREEMENT

**DEPOSITOR SIGNATURE PAGE**

**RE/MAX FRANCHISEES ADVERTISING ESCROW ACCOUNT AGREEMENT**

RE/MAX Home Center
6000 S. Pulaski
Chicago, IL  60629

BY: _____
    Walter M. Zubricki

Executed _____6-28-2005_____

## ESCROW AGREEMENT

**THIS ESCROW AGREMENT is** entered into on March 31, 2005 by and between American Community Bank and Trust (hereinafter referred to as "Escrow Agent") and the Franchisees of ROARING FORK CAPITAL PARTNERS, INC. doing business as **RE/MAX NORTHERN ILLINOIS**, a Colorado Corporation ("RE/MAX"), each of whom is named on a separate signature page appearing at the end of this Agreement (hereinafter singularly referred to as "Depositor").

## RECITALS

**WHEREAS,** Each Depositor is a franchisee of RE/MAX under a franchise agreement (hereinafter referred to as "Franchise Agreement").

**WHEREAS** The Franchise Agreement provides for an advertising fee (hereinafter referred to as "Advertising Fee") to be paid to an Escrow Account known as the RE/MAX Franchisees' Advertising Escrow Account, (hereinafter referred to as "Escrow Account").

**WHEREAS** The Advertising Fee is used to pay for the cooperative advertising for all the Depositors.

**WHEREAS** This purpose of the Escrow Account is to facilitate the receipt and disbursement of the Advertising Fees and is not for the benefit of those persons who are payees of the funds in the Escrow Account.

**NOW, THEREFORE,** the parties agree as follows:

1. **Deposits.**
   The Escrow Agent shall accept for deposit into the Escrow Account checks representing the Advertising Fees from the Depositors. The Escrow Account shall be non-interest bearing. A request shall be made of the Internal Revenue Service for a tax identification number for the Escrow Account.

2. **Disbursements.**
   The Escrow Agent shall from time to time disburse all or part of the funds in the Escrow Account pursuant to the written instructions of RE/MAX.

3. **Account Records.**
   The Escrow Agent shall furnish copies of all Escrow Account cancelled checks and bank statements to RE/MAX on a monthly basis.

4. **Change in Depositors.**
   Depositors may be added and deleted from this Agreement from time to time.

5. **Indemnification of Escrow Agent.**
   The Escrow Agent shall have the right to indemnify itself from the funds in the Escrow Account from attorney's fees incurred in connection with this Agreement, all claims, demands, and suits brought against it and arising out of its actions or failure to act hereunder, except for its negligence.

6. **No Third Party Beneficiaries.**
   In no event shall any third party be a third-party beneficiary of this Agreement.

Initials

7. **Owners of Escrow Funds.**
All funds in the Escrow Account, until disbursed pursuant to Paragraph 2 of this Agreement, shall be the property of the Depositors.

8. **Disposition on Termination.**
Upon termination of this Escrow Account, the balance in the Escrow Account shall be disbursed as instructed by RE/MAX in writing.

9. **No Fee.**
The Escrow Agent shall receive no fee for performing its duties hereunder.

10. **Termination.**
The Agreement may be terminated by the Escrow Agent giving thirty (30) days notice to the Depositors and by RE/MAX on behalf of the Depositors, giving thirty (30) days notice to the Escrow Agent.

11. **Notice.**
All notices shall be in writing and shall be served on the parties at the addresses stated below. The mailing of a notice by registered or certified mail, return receipt requested, shall be effective notice as of the date of mailing.

If to Escrow Agent:
Ms. Charie Zanck, Chief Executive Officer
American Community Bank and Trust
1290 Lake Avenue
P.O. Box 1720
Woodstock, IL 60098

If to Depositor:
c/o RE/MAX Northern Illinois
2205 Point Boulevard, Suite 100
Elgin, IL 60123

12. **Binding Effect.**
This Agreement is binding upon and insures to the benefit of Escrow Agent and Depositors, there successors, assigns, heirs, administrators and representatives.

13. **Governing Law.**
This Agreement shall be construed under and governed by the laws of the State of Illinois.

14. **Singular and Plural.**
The plural shall include the singular, and the singular the plural, as the context requires.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement the day and year first above written.

Roaring Fork Capital Partners, Inc.                    American Community Bank and Trust
d/b/a RE/MAX Northern Illinois


By: _____          By: _____
James M. Merrion, Regional Director          Charie Zanck, Chief Executive Officer

Initials

ADDENDUM TO FRANCHISE AGREEMENT dated July 2, 2005
by and between ROARING FORK CAPITAL PARTNERS, INC.
doing business as RE/MAX NORTHERN ILLINOIS (the "Company")
and Walter M. Zubricki
doing business as RE/MAX Home Center (the "Franchisee")
(hereinafter referred to as the "Franchise Agreement")

This Addendum is being executed to amend and/or clarify certain terms and conditions of the Franchise Agreement applicable to the renewal of Franchisee's franchise as follows:

1.    Paragraph 3E of the Franchise Agreement (regarding signage) is hereby amended to read as follows:

"E.  Franchisee will maintain the previously approved exterior sign at the Office premises during the term of this Agreement."

2.    Paragraph 3S of the Franchise Agreement (regarding Office opening) is hereby amended to read as follows:

"S.  Franchisee agrees that the Office shall continue to be open and operating with a minimum of 1200 square feet of office space, and it shall be equipped with furniture, phones and office equipment and staffed by a broker of record and a full-time secretary."

3.    Paragraph 3T of the Franchise Agreement (regarding training) is hereby amended to read as follows:

"T.  All managers or other responsible brokers appointed by Franchisee shall be under written contract with Franchisee, which contract shall contain such confidentiality and trade secret provisions as approved by the Company. All managers or other responsible brokers appointed by Franchisee must attend the training program conducted by RE/MAX International, Inc. within thirty (30) days of their appointment.  The Company retains the right to require that Franchisee's manager or other responsible broker attend refresher training courses."

4.    Paragraph 6A of the Franchise Agreement (regarding the term of the agreement) is amended to read as follows:

"A.  The effective date of the Franchise Agreement shall be July 2, 2005.  The expiration date of the Franchise Agreement shall be July 1, 2010."

5.    Paragraphs 7A (i) and (ii) of the Franchise Agreement (regarding failure to select a location and open the Office) are hereby deleted in their entirety.

6.    Paragraph 7A (iv) of the Franchise Agreement (regarding the Company's right to terminate the Franchise Agreement) is hereby amended to read as follows:

"(iv)  Franchisee fails to send a designated manager under written contract with Franchisee, which contract shall contain such confidentiality and trade secret provisions as approved by the Company, to the training program conducted by RE/MAX International, Inc. within thirty (30) days after such manager assumes his or her duties;"

7.    Paragraph 9A of the Franchise Agreement (entitled "Initial Franchise Fee") is re-captioned "Fee Due Upon Signing This Agreement", and is hereby amended to read as follows:

"A. **Fee Due Upon Signing This Agreement.** Because this Agreement is being executed upon a renewal of an expiring franchise agreement, Franchisee is not required to pay the standard initial fee upon signing this Agreement. However, Franchisee shall pay (in cash or cashier's check) a renewal fee upon signing this Agreement in the amount of $10,500.00. No rights or privileges under this Agreement shall exist until the renewal fee is paid. The renewal fee payment shall become the sole property of the Company upon payment and it shall not be refunded in any event."

8.    Paragraph 9B of the Franchise Agreement (entitled "Continuing Franchise Fee") is hereby amended to read as follows:

"B. **Continuing Franchise Fee.**

Within five (5) days after the end of each calendar month, throughout this Agreement, Franchisee shall pay the Company as a continuing franchise fee for this franchise, an amount equal to $110 for each licensed real estate agent under contract by or representing Franchisee during any part of the preceding calendar month (prorated) or one-fifth (1/5) of the monthly management fee charged to each licensed real estate agent under contract by or representing Franchisee during any part of the preceding calendar month (prorated), whichever is higher. Franchisee shall charge each licensed real estate agent a monthly management fee, which the Company currently suggests, but does not require, be in the amount of $550. The management fee represents compensation for the Franchisee's time in managing the office as well as the Franchisee's return on investment that the Franchisee makes to establish the Office. Notwithstanding the number of licensed real estate agents in Franchisee's Office, Franchisee shall pay to the Company a minimum continuing franchise fees as follows:

(i)    for the first (1st) to the twelfth (12th) months after the effective date of this Agreement, the minimum continuing franchise fee shall be four thousand four hundred dollars ($4,400.00) per month;

(ii)    For the thirteenth (13th) to the twenty-fourth (24th) months after the effective date of this Agreement, the minimum continuing franchise fee shall be five thousand five hundred dollars ($5,500.00) per month; and

(iii)    By the end of the twenty-fourth (24th) month after the effective date of this Agreement and each month thereafter during the term of the Agreement, the minimum continuing franchise fee shall be six thousand six hundred dollars ($6,600.00) per month.

The continuing franchise fees described in this paragraph represent an increase in the continuing franchise fees paid by the Franchisee during the prior franchise term.

9.    Paragraph 9H of the Franchise Agreement (regarding initial membership fee in Broker/Owner Council) is amended to read as follows:

The Council may impose special assessments upon its members, including Franchisee, but such assessments may be imposed only upon a majority vote of all of the Council's members present at a scheduled meeting.

10.    The following sentence is added to the end of Paragraph 9I of the Franchise Agreement (entitled "Technology Compliance Deposit"):

~3/2004 Renewal Addendum
CHGO1:30424797.v4

2

"The Company shall waive the technology compliance deposit if Franchisee can demonstrate compliance with the Company's technology requirements prior to renewal."

11. Paragraph 10 of the Franchise Agreement is hereby amended to read as follows:

"10. Quota. Franchisee shall have the following numbers of licensed real estate agents in Franchisee's Office:

   A. A minimum of forty (40) licensed real estate agents as of the effective date of the Agreement and each month thereafter through the twelfth (12th) month after the effective date of this Agreement; and

   B. A minimum of fifty (50) licensed real estate agents by the end of the twelfth(12th) month after the effective date of this Agreement and each month thereafter through the twenty-fourth (24th) month after the date of this Agreement; and

   C. A minimum of sixty (60) licensed real estate agents by the end of the twenty-fourth (24th) month after the effective date of this Agreement and each month thereafter through the remainder of the term of this Agreement.

Licensed real estate agents who have been affiliated with the RE/MAX network of real estate offices at anytime during the 6 month period prior to their affiliation with Franchisee will not be counted towards the satisfaction of Franchisee's quota requirement unless the office at which they were affiliated immediately prior to their affiliation with Franchisee was closed or transferred to Franchisee, or the Company previously counted such licensed real estate agents toward the satisfaction of Franchisee's quota requirement.

Franchisee's failure to meet said quotas constitutes grounds for termination of this Agreement. In the Company's sole discretion, Franchisee may be excused from complying with said quotas upon written approval from the Company. Notwithstanding such approval by the Company, Franchisee shall not be excused from paying continuing franchise fees for the number of licensed real estate agents stipulated herein."

13.    In the event the terms of this Addendum conflict with the terms of the Franchise Agreement, the terms set forth herein shall govern.

~3/2004 Renewal Addendum
CHGO1:30424797.v4

3

IN WITNESS WHEREOF, the parties have executed this Addendum.

ROARING FORK CAPITAL PARTNERS, INC.
D/B/A RE/MAX NORTHERN ILLINOIS

By: _____
    James M. Merrion, Regional Director

FRANCHISEE:

By: _____
    Walter M. Zubricki

Execution Date: _____6/28/05_____

Execution Date: _____6-78-2005_____

ASSIGNMENT TO CORPORATION AGREEMENT

THIS AGREEMENT is made and entered into this 2<u>nd</u> <u>day of July, 2005</u> by and among Roaring Fork Capital Partners, Inc., a Colorado corporation ("RE/MAX") doing business as **RE/MAX Northern Illinois**, <u>Center Holding Company</u>, an Illinois corporation (the "Company") and <u>Walter M. Zubricki</u>, who constitutes the sole shareholder of the Company (the "Shareholder").

W I T N E S S E T H:

WHEREAS, the Shareholder as Franchisee and RE/MAX as Franchisor entered into a franchise agreement dated <u>July 2, 2005</u> (the "Franchise Agreement"), the terms and conditions of which are incorporated herein by this reference, for the operation of a RE/MAX real estate business(s) located at:

<u>6000 S. Pulaski, Chicago, Illinois  60629</u>

WHEREAS, the Shareholder wishes to assign all of the right, title and interest in, to and under the Franchise Agreement to the Company, all in accordance with the provisions of the Franchise Agreement;

WHEREAS, the Shareholder, in order to induce RE/MAX's consent to such assignment of the Franchise Agreement, is willing to guarantee the Company's performance under the Franchise Agreement and to remain personally bound by certain provisions of the Franchise Agreement; and

WHEREAS, the Shareholder owns all of the issued and outstanding shares of capital stock of the Company as follows:

| <u>Shareholder</u> | <u>Percentage Ownership</u> |
|---|---|
| Walter M. Zubricki | 100% |

NOW, THEREFORE, in consideration of their mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged:

1.      <u>Recitals</u>.  The parties hereto agree that the recitals hereof are hereby incorporated as agreements and understandings.

2.      <u>Assignment</u>.  As of the date hereof, the Shareholder hereby assigns to the Company all of the right, title and interest in, to and under the Franchise Agreement.

3.      <u>Acceptance and Assumption</u>.  The Company hereby accepts the assignment by the Shareholder of all of the right, title and interest in, to and under the Franchise Agreement, and further hereby assumes all the liabilities, agreements, commitments, duties and obligations of the Shareholder under the Franchise Agreement and, further, agrees to faithfully perform, observe and fulfill all of the

~3/2004 Assignment
CHGO1:30414873.v3 |4/8/05

1

**Exhibit B**

agreements, commitments, duties and obligations of the Shareholder under the Franchise Agreement on and after the date hereof with the same force and effect as if the Franchise Agreements were originally written with the Company as Franchisee.

4.    Representations and Warranties. The Shareholder and the Company hereby represent and warrant that the Shareholder owns all of the issued and outstanding shares of capital stock of the Company as set forth in the recitals above. The Shareholder and the Company hereby represent and warrant that the Articles of Incorporation, By-Laws and other organizational documents of the Company shall recite that the issuance and transfer of any interest in the Company is restricted by the terms of the Franchise Agreement and all issued and outstanding stock certificates of the Company shall bear the following legend: "The transfer of this stock is subject to the terms and conditions of the Franchise Agreement between this corporation and Roaring Fork Capital Partners, Inc. dba RE/MAX Northern Illinois. These restrictions prohibit transfer without the prior written approval of Roaring Fork Capital Partners, Inc." The Shareholder and the Company shall submit copies of all corporate documents to RE/MAX upon request. The Shareholder and the Company hereby represent and warrant that the Company shall not conduct or operate any business other than the business required to be conducted pursuant to the Franchise Agreement, without the prior written approval of RE/MAX.

5.    Personal Guarantee of Shareholder. The Shareholder hereby:

(a)    Guarantees absolutely and unconditionally at all times the prompt and full payment of all monies due under the Franchise Agreement, and the prompt and full performance of all of the obligations of the Company under the Franchise Agreement, all regardless of the ability, or inability, of the Company to pay monies due under, or to perform the obligations contained in, the Franchise Agreement;

(b)    Agrees to pay all costs, expenses and reasonable attorneys' fees paid or incurred by RE/MAX or by its successors or assigns, in prosecuting any suit against the Company or against the Shareholder, or in enforcing any rights under the Franchise Agreement or this Agreement, except as may otherwise be specifically provided by the Franchise Agreement;

(c)    Waives presentment, demand, notice of any default and all other notices, protests and notice of protest with respect to the Company's failure to perform under the Franchise Agreement;

(d)    Waives any right the Shareholder may have to require that an action be brought against the Company or any other person as a condition of liability;

(e)    Waives all rights to payments and claims for reimbursement or subrogation which any of the Shareholder may have against the Company arising as a result of the Shareholder's execution of and performance under this Agreement;

(f)    Agrees that:

(i)    Any extension or extensions of time of payment of any sum payable under the Franchise Agreement, or of the time for performance of any obligation of the Company under the Franchise Agreement,

(ii)    Any indulgence or indulgences in any payment required of the Company under the Franchise Agreement or in the performance of any obligation of the Company under the Franchise Agreement, or

(iii)    Any failure or failures or omission or omissions to enforce any rights against the Company under the Franchise Agreement or to exercise diligence with respect to the enforcement of any such rights, shall not in any way or manner release, discharge, affect or impair the liabilities and obligations of Shareholder, and that, except as otherwise herein provided, the liabilities and obligations of

Shareholder under this guarantee shall be released and discharged only upon and by the prompt performance of all obligations under the Franchise Agreement and the prompt and full payment of monies due under the Franchise Agreement, together with all costs, expenses and reasonable attorneys' fees incurred in enforcing the obligations under the Franchise Agreement or in collecting monies due thereunder or in prosecuting any suit in connection therewith or in enforcing this guarantee.

(g)     Agrees that it shall not be necessary to pursue any remedy of any kind whatsoever against the Company under the Franchise Agreement, or under any other guarantee or other instrument as a prerequisite to enforcing the obligations of Shareholder under this guarantee;

(h)     Agrees that RE/MAX may, without notice to anyone, sell or assign any or all of the Franchise Agreement, or any part thereof, and in such event and to the extent of such assignment, this guarantee shall inure to the benefit of each and every immediate or remote assignee or holder of the Franchise Agreement, as fully as if herein specifically named; and

(I)     Agrees that this guarantee shall be binding upon Shareholder and upon the respective successors and assigns.

6.     Covenants of Shareholder.  The Shareholder does hereby agree to be personally bound by the terms and conditions of the Franchise Agreement, including without limitation, the confidentiality and in-term and post-term covenants not to compete contained therein.

7.     Consent.  RE/MAX hereby consents to the assignment and assumption of the Franchise Agreement, all in reliance on the representations, agreements, covenants and warranties of the Company and Shareholder set forth above.

8.     Breach of Franchise Agreement.  The parties agree that a violation by the Shareholder or the Company of any of the terms and conditions of this Agreement shall constitute a violation of the Franchise Agreement entitling RE/MAX to all remedies thereunder.

9.     Governing Law.  This Agreement shall be governed by the laws of the State of Illinois.

10.     Successors and Assigns.  This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their heirs, executors, administrators, successors and assigns.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed.

ROARING FORK CAPITAL PARTNERS, INC.
d/b/a RE/MAX NORTHERN ILLINOIS
   a Colorado corporation

By: _____
    James M. Merrion, Regional Director

CENTER HOLDING COMPANY
an Illinois corporation

By: _____
    Walter M. Zubricki, President

ATTEST:

_____
Walter M. Zubricki, Secretary

_____
Walter M. Zubricki, Individually

Execution Date: _____6/28/05_____

Execution Date: __6-28-2005__

## Amendment to Franchise Agreement
### (To Reduce Quota)

This Amendment (the "Amendment") is made and entered into the 2nd day of July, 2007 by and between ROARING FORK CAPITAL PARTNERS, INC. d/b/a RE/MAX Northern Illinois, a Colorado corporation (hereinafter "**Company**"); Center Holding Company d/b/a RE/MAX Home Center, an Illinois corporation (hereinafter "**Franchisee**"); and Walter M. Zubricki, who constitutes all of the shareholders of Franchisee (hereinafter "**Guarantor**").

**WHEREAS**, Company and Franchisee (as successor to the interests of the Guarantor) are parties to a certain Franchise Agreement dated July 2, 2005 (the "Franchise Agreement") for the operation of a RE/MAX real estate brokerage service office at 6000 S. Pulaski, Chicago, Illinois 60629 (the "**Office**").

**WHEREAS**, Franchisee and Company have agreed to amend the Franchise Agreement to reduce the required number of licensed real estate agents in the Office.

**NOW THEREFORE**, the parties agree as follows:

1.      Paragraph 9B of the Franchise Agreement entitled **Continuing Franchise Fee** (and all previous amendments thereto) is hereby deleted and replaced with the following:

"B.  **Continuing Franchise Fee.**

Within five (5) days after the end of each calendar month, throughout this Agreement, Franchisee shall pay the Company as a continuing franchise fee for this franchise, an amount equal to $110 for each licensed real estate agent under contract by or representing Franchisee during any part of the preceding calendar month (prorated) or one-fifth (1/5) of the monthly management fee charged to each licensed real estate agent under contract by or representing Franchisee during any part of the preceding calendar month (prorated), whichever is higher. Franchisee shall charge each licensed real estate agent a monthly management fee, which the Company currently suggests, but does not require, be in the amount of $550. The management fee represents compensation for the Franchisee's time in managing the office as well as the Franchisee's return on investment that the Franchisee makes to establish the Office. Notwithstanding the number of licensed real estate agents in Franchisee's Office, Franchisee shall pay to the Company a minimum continuing franchise fees as follows:

(i)     The minimum continuing franchise fee shall be <u>four thousand two hundred ninety dollars</u> ($4,290.00) per month beginning July 2, 2007 and each month thereafter through July 2, 2009, at which time the minimum continuing franchise fee will be adjusted in accordance with any adjustments to the Quota as provided in Paragraph 2 of this Amendment.

2.      Section 10 of the Franchise Agreement entitled **Quota** (and all previous amendments thereto) is hereby deleted and replaced with the following:

10.     **Quota.** Franchisee shall have a minimum of thirty-nine (39) licensed real estate agents in Franchisee's Office beginning July 2, 2007 and each month thereafter through July 2, 2009, at which time Quota for the Office will be reassessed and, if appropriate, adjusted by the Company, in its sole discretion, for the remainder of the term of the Agreement.

Licensed real estate agents who have been affiliated with the RE/MAX network of real estate offices at anytime during the six (6) month period prior to their affiliation with Franchisee will not be counted towards the satisfaction of Franchisee's quota requirement unless the office at which they were affiliated

**Exhibit C**                                            1

immediately prior to their affiliation with Franchisee was closed or transferred to Franchisee, or the Company previously counted such licensed real estate agents toward the satisfaction of Franchisee's quota requirement.

Franchisee's failure to meet said quotas constitutes grounds for termination of this Agreement. In the Company's sole discretion, Franchisee may be excused from complying with said quotas upon written approval from the Company. Notwithstanding such approval by the Company, Franchisee shall not be excused from paying continuing franchise fees for the number of licensed real estate agents stipulated above.

3.     The provisions of this Amendment shall amend and control the terms of the Franchise Agreement to the extent that they conflict, and shall supplement the Franchise Agreement with regard to new matters. The remainder of the terms and conditions of the Franchise Agreement shall be in full force and effect and shall continue to govern the relationship of the parties with regard to the subject matter thereof.


IN WITNESS WHEREOF, the undersigned have caused this Amendment to be duly executed.

ROARING FORK CAPITAL PARTNERS, INC.     CENTER HOLDING COMPANY,
D/B/A RE/MAX NORTHERN ILLINOIS          D/B/A RE/MAX HOME CENTER


_____         _____
James M. Merrion, Regional Director      Walter M. Zubricki, its President

                                        GUARANTORS:


                                        _____
                                        Walter M. Zubricki



*Rescinded 1/29/08*

January 17, 2008                          **SENT VIA FED EX OVERNIGHT DELIVERY**

Walter Zubricki
RE/MAX Home Center
6000 S. Pulaski
Chicago, IL  60629

### RE: 10 DAY NOTICE OF DEFAULT - RE/MAX HOME CENTER (23-305)

Dear Walter:

This letter is in reference to the franchise agreement that you entered into with RE/MAX Northern Illinois (hereinafter the "Company") on July 2, 2005 for the operation of a real estate brokerage office doing business as RE/MAX Home Center.   In reference thereto, you are hereby notified that you are in default under said Franchise Agreement by reason of your failure to pay fees and other charges due for the months of October, November and December as follows:

1.  You have failed to pay Continuing Franchise Fees (Management Fees) as required by Paragraph 9B of the Franchise Agreement.   The past due amount for Continuing Franchise Fees (Management Fees) is $2,970.00.
2.  You have failed to pay Advertising Fees as required by Paragraph 9E of the Franchise Agreement.  The past due amount for Advertising Fees is $1,817.68.
3.  You have failed to pay Website Fees as required by Paragraph 9J of the Franchise Agreement.  The past due amount for Website Fees is $604.00.

As stated in Paragraph 9L of the Franchise Agreement, Franchisee shall pay a late penalty of twenty percent (20%) of any amounts due which are received after the fifth of each month in which they become due.

The amount now due, including late fees, is summarized as follows:

| | | |
|---|---|---|
| 1. | Continuing Franchise Fees (Management Fees) | $ 2,970.00 |
| 2. | Advertising Fees | $ 1,817.68 |
| 3. | Website Fees | $  604.00 |
| 4. | Late fees @ 20% | $ 1,078.34 |
| | **TOTAL NOW DUE** | **$ 6,470.02*** |

***Amount due must be paid by certified or cashiers check, cash or wire transfer.**

**Exhibit D**

Pursuant to Paragraph 7A(vi) of the Franchise Agreement, the Franchisee shall have **ten (10) days** to pay the above described fees and charges to the Company. If these defaults are not cured within the prescribed period of time, the Company may exercise any rights and remedies available to it, including its right to terminate your Franchise Agreement. In the event the Franchise Agreement is terminated, the Company will expect full compliance with Paragraphs 8 ("Rights and Obligations of the Company and Franchisee Upon Expiration or Termination of Agreement") and 18 ("Covenant Not To Compete") of the Franchise Agreement. We also reserve our right to charge you interest on overdue amounts at the rate of 1.5% as provided in Paragraph 9L of the Franchise Agreement in addition to all other remedies available to the Company.

Please note: Paying based on amounts collected from your sales associates is not acceptable. Payments are to be made according to the agreed upon terms in the Franchise Agreement which is the higher of quota or actual agent count.

The enumeration of the above grounds for default shall not constitute a waiver by the Company as to the existence of any other defaults under the Franchise Agreements, whether or not the same are presently known to the Company.

Your immediate attention to these matters is required.

Sincerely,

James M. Merrion
Regional Director



March 19, 2008                              **SENT VIA FED EX OVERNIGHT**

Walter Zubricki
RE/MAX Home Center
6000 S. Pulaski
Chicago, IL 60629

**RE: 10 DAY NOTICE OF DEFAULT - RE/MAX HOME CENTER (23-305)
FRANCHISE AGREEMENT DATED JULY 2, 2005**

Dear Walter:

We have reached the end of our patience in trying to help you, as we still have not received the financial information requested by us and promised by you. It is time to call a stop to the games. We have a right to request, and you the obligation to provide, financial information about your franchise as specified in paragraphs 3H, page 4, and 3L, page 5, of the Franchise Agreement.

For a month now, you have been promising complete financials, and we still do not have the information necessary for a full look at your financial situation so that we may help craft a solution for you. This is extremely unusual, as all other franchisees furnish this information to us readily, and without delay. This hardly what I would expect from a RE/MAX franchisee who is also a CPA.

Therefore, you are hereby notified that you are in default under the above-referenced Franchise Agreement by reason of your failure to pay fees and other charges due as follows:

1. You have failed to pay Continuing Franchise Fees (Management Fees) as required by Paragraph 9B of the Franchise Agreement. The past due amount for Continuing Franchise Fees (Management Fees) is $9,264.00.
2. You have failed to pay Service Fees as required by Paragraph 9C of the Franchise Agreement. The past due amount for Service Fees is $67.51.
3. You have failed to pay Advertising Fees as required by Paragraph 9E of the Franchise Agreement. The past due amount for Advertising Fees is $6,482.52.
4. You have failed to pay Website Fees as required by Paragraph 9J of the Franchise Agreement. The past due amount for Website Fees is $1,833.09.

**Exhibit E**

**RE/MAX Northern Illinois**
2205 Point Boulevard, Suite 100, Elgin, Illinois 60123
Office: (847) 428-4200, Fax: (847) 428-3600, Website: www.illinoisproperty.com

℗ Each Office Independently Owned and Operated

As stated in Paragraph 9L of the Franchise Agreement, Franchisee shall pay a late penalty of twenty percent (20%) of any amounts due which are received after the fifth of each month in which they become due.

The amount now due, including late fees, is summarized as follows:

| | | |
|---|---|---|
| 1. | Continuing Franchise Fees (Management Fees) | $ 9,264.00 |
| 2. | Service Fees | $    67.51 |
| 3. | Advertising Fees | $ 6,482.52 |
| 4. | Website Fees | $ 1,833.09 |
| 5. | Late fees @ 20% | $ 3,529.42 |
| | **TOTAL NOW DUE** | **$21,176.54*** |

**\*Amount due must be paid by certified or cashiers check, cash or wire transfer.**

Pursuant to Paragraph 7A(vi) of the Franchise Agreement, the Franchisee shall have **ten (10) days** to pay the above described fees and charges to the Company. If these defaults are not cured within the prescribed period of time, the Company may exercise any rights and remedies available to it, including its right to terminate your Franchise Agreement. In the event the Franchise Agreement is terminated, the Company will expect full compliance with Paragraphs 8 ("Rights and Obligations of the Company and Franchisee Upon Expiration or Termination of Agreement") and 18 ("Covenant Not To Compete") of the Franchise Agreement. We also reserve our right to charge you interest on overdue amounts at the rate of 1.5% as provided in Paragraph 9L of the Franchise Agreement in addition to all other remedies available to the Company.

The enumeration of the above grounds for default shall not constitute a waiver by the Company as to the existence of any other defaults under the Franchise Agreements, whether or not the same are presently known to the Company.

If, however, you provide us full access to your entire 2006 and 2007 Quick Books, including cash accounts and balance sheets for 2006 and 2007, within the next seven days (no later than 5:00 p.m., March 27, 2008), we will review this information and determine whether your level of cooperation warrants a rescission of this letter.

Your immediate attention to these matters is required.

Sincerely,

James M. Merrion
Regional Director



July 15, 2008                                              **SENT VIA FED EX OVERNIGHT**

Walter Zubricki
RE/MAX Home Center
6000 S. Pulaski
Chicago, IL 60629

### RE:  10 DAY NOTICE OF DEFAULT - RE/MAX HOME CENTER (23-305)

Dear Walter:

This letter is in reference to the franchise agreement that you entered into with RE/MAX Northern Illinois (hereinafter the "Company") on July 2, 2005 for the operation of a real estate brokerage office doing business as RE/MAX Home Center.  In reference thereto, you are hereby notified that you are in default under said Franchise Agreement by reason of your failure to pay fees and other charges due as follows:

1.  You have failed to pay Continuing Franchise Fees (Management Fees) as required by Paragraph 9B of the Franchise Agreement.  The past due amount for Continuing Franchise Fees (Management Fees) is $20,484.00.
2.  You have failed to pay Service Fees as required by Paragraph 9C of the Franchise Agreement.  The past due amount for Service Fees is $67.51.
3.  You have failed to pay Advertising Fees as required by Paragraph 9E of the Franchise Agreement.  The past due amount for Advertising Fees is $14,363.82.
4.  You have failed to pay Website Fees as required by Paragraph 9J of the Franchise Agreement.  The past due amount for Website Fees is $4,321.92.

As stated in Paragraph 9L of the Franchise Agreement, Franchisee shall pay a late penalty of twenty percent (20%) of any amounts due which are received after the fifth of each month in which they become due.

The amount now due, including late fees, is summarized as follows:

1.  Continuing Franchise Fees (Management Fees)$ 20,484.00
2.  Service Fees                                                    $        67.51
3.  Advertising Fees                                           $ 14,363.82
4.  Website Fees                                               $   4,321.92
5.  Late fees @ 20%                                          $   7,847.45
         **TOTAL NOW DUE**                           $ 47,084.70*

**Exhibit F**

**RE/MAX Northern Illinois**
2205 Point Boulevard, Suite 100, Elgin, Illinois 60123
Office: (847) 428-4200, Fax: (847) 428-3600, Website: www.illinoisproperty.com

☎ Each Office Independently Owned and Operated



**\*Amount due must be paid by certified or cashiers check, cash or wire transfer.**

Pursuant to Paragraph 7A(vi) of the Franchise Agreement, the Franchisee shall have **ten (10) days** to pay the above described fees and charges to the Company. If these defaults are not cured within the prescribed period of time, the Company may exercise any rights and remedies available to it, including its right to terminate your Franchise Agreement. In the event the Franchise Agreement is terminated, the Company will expect full compliance with Paragraphs 8 ("Rights and Obligations of the Company and Franchisee Upon Expiration or Termination of Agreement") and 18 ("Covenant Not To Compete") of the Franchise Agreement. We also reserve our right to charge you interest on overdue amounts at the rate of 1.5% as provided in Paragraph 9L of the Franchise Agreement in addition to all other remedies available to the Company.

The enumeration of the above grounds for default shall not constitute a waiver by the Company as to the existence of any other defaults under the Franchise Agreements, whether or not the same are presently known to the Company.

Your immediate attention to these matters is required.

Sincerely,

James M. Merrion
Regional Director

**RE/MAX Northern Illinois**
2205 Point Boulevard, Suite 100, Elgin, Illinois 60123
Office: (847) 428-4200, Fax: (847) 428-3600, Website: www.illinoisproperty.com

☎ Each Office Independently Owned and Operated

 **Shipment Receipt**

**Address Information**

| Ship to: | Ship from: |
|---|---|
| Walter Zubricki | Debbie Rieke |
| REMAX Home Center | REMAX Northern Illinois |
| 6000 S PULASKI RD | 2205 Point Blvd., Ste. 100 |
| CHICAGO, IL | Elgin, IL |
| 606294538 | 60123 |
| US | US |
| 773-735-6000 | 8474284200 |

**Shipping Information**
Tracking number: 798979940417
Ship date: 07/15/2008
Estimated shipping charges: 10.53

**Package Information**
Service type: Standard Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0LBS
Declared value: 0.00USD
Special Services:
Pickup/Drop-off: Give to scheduled courier at my location

**Billing Information**
Bill transportation to: Sender
Your reference: Legal Dept
P.O. no.:
Invoice no.:
Department no.:

Thank you for shipping online with Fedex ShipManager at fedex.com.

**Please Note**

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

**FedEx** ®

Español | Customer Support | FedEx Locations   Search   Go

| Package/Envelope | Freight | Expedited | Office/Print Services ✱ |

Ship ▸     Track ▸     Manage ▸     Business Solutions ▸

Track Shipments/FedEx Kinko's Orders      ℗ Printable Version  ? Quick Help
## Detailed Results

| | | | | |
|---|---|---|---|---|
| Tracking number | 798979940417 | Reference | Legal Dept | **Wrong Address?** |
| Signed for by | R.DIAZ | Destination | CHICAGO, IL | Reduce future mistakes by using |
| Ship date | Jul 15, 2008 | Delivered to | Receptionist/Front Desk | FedEx Address Checker. |
| Delivery date | Jul 16, 2008 9:44 AM | Service type | Standard Envelope | |
| | | Weight | 0.5 lbs. | **Tracking a FedEx SmartPost** |
| | | | | **Shipment?** |
| **Status** | Delivered | | | Go to shipper login |
| **Signature image available** | Yes | | | |


Find locations even easier.

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| Jul 16, 2008 | 9:44 AM | Delivered | CHICAGO, IL | |
| | 7:55 AM | On FedEx vehicle for delivery | BEDFORD PARK, IL | |
| | 6:28 AM | At local FedEx facility | BEDFORD PARK, IL | |
| Jul 15, 2008 | 10:36 PM | At dest sort facility | CHICAGO, IL | |
| | 10:02 PM | Left FedEx origin facility | SCHAUMBURG, IL | |
| | 6:28 PM | Picked up | SCHAUMBURG, IL | |
| | 4:47 PM | Package data transmitted to FedEx | | |

[ Signature proof ]  [ E-mail results ]  [ Track more shipments/orders ]

Subscribe to tracking updates (optional)

Your name: [                    ]      Your e-mail address: [                    ]

| E-mail address | Language | Exception updates | Delivery updates |
|---|---|---|---|
| [          ] | English | ☐ | ☑ |
| [          ] | English | ☐ | ☑ |
| [          ] | English | ☐ | ☑ |
| [          ] | English | ☐ | ☑ |

Select format: ◉ HTML  ◯ Text  ◉ Wireless

Add personal message:

Not available for Wireless or non-English characters.
[                                        ]

☐ By selecting this check box and the Submit button, I agree to these Terms and Conditions      [ Submit ]



July 30, 2008

Walter Zubricki                 **SENT VIA FED EX OVERNIGHT DELIVERY**
Teresa Zubricki or Designated Representative of Franchisee
RE/MAX Home Center
6000 S. Pulaski
Chicago, IL. 60629

RE: Franchise Agreement dated July 2, 2005 –
      RE/MAX Home Center, Chicago, 23-305

Dear Walter,

RE/MAX Northern Illinois has not received any response (written or verbal) from you or
your designated representative regarding any of our communications related to your 10-
Day Notice of Default, dated July 15, 2008, for failure to cure your outstanding financial
obligations related to the above-referenced Franchise Agreement. Due to the severity of
the consequences of not curing the financial default described in the 10-Day Notice, we
are giving you one final opportunity to contact us and make arrangements to cure this
default.

If the default has not been cured and we have not heard from you or your designated
representative, we will be forced to terminate your Franchise Agreement at 5:00 p.m. on
Thursday, August 14, 2008. If you would like to make payment arrangements, please
contact us and we will provide wire transfer information or accept certified funds. Either
you or your designated representative are encouraged to contact RE/MAX Northern
Illinois immediately.

Teresa: If Walter is unable to review and deal with the documents, we highly
recommend that you or Walter's designated representative seek legal and financial
counsel immediately regarding the terms of Walter's Franchise Agreement and the 10-
Day Notice of Default that has been sent to him.

Sincerely,

*Jim Merrion*

Jim Merrion                                              **Exhibit G**
Regional Director

**RE/MAX Northern Illinois**
2205 Point Boulevard, Suite 100, Elgin, Illinois 60123
Office: (847) 428-4200, Fax: (847) 428-3600, Website: www.illinoisproperty.com

⌂ Each Office Independently Owned and Operated

# FedEx. Shipment Receipt

## Address Information

**Ship to:**
Walter & Teresa Zubricki
REMAX Home Center
6000 S PULASKI RD

CHICAGO, IL
606294538
US
773-735-6000

**Ship from:**
Debbie Rieke
REMAX Northern Illinois
2205 Point Blvd., Ste. 100

Elgin, IL
60123
US
8474284200

## Shipping Information

Tracking number: 790553450239
Ship date: 07/30/2008
Estimated shipping charges: 10.53

## Package Information

Service type: Standard Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0LBS
Declared value: 0.00USD
Special Services:
Pickup/Drop-off: Give to scheduled courier at my location

## Billing Information

Bill transportation to: Sender
Your reference: Legal Dept
P.O. no.:
Invoice no.:
Department no.:

Thank you for shipping online with Fedex ShipManager at fedex.com.

## Please Note

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

FedEx | Track                                                    Page 1 of 1

Track Shipments/FedEx Kinko's Orders                          (?) Quick Help
**Detailed Results**

| Tracking number | 790553450239 | Reference | Legal Dept |
|---|---|---|---|
| Signed for by | D.GARCIA | Destination | CHICAGO, IL |
| Ship date | Jul 30, 2008 | Delivered to | Receptionist/Front Desk |
| Delivery date | Jul 31, 2008 9:38 AM | Service type | Standard Envelope |
| | | Weight | 0.5 lbs. |

**Status**            Delivered

**Signature image       Yes
available**

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| Jul 31, 2008 | 9:38 AM | Delivered | CHICAGO, IL | |
| | 8:09 AM | On FedEx vehicle for delivery | BEDFORD PARK, IL | |
| | 6:44 AM | At local FedEx facility | BEDFORD PARK, IL | |
| Jul 30, 2008 | 11:07 PM | At dest sort facility | CHICAGO, IL | |
| | 9:57 PM | Left FedEx origin facility | SCHAUMBURG, IL | |
| | 6:20 PM | Picked up | SCHAUMBURG, IL | |
| | 3:40 PM | Package data transmitted to FedEx | | |

Signature proof    E-mail results    Track more shipments/orders

Subscribe to tracking updates (optional)

Your name: [                    ]    Your e-mail address: [                    ]

| E-mail address | Language | | Exception updates | Delivery updates |
|---|---|---|---|---|
| [          ] | English | | ☒ | ☐ |
| [          ] | English | | ☒ | ☐ |
| [          ] | English | | ☒ | ☐ |
| [          ] | English | | ☒ | ☐ |

Select format: ⦿ HTML  ○ Text  ○ Wireless
Add personal message:

Not available for Wireless or
non-English characters.

☐ By selecting this check box and the Submit button, I agree to these Terms and    Submit
Conditions



August 14, 2008

Walter Zubricki                          **SENT VIA FED EX OVERNIGHT DELIVERY**
Center Holding Company
d/b/a RE/MAX Home Center
6000 S. Pulaski
Chicago, IL 60629

Re:    **NOTICE OF TERMINATION OF FRANCHISE AGREEMENT –**
       **RE/MAX HOME CENTER, CHICAGO, #23-305**

Dear Walter:

We are writing you with reference to your Franchise Agreement dated July 2, 2005 (the "Franchise Agreement") with Roaring Fork Capital Partners, Inc. (d/b/a RE/MAX Northern Illinois) for the operation of a RE/MAX real estate brokerage office at 6000 S. Pulaski, Chicago, Illinois 60629 (the "Office"). Under Section 7A.(vi) of the Franchise Agreement, RE/MAX Northern Illinois has the right to terminate the Franchise Agreement upon delivery of notice to you if:

> "Franchisee fails to pay when due any of the fees owed to the Company, International, the Sales Advisory Council or the Regional Broker/Owner Council under this agreement or any other agreement and does not correct such failure within (10) ten days after written notice of such failure is delivered to franchisee..."

A 10-Day Notice of Default was delivered to you on July 16, 2008, for failure to pay fees and other charges due the Company. The default was not cured within the ten day cure period. A letter extending the cure period to 5:00 p.m., August 14, 2008, was delivered to you on July 31, 2008. The default was still not cured during the extended cure period. This is to advise you of RE/MAX Northern Illinois' election to terminate the Franchise Agreement pursuant to the provisions of Section 7A.(vi), effective immediately.

RE/MAX Northern Illinois will expect your full and complete compliance with your obligations upon termination of the Franchise Agreement, including your obligations under Section 8

**RE/MAX Northern Illinois**
2205 Point Boulevard, Suite 100, Elgin, Illinois 60123
Office: (847) 428-4200, Fax: (847) 428-3600

🏠 Each Office Independently Owned and Operated          **Exhibit H**

("Rights and Obligations of the Company and Franchisee Upon Termination or Expiration of Agreement") and Section 18 ("Covenant Not To Compete") thereof.

Please note that under Section 8 of the Franchise Agreement, you are obligated to pay RE/MAX Northern Illinois all amounts owed. Your current balance including any penalties and interest is $58,408.82. Further, your breach of the Franchise Agreement and the termination of your Franchise will result in the loss of the continuing franchise fees RE/MAX Northern Illinois would have earned over the remaining term of the Franchise Agreement. The lost franchise fees to RE/MAX Northern Illinois through the end of the term of the Franchise Agreement based upon the agreed upon quotas is $130,903.55. The attached schedule reflects the total amount now due and payable to RE/MAX Northern Illinois.

This notice is without waiver of any other rights or remedies available to RE/MAX Northern Illinois under the Franchise Agreement or applicable law.

Please give this matter your immediate attention.

Sincerely,

Roaring Fork Capital Partners, Inc.
d/b/a RE/MAX Northern Illinois

James Merrion
Regional Director

**23-305 RE/MAX Home Center**
**Chicago**
**Amount Due on Franchise Agreement**
8/15/08-7/1/10

| | Quota | | Management Fee per day | | # of Days | | Amount Due |
|---|---|---|---|---|---|---|---|
| 8/15/2008-8/31/08 | 39 | x | 3.548387097 | x | 17 | = | $2,352.58 |
| Sep-08 | 39 | x | 3.666666667 | x | 30 | = | $4,290.00 |
| Oct-08 | 39 | x | 3.548387097 | x | 31 | = | $4,290.00 |
| Nov-08 | 39 | x | 3.666666667 | x | 30 | = | $4,290.00 |
| Dec-08 | 39 | x | 3.548387097 | x | 31 | = | $4,290.00 |
| Jan-09 | 39 | x | 3.548387097 | x | 31 | = | $4,290.00 |
| Feb-09 | 39 | x | 3.928571429 | x | 28 | = | $4,290.00 |
| Mar-09 | 39 | x | 3.548387097 | x | 31 | = | $4,290.00 |
| Apr-09 | 39 | x | 3.666666667 | x | 30 | = | $4,290.00 |
| May-09 | 39 | x | 3.548387097 | x | 31 | = | $4,290.00 |
| Jun-09 | 39 | x | 3.666666667 | x | 30 | = | $4,290.00 |
| 7/1/09-7/2/09 | 39 | x | 3.548387097 | x | 2 | = | $276.77 |
| 7/3/09-7/31/09 | 60 | x | 3.548387097 | x | 29 | = | $6,174.19 |
| Aug-09 | 60 | x | 3.548387097 | x | 31 | = | $6,600.00 |
| Sep-09 | 60 | x | 3.666666667 | x | 30 | = | $6,600.00 |
| Oct-09 | 60 | x | 3.548387097 | x | 31 | = | $6,600.00 |
| Nov-09 | 60 | x | 3.666666667 | x | 30 | = | $6,600.00 |
| Dec-09 | 60 | x | 3.548387097 | x | 31 | = | $6,600.00 |
| Jan-10 | 60 | x | 3.548387097 | x | 31 | = | $6,600.00 |
| Feb-10 | 60 | x | 3.928571429 | x | 28 | = | $6,600.00 |
| Mar-10 | 60 | x | 3.548387097 | x | 31 | = | $6,600.00 |
| Apr-10 | 60 | x | 3.666666667 | x | 30 | = | $6,600.00 |
| May-10 | 60 | x | 3.548387097 | x | 31 | = | $6,600.00 |
| Jun-10 | 60 | x | 3.666666667 | x | 30 | = | $6,600.00 |
| 7/1/10 | 60 | x | 3.548387097 | x | 31 | = | $6,600.00 |

| | | |
|---|---|---|
| **Remainder of Franchise Agreement** | | $130,903.55 |

**Open Invoices**

| | | |
|---|---|---|
| December 07-July 08 | $54,687.53 | *see attached calculations |

**August 1-14th**

| | |
|---|---|
| Advertising | $1,330.00 |
| Management | $1,971.29 |
| Website | $420.00 |
| BSF | TBD |
| | $3,721.29 |

| **GRAND TOTAL:** | **$189,312.36** |
|---|---|

| Office No | Office Name | Month | Management Fees | Ad Fund Fees | Website Fees | BSF Fees | Late Fees (20%) | Interest (1.5% per month) | Total Fees Due |
|---|---|---|---|---|---|---|---|---|---|
| 23-305 | RE/MAX Home Center | 1/5/08-2/4/08 | $1,819.00 | $677.68 | | | $ 499.34 | $ 37.45 | $3,033.47 |
| | | 2/5/08-3/4/08 | $4,365.00 | $3,325.00 | $1,050.00 | | 1,748.00 | $176.60 | $13,698.07 |
| | | 3/5/08-4/4/08 | $3,053.45 | $2,479.84 | $ 783.09 | $ 67.51 | 1,276.78 | $301.23 | $21,659.97 |
| | | 4/5/08-5/4/08 | $3,106.55 | $2,587.93 | $ 817.24 | | 1,302.34 | $422.58 | $29,896.60 |
| | | 5/5/2008-6/4/08 | $2,880.00 | $2,280.00 | $720.00 | | 1,172.00 | $536.35 | $37,484.95 |
| | | 6/5/08-7/4/08 | $2,750.00 | $1,811.34 | $572.00 | | 1,026.67 | $638.97 | $44,283.94 |
| | | 7/5/08-8/4/08 | $2,530.00 | $1,202.03 | $379.59 | | 822.32 | $725.63 | $49,923.51 |
| | | 8/5/08-8/14/08 | $2,124.40 | $1,238.17 | $391.00 | | 750.71 | $259.73 | $54,687.53 |
| | | | $22,608.40 | $15,601.99 | $ 4,712.92 | $67.51 | $ 8,598.16 | $ 3,098.54 | |

 **Shipment Receipt**

## Address Information

**Ship to:**
Walter Zubricki
REMAX Home Center
6000 S PULASKI RD

CHICAGO, IL
606294538
US
773-735-6000

**Ship from:**
Debbie Rieke
REMAX Northern Illinois
2205 Point Blvd., Ste. 100

Elgin, IL
60123
US
8474284200

## Shipping Information
Tracking number: 791121812125
Ship date: 08/14/2008
Estimated shipping charges: 12.39

## Package Information
Service type: Priority Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0LBS
Declared value: 0.00USD
Special Services:
Pickup/Drop-off: Give to scheduled courier at my location

## Billing Information
Bill transportation to: Sender
Your reference: Legal Dept
P.O. no.:
Invoice no.:
Department no.:

---

| Thank you for shipping online with Fedex ShipManager at fedex.com. |
| --- |

**Please Note**

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.



Exhibit I

RE/MAX Home Center Phone Number:  (773) 735-6000

RE/MAX Home Center Fax Number:  (773) 284-3850

RE/MAX Home Center Direct Dial Phone Numbers:

| Agent | Direct Dial Number |
|---|---|
| Blanca Andere | 773-284-3876 |
| Jessica Barrera | 773-284-3828 |
| Manuel Barrios | |
| Maria "Connie" Bernal | 773-284-4832 |
| Oscar Campos | 773-284-3845 |
| Anna Chrobak | 773-284-3846 |
| Joanna Ciesla | 773-284-3862 |
| Thomas Cunningham | 773-284-3872 |
| Juanita Flores | 773-284-3873 |
| Israel Fuentes | 773-284-3820<br>773-948-4820 |
| Alejandra Lopez | |
| Elizabeth Loza | 773-284-3867 |
| Christopher Makowski | 773-284-3884 |
| Jose Luis Miranda | 773-284-3863 |
| Agent | Phone Number |

Exhibit J

| | |
|---|---|
| Rosie Montiel | 773-284-3869 |
| Enrique Munoz | 773-284-3836 |
| Nilda Olvera | 773-284-3877 |
| Grace Pawlikowski | 773-948-4435 |
| Alicja Pruis-Kowalczyk | 773-284-3881 |
| Nicholas Radakovich | 773-284-3858 |
| Cristina Rangel | 773-284-3899 |
| Luz Renteria | 773-284-3876 |
| Eduardo Salazar | 773-284-3895 |
| Fuad Saleh | 773-284-3871 |
| Sonia Tapia | 773-284-3889 |
| Abeer Wahdan | 773-284-3860 |
| Krzysztof Wasowicz | 773-284-3853 |
| Yolanda Zapiain | 773-284-3875 |
| Maggie Zubek | 773-284-3898 |
| Theresa Zubricki | 773-284-3870 |
| Walter Zubricki | |

# YELLOWPAGES.COM

Standard  |  <u>Distance</u>  |  <u>Phone Number</u>



**Map Chicago Results**

<u>Home</u> > <u>Chicago</u> > Name Search - remax Home Center

## Remax Home Center
6000 S Pulaski Rd
Chicago, IL 60629 <u>Map</u>

**(773) 735-6000**

★ ★ ★ ★ ★
Review This Business!
<u>Rate it</u> | **Read Reviews**

<u>Improve this listing</u>

**More Info**

<u>Send to Mobile</u> | <u>Map It</u> | <u>E-mail It</u> | <u>Get Directions</u> | <u>Search Nearby</u> | <u>Save This Listing</u> | <u>Save a Note</u>

### RELATED BUSINESSES

**Right Source Solutions Realty**



10661 S Roberts Rd
Palos Hills, IL 60465
**(708) 274-0502**
More Info | Web Site

**Foreclosure Rescue R Us**



Serving Your Area
**(800) 979-4243**
More Info | Web Site

**Century 21 Kennedy Ryan Monigal and Assoc Inc**



5508 S Lake Park Av
Chicago, IL 60637
**(773) 667-5555**

**Group Exhibit K**

More Info | Web Site

**Midland Realty Group**



7063 W Belmont Av
Chicago, IL 60634
**(773) 637-0100**
More Info | Web Site

**Part of the new at&t**

© 2008 YELLOWPAGES.COM LLC. All rights reserved.
© 2008 AT&T Intellectual Property. All rights reserved. AT&T, AT&T logo and all other marks contained herein are trademarks of AT&T Intellectual Property and/or AT&T affiliated companies.

Some data provided by Localeze and Acxiom.

Yahoo!    My Yahoo!    Mail    More     **Make Y! My Home Page**       New User? Sign Up    **Sign In**    Help

# YAHOO! LOCAL
### Yellow Pages

| Search | **WEB SEARCH** |

## Service Ministries - Chicago Wedding

Providing personalized Wedding celebrations to Chicago area, N Illinois, NW Indiana and SE Wisconsin. Religious, interfaith, nondenominational and civil. Our mission is to serve, not judge.

www.serviceministries.org

## Yahoo! Yellow Pages

**Your Search:** remax home center    [ Search ]

Search by Category or Business Name (e.g. Hotel or Holiday Inn)

**Location:** ★ Chicago IL

Save Location | Change Location

**Top** > Search for: **remax home center**

**Sort by:**   **Name**  |   Distance                    Showing 1 to 1 of 1

| Business Name: | Address: |
|---|---|
| **Zubricki, Walter - Re/Max Home Ctr**<br>**(773) 735-6000**   See reviews on Local | 6000 S Pulaski Rd<br>**Chicago, IL** Map |

Sort by:   **Name**  |   **Distance**              Showing 1-1 of 1

**Beyond Chicago**

### Beyond Chicago

**CATEGORY SPONSORS**

**Remax Home**
**www.ChicagoSellsin90Days.com** - Your Home SOLD in 90 days or get paid $2,000. FREE Home Stager & Tour.

RE/MAX Indianapolis Indiana Real Estate
**real-estate-indianapolis.com** - Find, buy, sell your new home. RE/MAX Realtor broker serving Indy, Carmel, Fishers, Geist, Lawrence, Meridian Hills, Noblesville, Westfield, Zionsville, Hamilton and Marion County.

Free Relocation Package
**www.birminghamdreamhometeam.com** - Free MLS search, School Info, Community links, and moving information.

Some links and information accompanying the All Businesses listings may be provided by Yahoo! and Yahoo!'s content providers, and are not affiliated with or endorsed by the listers or their listing agents.

### Modify your Search

**SEARCH:**   remax home center
(by name or category)

**Locations:**   ---none selected---
(Address, Intersection or Airport Code)

**Address:**

(Optional)

**Tip:** If you specify an address, we will search for businesses closest to that address.

**City, State or Zip:**  Chicago IL

**Country:**  United States

Continue

---

**In Affiliation With**



Business Information provided by InfoUSA ®, Omaha, Nebraska Copyright © 2008. All Rights Reserved. Use Subject to License.

Driving Directions - Local - Maps - Real Estate - Yellow Pages

Copyright © 2008 Yahoo! Inc. All rights reserved. Help - Copyright/IP Policy - Privacy Policy - Terms of Service



| PRODUCT / SERVICE | NAME OF BUSINESS | LOCATION |
|---|---|---|
| | remax home center | Chicago, IL |

**Local Business Results (1)**                 Sort by:  **A - Z**   **Closest match ✔**



### RE/MAX Home Center
773-735-6000

6000 S Pulaski Rd
Chicago, IL 60629



NEW! Video cont
on yellowbook.cc
» Learn more abou

‹‹   ‹   **1**   ›   ››

©2008 Yellow Book USA, Inc. All rights reserved | 1-800-YB-YELLOW

 s Chicago

**Finding DexKnows.com helpful? Click here to bookmark our home page**

| List View | Map View | | Sorted by: **Relevance** | Name A-Z | Name Z-A | Distance | Rating | Narrow My Search |

## Showing 1 listings for "remax home center" around Chicago, IL

**A**  Re/Max Home Center
6000 S Pulaski
5.90 miles from the center of Chicago, IL

☆☆☆☆☆
not yet rated

**(773) 735-6000**

Business Owners: Learn about business profiles
Additional data provided by Localeze

   classmates·com 

1984
1974
1964



This year home buyers could have saved this much with No Fee Mortgage PLUS:    Bank of America
Bank of Opportunity

$ 4,444,559,530    Believe It

As of August 26, 2008 12:58:34 PM ES

Get a sneak peek at the new REALTOR.com® beta.    Check it out.



**REALTOR.com**
Official Site of the
National Association of REALTORS®
REALTOR

---

| Modify Your White Pages Search | New White Pages Search |
|---|---|

## 30 REALTORS® found.

Displaying 1 through 20. REALTORS® are listed alphabetically.

| REALTOR® Yellow Pages | OFFICE Yellow Pages | REALTOR® White Pages |
|---|---|---|

1 2

Next page>>

**Barrera, Jessica** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Barrios, Manuel M** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Bernal, Maria C** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Campos, Oscar** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Chrobak, Anna** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Ciesla, Joanna** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Cunningham, Thomas J** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Flores, Juanita G - TRC** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Fuentes, Israel** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Labuz-Kolasa, Renata** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Lopez, Alejandra** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Loza, Elizabeth** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000



National
University

> learn more

SPONSORED LINKS

**Chicago Real Estate**
Don't Get Stuck In A
Cardboard Box Find A
Home In Chicago...
IllinoisProperty.com/r

**New Homes Chicago
NW...**
Lexington's famed
townhome designs no
showing Wheeling,
Des...
lexingtonchicago.com

**Group Exhibit L**

**Makowski, Christopher** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Miranda, Jose Luis** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Montiel, Rosalba S** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Munoz, Enrique** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Olvera, Nilda** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Pawlikowski, Grazyna** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Prus, Alicja** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

**Radakovich, Nicholas P** - RE/MAX Home Center, Chicago, IL.

(773) 735-6000

1 2                                                            Next page>>

| Modify Your White Pages Search | New White Pages Search |
| --- | --- |

**Search in popular metros:**

Atlanta | Austin | Boston | Campbell | Chicago | Dallas | Denver | Detroit | Houston | Las Vegas | Long Island
Los Angeles | Memphis | Miami | New York City | Palm Beach | Sacramento | San Diego | Seattle

Site Map | Corporate News & Info | Contact Us | Advertise With Us | Careers | Provide Feedback
Terms of Use and Privacy Policy.

Homes by REALTOR.com® | Rentals by REALTOR.com® | What's Your Home Worth
Move.com® | REALTOR.com® | Welcome Wagon® | Moving.com | Assisted Living | TOP PRODUCER®
HomeInsight.com | Find a Home | New Homes | Manufactured Homes | Apartments | Houses for Rent | Property Values

© 1995- 2008 NATIONAL ASSOCIATION OF REALTORS® and Move, Inc. All rights reserved.   ☖ Equal Housing Opportunity
REALTOR.com® is the official site of the National Association of REALTORS® and is operated by Move, Inc.

REALTOR® -- A Registered collective membership mark that identifies a real estate professional who is a member of the National Association of REALTORS® and
subscribes to its strict Code of Ethics. Inquiries regarding the Code of Ethics should be directed to the board in which a REALTOR® holds membership.



about IAR
local associations
events
education
market stats
news room
hotlinks
international
marketing

CONSUMER INFO
MEMBERS ONLY

## Search results using the following criteria:

**Company: Home Center**
**City: Chicago**
**Language: English**

**Total Retrieved: 30**



| Name | Company | Address | Phone | Fax | Email |
|------|---------|---------|-------|-----|-------|
| Barrera, Jessica | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | jessicabarrera05@yahoo.com |
| Barrios, Manuel M | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | barrios6@juno.com |
| Bernal, Maria C | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | conniebernalrealtor@yahoo.com |
| Campos, Oscar | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | oscarc@rxhc.com |
| Chrobak, Anna | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | aniachrobakmonkeybac@aol.com |
| Ciesla, Joanna | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | ciesla21@comcast.net |
| Cunningham, | Home Center | 6000 S Pulaski Rd | 773-735- | 773-284- | tomc@rxhc.com |

| | | | | | | |
|---|---|---|---|---|---|---|
| Thomas J | Realty | Chicago, IL 60629 | 6000 | 3850 | |
| Flores, Juanita G | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | juanitafl@hotmail.com |
| Fuentes, Israel | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | israel@masteryourinvestment.com |
| Labuz-Kolasa, Renata | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | |
| Lopez, Alejandra | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | alejandra@rxhc.com |
| Loza, Elizabeth | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | elizabethl@rxhc.com |
| Makowski, Christopher | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | krism@rxhc.com |
| Miranda, Jose Luis | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | j_miranda@remax.net |
| Montiel, Rosalba S | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | rosiemontiel@hotmail.com |
| Munoz, Enrique | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | enriquem@rxhc.com |
| Olvera, Nilda | Home Center Realty | 6000 S Pulaski Rd Chicago, | 773-735-6000 | 773-284-3850 | sancen_mcm@yahoo.com |

| | | IL 60629 | | | |
|---|---|---|---|---|---|
| Pawlikowski, Grazyna | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | pawlikowskirealtor@yahoo.com |
| Prus, Alicja | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | ALA@DOMYAMERYKA.COM |
| Radakovich, Nicholas P | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | nickrxhc@yahoo.com |
| Rangel, Cristina | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | |
| Renteria, Luz A | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | luz@rxhc.com |
| Saleh, Fuad | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | fuad@rxhc.com |
| Tapia, Sonia | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | soniat@rxhc.com |
| Wahdan, Abeer | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | abeerw@sbcglobal.net |
| Wasowicz, Krzysztof | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | |
| Zapiain, Yolanda I | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | yolazap@gmail.com |

| | | | | | |
|---|---|---|---|---|---|
| Zubek, Maggie | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | maggiezubek@sbcglobal.net |
| Zubricki, Teresa M | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | teresazubricki@hotmail.com |
| Zubricki, Walter M | Home Center Realty | 6000 S Pulaski Rd Chicago, IL 60629 | 773-735-6000 | 773-284-3850 | walterz@rxhc.com |



**ILLINOIS**
**ASSOCIATION OF**
**REALTORS**

 

© Illinois Association of REALTORS®
Disclaimer
Site Map

REALTOR® is a registered trademark of the National
Association of REALTORS®

IARaccess@iar.org
217/529-2600
fax 217/529-3904
P.O. Box 19451
Springfield, IL 62794-9451



6000 S. Pulaski Rd, Chicago IL 60629    773-735-6000

View Listings
Search Listings
Our Agents
Buyers
Sellers
About Us
Home Page



#**1**

Professional Work Environment

100% Commission Concept

Our Edge: The Technology

Office Rank and Market Share

Professional Administrative Staff

Modern Office Facility

Quick Start Program For Joining Us Agents

Back to Top

**Professional Work Environment**

Team of full time real estate agents creates unique, professional work environment. They share their newest listings, ideas and information to promote and raise our office in-house sales. Our Agents specialize in many different areas, dealing with many types of real estate. Unlike in most real estate companies, our Broker has decided not to compete with agents and to "run the office" full time. He is always available in case an agent needs help.

Agents at Home Center Realty do not have to be in the office to be successful. Our technology allows agents to work from any place they choose to - but many of the agents prefer to be in the office, where professional work environment and contact with officemates makes them even more motivated and focused.



Reception Area - Welcome to Home Center Realty

**100% Commission Concept**

Back to Top

The main reason that so many Agents have joined RE/MAX is the highest earning potential. The 100% commission concept allows our agents to collect all the commission they earn ! Modern office, technology support, top pay, and the ability for agent to go as high as one may desire, makes us an extremely attractive choice for carrier and success oriented Realtors.

**Exhibit M**



Company Growth of Sales 1997 (green) - 2000 (red)



Average Commission Payout per agent 1997-2000
Notice: In July 2000 we paid $10,287 average per agent !

RE/MAX Agents are in business for themselves, but not by themselves. Our office supports and helps Agents make their work easier and more effective. The Administration team and secretaries handle day-to-day business tasks including escrow accounts, closing documents preparation, possessions, appointments, new listing processing, file storage, etc. They also coordinate group advertisement (did you notice our full page newspaper ads?), take care of E&O insurances, board memberships and licensing. We host monthly sales meetings to educate and motivate Realtors. Our Office provides the technology and support. That means that Agents can focus on what they do best: Selling Homes.

The 100% commission concept is NOT for everybody. This system was designed and works best for full-time agents producing over $1.5 million in annual sales volume.

**Our Edge: The Technology**                                          Back to Top

We believe that today's real estate business is changing rapidly. We are using the latest technology to keep up with changes and be the best in our business. Following is an abbreviate list of unique features that Home Center Realty has to offer:

**Computerized Front Desk solution**

Did you know that we average 500 - 800 calls a day coming to our front desk ? That is not counting another 200 calls made directly to agents' desks. Such call volume requires special care. Our front desk solution was developed exclusively for us. The Front Desk is powered by the network of 14 computers managed by TELEBase 2 software. It keeps track of every call, has built-in Caller ID and Alphanumeric Messaging capacity, integrates with MLS listings / agents databases and makes secretary work fast, accurate and efficient. This system solved the problem that many offices face: Agents receiving all their calls, regardless if they are in the office or somewhere else. Our Agents receive all of their calls. In fact, they are notified about every call so fast, that they are able to call back their clients in less than a minute!



TELEBase 2 system is a network of 14 computers working together at the Front Desk

Our Front Desk is fully computerized, but our callers are always getting live, friendly assistance from our secretaries. They provide bi-lingual, professional and live caller assistance.

For Agents Only     Our policy is to provide an Agent with all of the information regarding their deals.

Whenever an Agent have a message, or someone left no-message or when an Agent receives fax, package, or someone is calling regarding a transaction the Agent is instantly notified on the alphanumeric pager. This allows the Agent to work longer in the field. No need to run to the office to "check on things".



TELEBase 2 Terminal - Receptionist workstation

**Appointment Desk**

Did you ever call us to schedule an appointment for one of our listings? Try us! Our system (part of TELEBase 2 system described above) keeps track of the agents and listings. Our appointment desk is so efficient, that we are handling over 100 appointments on busy days! Our Appointment Desk is still expanding. In the near future all agents and interested clients will be able to request appointments thru the Internet! We expect this service will significantly increase our client base and generate more sales for agents.

**RRS: Rapid Response System**

Another legendary component of TELEBase 2 system. When someone calls an Agent's extension, that Agent is notified. It is like having a Caller ID box with you all the time! Imagine surprised faces of clients when their Agent is calling them back BEFORE they leave a message with our secretaries!



Alphanumeric Pager

**BSA: Buyer Seller Alert**

After several years of research and development, we are proud to introduce Buyer Seller Alert System. BSA is a sophisticated computer system working on our especially designed computer network that continuously scans MLS for new listings for our clients. Once an Agent enters client to computer, search begins. Day after day, every few minutes BSA scans the market. When a match is made, BSA pages the Agent that new property just came out! The message contains brief listing description and contact information so he/she is able to schedule an appointment with their clients to see new listing within minutes of entering it to MLS! The best part is that an Agent does NOT have to be in the office to do that. All info is displayed on the alphanumeric pager. Did you know, that our agents are usually first to show new homes on MLS ? Thanks to BSA we can act much faster than our competitors!
Large client inventory on BSA allow Agents to do reverse searching when they have a new listing. Once entered, BSA notifies which agent has possible clients. Often, a sale is made the next day in-house - before the new listing is entered to MLS!



SearchNOW!
Program to enter clients to BSA

**www.RXHC.com**

This web site is also a part of Home Center Realty technology advantage. Not like typical real estate web sites - it is being designed as a convenient way to conduct business with our company. Whenever you need to schedule an appointment, page an agent, download forms or search for a house, you will be able to do it on-line. www.RXHC.com is still under continues development. Please contact the Web Administrator (admin@rxhc.com) if you have any questions or suggestions regarding this web site.

**Office Rank and Market Share**

Back to Top

MLS

According to 2001 Power Broker Report



 report we are the #1 largest single-location office in Chicago, #4 in Illinois and #38 in the country !
Power Broker Report is compiled from sales reports of major real estate companies Including all franchises and independent brokers.

**Year 2000 office sales**

| 2000 Sales | Number of units | Transaction Volume |
|---|---|---|
| Listing Sides: | 492 | 63,143,574 |
| Sales Sides: | 862 | 91,117,495 |
| Total Sales: | 1,174 | 154,261,069 |

**Home Center Realty Market Share**

Our annual study shows that every one of five homes sold in our neighborhood is sold thru us! We lead the market, and we work hard to keep our position. Year after year we are experiencing growth of sales and market exposure. We advertise full page ads in local newspapers, sponsor many events and actively promote our company! See the results:



Home Center Realty Market Presence by MLS Area in 2000



Home Center Realty Market Presence in individual MLS Areas in 2000

**MLS Areas Legend:**
8065 - Chicago - West Lawn
8066 - Chicago - West Elston
8063 - Chicago - Gage Park
8062 - Chicago - West Eladon
8070 - Chicago - Ashburn
8057 - Chicago - Archer Heights
8058 - Chicago - Brighton Park
8056 - Chicago - Garfield Ridge
454 - Burbank
8064 - Chicago - Clearing

**Professional Administrative Staff**

Back to Top

Working with top producers and closing high volume of listings every week requires a full-time administration staff and fully computerized accounting solution. Please visit the office page for details.

 


Kathy, Lynette and Agnes took over Walter's office

**Modern Office Facility**                                          Back to Top

RE/MAX Home Center was built from the ground up with "Hi-Tech Office" in mind. Miles of extra wiring was laid, computer ports, triple telephone connections, sophisticated electric system, networking and cable television circuits - we have it all! We always make sure that our technology is at Agent disposal. Currently we have 12 computer stations on the floor available to use. That include 4 state-of-the art conference rooms. Most of our clients are very much impressed with this setup as they enjoy to look for homes on the computer before an actual showings. High speed Internet/MLS access make shopping for homes even more convenient.


Our clients enjoy browsing the MLS and Internet with Agent in one of our well equipped 4 conference rooms

In a busy office like ours, it is critical for agents to be able to get on the MLS, e-mail and Internet all the time. We maintain a hi-speed communication room in our office. Total of six workstations connected to dual DSL circuit in this room are available to our agents 24 hours a day. An instant and fast connection with an easy to use setup makes agent's work a pleasure.


MLS Room - 6 Internet and MLS workstations in single room!

**Example of Individual Agent Setup**

Assigned desk / private office
Alphanumeric pager integrated with all office systems (RRS, BSA, TeleBase, Web Paging and more)
Separate telephone line with Caller ID and RRS (see technology section)
Place in office group advertisement and floor-time privileges
High-speed Internet / network hookup for PC or laptop
Internet web site (see our agents web sites) with alphanumeric messaging capacity and e-mail address ____@rxhc.com
Access to technology support / help desk with PC technician

**Quick Start Program Available For Joining Us Agents**                    Back to Top

**Work With Us: Requirements**                                                              Back to Top



Home Center Realty is waiting for you !

State of Illinois Real Estate License *(don't have one? call us for school information)*
At least one year of experience in real estate or real estate related field
Strong desire to become successful Realtor
Good people and communication skills

Please contact our Broker, to setup an interview.

Equal Housing Opportunity
Member of NAR, CAR and MLS

  

**Agent Tools**
Copyright Home Center Realty 2008  All rights reserved
Developed by Cybermash



August 20, 2008

Mr. Walter Zubricki                                              **HAND DELIVERED &**
6000 S. Pulaski                                          **SENT VIA FED EX OVERNIGHT DELIVERY**
Chicago, IL 60629

     **RE:  Demand to Cease and Desist**

Dear Mr. Zubricki:

We are writing in connection with the now-terminated Franchise Agreement dated July 2,

2005 between Roaring Fork Capital Partners, Inc. d/b/a RE/MAX Northern Illinois (the

"Region") and Center Holding Company (as successor to the interests of Walter Zubricki,

individually) for a real estate brokerage office located at 6000 S. Pulaski, Chicago, IL

60629 and doing business as "RE/MAX Home Center" (the "RE/MAX Office").


It has come to the attention of the Region that you continue to operate under the name

"Home Center Realty." You are using telephone number **(773) 735-6000** in conjunction

with this business along with the direct inside dial numbers of the licensed agents

previously associated with RE/MAX and facsimile number **(773) 284-3850**. You have

not removed the RE/MAX signage from your building. You are using a website that is

branded to RE/MAX with the domain www.rxhc.com. This website also contains

advertising using the RE/MAX logo. Home Center Realty Listings are appearing on

Midwest Real Estate Data, LLC (the "MLS") under the RE/MAX Home Center MLS

**RE/MAX Northern Illinois**
2205 Point Boulevard, Suite 100, Elgin, Illinois 60123
Office: (847) 428-4200, Fax: (847) 428-3600, Website: www.illinoisproperty.com

&#9750; Each Office Independently Owned and Operated          **Exhibit N**

identification numbers. You have not returned the training manuals, 6' cold air balloon, and other materials belonging to the Company. These are violations of your post-termination obligations under Section 8 of the Franchise Agreement. Specifically, Subsections 8.B.(1), (2), (3), (5), (6), (7), (8) and (9) of the Franchise Agreement (which are quoted below) require the franchisee, within five days of the termination of the Franchise Agreement, to comply with the following obligations:

(1) **discontinue all use, imitation or duplication of all distinguishing characteristics of the System,** including but not limited to, trade names, trademarks, service marks, membership marks, certification marks, copyrights, designs, slogans, logos, names, advertising copy or other printed or physical materials now or hereafter displayed, used or becoming a part of the System; and

(2) cease and refrain from using in any manner, directly or indirectly, the System or any part thereof and **Franchisee shall immediately cease and refrain from holding himself or herself out to the public in any way as a current or former member of the System,** Franchisee, Affiliate or operator under the System; and

(3) **make or cause to be made, at his expense, such changes in signs, trade dress, operations, telephone numbers, buildings or other structures so as to distinguish Franchisee and the Office effectively from its former appearance** and from other RE/MAX® real estate brokerage service offices and to avoid every possibility of any confusion by the public. **Such changes shall include a complete change in the trade name and trade dress from that under which Franchisee conducted his/her business while affiliated with the Company.** If Franchisee shall, upon request, fail or omit to make or cause to be made such changes within five (5) days, then the Company shall have the right to enter upon the premises, without liability, and to make, or cause to be made, such changes at the expense of Franchisee which expenses shall be paid by Franchisee upon demand; and

(5) **return to the Company all manuals, bulletins, instruction sheets, forms, marks, designs, signs, printed matter and other materials obtained from, or loaned by, the Company or International under and pursuant to this Agreement, together with copies of same that may have been made by**

**Franchisee, or that are in Franchisee's possession, custody or control.** If any of the above items are not returned to the Company, Franchisee shall be obligated to pay to the Company an amount not to exceed $2,000 for the cost of replacing such materials; and

(6) **notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use all telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and all classified and other directory listings relating to the office and to authorize transfer of these to the Company or its designee.** Franchisee hereby acknowledges that the Company has the sole right to, and interest in, all telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and directory listings relating to any RE/MAX® marks whether or not previously owned or used by Franchisee, and Franchisee hereby authorizes the Company to direct the telephone company and all listing agencies to transfer all telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and directory listings to the Company or its designee. Franchisee further acknowledges that if Franchisee fails to comply with any of the foregoing obligations, the telephone company and all listing agencies may accept a copy of this provision and the Company's direction as evidence of the Company's exclusive rights in the telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and directory listings and its authority to direct any such transfer. Upon execution of this Agreement, Franchisee agrees to execute the form of pre-approved authorization which is attached as Exhibit B directing the telephone company and any listing agencies to transfer all telephone numbers, licensed agents' direct inside dial numbers, facsimile numbers and directory listings to the Company, upon the occurrence of any such termination or expiration. Franchisee agrees to sign any additional forms of authorization or pre-authorization prescribed by the Company. Franchisee also agrees to provide the Company with its most current telephone bill within five (5) days following expiration or termination of this Agreement; and

(7) **refrain from adopting or using in connection with, or in connection with the name of, any subsequent business, any trade name, trademark, service mark, trade dress, slogan or logo of the Company or International,** including but not limited to the RE/MAX® red-over-white-over-blue trade dress, the term "RE/MAX®" or any term or trade dress deemed by the Company or International to be confusingly similar to such term or trade dress, or any other term or trade dress which may have the effect of creating confusion or question regarding Franchisee's affiliation with the RE/MAX® organization, including without limitation any name or term with the prefix "RE" or the suffix "MAX". Franchisee further agrees to refrain from the use of the colors red, white and blue in any three-color identity scheme, from the use of the red-over-white-over-blue horizontal bar design, from use of a hot air balloon or a hot air balloon

symbol and from the use of the term "above the crowd" or any other three-word phrase beginning with "above" or ending with "crowd"; and

(8) cancel or, at the Company's option, assign to the Company or its designee any electronic address, domain name, URLs or websites which displays any Mark or that identifies Franchisee as associated with the Company or the RE/MAX real estate brokerage service.  Upon execution of this Agreement, Franchisee agrees to execute the pre-approved authorization which is attached as Exhibit C directing the assignment and transfer to the Company of all domain names, URL's or websites adopted or associated with the Office.  Franchisee agrees to sign any additional forms of authorization or pre-authorization prescribed by the Company;

(9) in the event Franchisee continues to operate a real estate brokerage office at the premises of the Office, obtain a new Multiple Listing Service identification number.  Franchisee understands and agrees that all historical sales data maintained by the Multiple Listing Service while Franchisee operated its RE/MAX Office shall be and remain the property of the Company including, without limitation, for market shares and other reporting purposes.

Therefore, we hereby demand that you immediately cease use of the trade name "Home Center Realty" and, in selecting a trade name for your ongoing business, comply with the Franchise Agreement provisions quoted above.  Further, we hereby demand that you provide the Region with your most current telephone bill, complete and sign the "Form Letter Assigning Telephone Number" and the "Form Letter Assigning Domain Names, Urls and Websites" left at your office with Christopher Mankowski by Jim Merrion on Friday, August 15, and make arrangements to have the telephone number, direct inside dial numbers, facsimile number and website identified above transferred to the Region. Demand is also made upon you to immediately:  remove all RE/MAX signage from your office; discontinue using the existing RE/MAX Home Center MLS identification

numbers; and return all manuals, 6' cold air balloon, stationery, etc. as identified in Paragraph 8(5) of the Franchise Agreement to the Regional Office.

Further, RE/MAX Northern Illinois will also expect payment of all amounts owed by August 29, 2008, the date specified in the Franchise Agreement.

Finally, RE/MAX will expect full and complete compliance with Section 18 of the Franchise Agreement ("Covenant Not to Compete") which states:

> **"Covenant Not to Compete.** Franchisee agrees that, upon termination or expiration of this Agreement, for a period of two (2) years commencing on the effective date of such termination or expiration, neither Franchisee nor his or her spouse (nor its owners or their spouses, if Franchisee is a corporation, limited liability company or other approved entity) will have any interest as an owner, partner, director, officer, employee, consultant, representative or agent or in any other capacity, in any real estate brokerage service business similar to the RE/MAX System or to offices operated under the System (except as permitted under any other RE/MAX® franchise agreement or as a licensed agent of a RE/MAX® real estate brokerage service office) that operates at or within a ten (10) mile radius of the Office."

You are hereby advised that RE/MAX Northern Illinois intends to commence legal action against you under the Franchise Agreement and applicable law unless you comply immediately with all of your post-termination obligations under the Franchise Agreement, including without limitation the obligations set forth above. If RE/MAX Northern Illinois is forced to commence legal action, it will seek to recover the costs it incurs, including attorneys' fees as provided in Section 20 of the Franchise Agreement, which states, in part, as follows:

> "The Company shall have the right to enforce by judicial process the obligations of Franchisee under Paragraphs 3.O., 8 and 18 of this Agreement. The prevailing party in any such legal proceeding, or in any proceeding seeking temporary or preliminary relief to enforce the provisions of Paragraphs 3.O., 8 or 18 hereof or any other provisions hereof, shall be entitled to its costs and expenses, including reasonable attorney's fees."

This is also to inform you that we will be performing a final operational review of your RE/MAX Home Center accounts. There may be additional amounts owed beyond what appears in your Termination Notice dated August 14, 2008, including but not limited to amounts arising from income collected by RE/MAX Home Center from sales associates operating on splits. The Franchise Agreement states that RE/MAX Home Center must pay RE/MAX Northern Illinois the higher of: 1.) 20% of all Broker Service Fees you

charge your sales associates or 2.) 1% of all commissions from transactions handled by your sales associates, whichever is greater. These amounts, if any, will be covered by separate invoice determined by our operational review of your office, independent contractor agreements, and records. **We would like to begin this operational review immediately.**

**Contact me either by phone (847-428-4200) or via e-mail (jmerrion@remax.net) immediately to confirm your compliance with this demand and to schedule the operational review described above.** This letter shall not, in any way, act as a waiver of the Region's rights or remedies under any agreement or applicable law.

Sincerely,

James Merrion
Regional Director

 **Shipment Receipt**

## Address Information

| Ship to: | Ship from: |
|---|---|
| Walter Zubricki | Jim Merrion |
| Select or enter | ReMax Northern Illinois |
| 6000 S PULASKI RD | 2205 Point Blvd Ste 100 |
| | |
| CHICAGO, IL | Elgin, IL |
| 606294538 | 60123 |
| US | US |
| 773-735-6000 | 847-428-4200 |

## Shipping Information
Tracking number: 798499336986
Ship date: 08/20/2008
Estimated shipping charges: 10.69

## Package Information
Service type: Standard Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0LBS
Declared value: 0.00USD
Special Services:
Pickup/Drop-off: Give to scheduled courier at my location

## Billing Information
Bill transportation to: Sender
Your reference: Legal Dept
P.O. no.:
Invoice no.:
Department no.:

---

Thank you for shipping online with Fedex ShipManager at fedex.com.

---

## Please Note
FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

## Debbie Rieke

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Thursday, August 21, 2008 9:59 AM |
| **To:** | drieke@remax.net |
| **Subject:** | FedEx Shipment 798499336986 Delivered |

This tracking update has been requested by:

Company Name: ReMax Northern Illinois
Name:        Jim Merrion
E-mail:      drieke@remax.net

Our records indicate that the following shipment has been delivered:

Reference:              Legal Dept
Ship (P/U) date:        Aug 20, 2008
Delivery date:          Aug 21, 2008 9:54 AM
Sign for by:            E.DIAZ
Delivered to:           Receptionist/Front Desk
Service type:           FedEx Standard Overnight
Packaging type:         FedEx Envelope
Number of pieces:       1
Weight:                 0.50 lb.
Special handling/Services: Deliver Weekday
Tracking number: 798499336986

Shipper Information        Recipient Information
Jim Merrion                Walter Zubricki
ReMax Northern Illinois    6000 S PULASKI RD
2205 Point Blvd Ste 100    CHICAGO
Elgin                      IL
IL                         US
US                         606294538
60123

Please do not respond to this message. This email was sent from an unattended
mailbox. This report was generated at approximately 9:58 AM CDT
on 08/21/2008.
To learn more about FedEx Express, please visit our website at fedex.com.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above,
or visit us at fedex.com.
This tracking update has been sent to you by FedEx on the behalf of the
Requestor noted above. FedEx does not validate the authenticity of the
requestor and does not validate, guarantee or warrant the authenticity of the
request, the requestor's message, or the accuracy of this tracking update. For
tracking results and fedex.com's terms of use, go to fedex.com.

Thank you for your business.

1